## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**PETER NORMAN DABISH, #786892,**

      Plaintiff,

                                        File No.

-vs-

                                        Hon.

**RANDALL HAAS, WARDEN,**
**MACOMB CORRECTIONAL FACILITY,**

      Defendant.

| **CRAIG A. DALY, P.C. (P27539)** | **ELIZABETH L. JACOBS (P24245)** |
|---|---|
| Attorney for Petitioner Dabish | Co-Counsel for Petitioner Dabish |
| 615 Griswold, Suite 820 | 615 Griswold, Suite 1125 |
| Detroit, Michigan 48226 | Detroit, Michigan 48226 |
| Phone: (313) 963-1455 | Phone: (313) 962-4090 |
| Fax: (313) 961-4315 | Fax: (313) 962-8068 |
| Email: 4bestdefense@sbcglobal.net | Email: elzjacobs@aol.com |

# PETITION FOR WRIT OF HABEAS CORPUS

**NOW COMES** Petitioner, PETER NORMAN DABISH, by and through counsel CRAIG A. DALY, P.C. and ELIZABETH L. JACOBS, and pursuant to *28 U.S.C. §2254*, hereby petitions this Honorable Court for a writ of habeas corpus, and in support sets forth the following:

## I. PARTIES

1.    Petitioner, PETER NORMAN DABISH, is currently a prisoner of the State of Michigan, in custody of the Department of Corrections, presently incarcerated

as Inmate #786892 at the Macomb Correctional Facility located at 34625 26 Mile Road, New Haven, Michigan 48048.

2.     Respondent, RANDALL HAAS, is employed by the Michigan Department of Corrections as the Warden of the Macomb Correctional Facility and is the State Officer legally responsible for Petitioner Dabish's custody.

## II.  FACTS

3.     Petitioner, PETER NORMAN DABISH, ("Dabish") was convicted of first-degree murder, *MCL 750.316 (1)(b)*, second-degree murder, *MCL 750.317*, and torture, *MCL 750.85*, after a jury trial in the Third Judicial Circuit Court, County of Wayne.

4.     On November 18, 2010, Dabish was sentenced to life without parole for the felony-murder conviction and 23 to 80 years for the torture conviction,[1]  by the Honorable Linda V. Parker, presiding.

5.     The trial attorney was Domnick J. Sorise.

6.     On his appeal of right, Dabish raised the following claims:

    I.    THERE WAS INSUFFICIENT EVIDENCE TO PERMIT THE CHARGES OF TORTURE AND  FELONY MURDER TO BE SUBMITTED TO THE JURY.

    II.    THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY ALLOWING THE

---

[1]The trial court vacated the second-degree murder conviction which the jury returned as lesser offense of the premeditated-murder count.

ADMISSION OF "OTHER ACTS" EVIDENCE THAT RENDERED DEFENDANT'S TRIAL FUNDAMEN-TALLY UNFAIR.

III. THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY REFUSING TO ALLOW THE DEFENSE TO AUTHENTICATE CRITI-CAL PIECES OF EVIDENCE ON A SEPARATE RE-CORD,  AS PERMITTED BY MRE 104 (c), AND IN SO DOING VIOLATED DEFENDANT'S CONSTITUTION-ALLY-ASSURED RIGHTS OF DUE PROCESS AND TO PRESENT A DEFENSE.

IV. THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY ALLOWING THE ADMISSION OF UNFAIRLY PREJUDICIAL EVI-DENCE REGARDING A TELEPHONE CONVERSA-TION BETWEEN HIMSELF AND THE DECEASED'S FATHER, AND ALLOWING THE PROSECUTION TO BOLSTER THAT EVIDENCE BY MEANS OF AN INADMISSIBLE PRIOR CONSISTENT STATEMENT, AND IN SO DOING VIOLATED DEFENDANT'S CONSTITUTIONALLY-ASSURED RIGHT TO DUE PROCESS OF LAW.

V. DEFENDANT WAS DENIED THE EFFECTIVE ASSIS-TANCE OF COUNSEL BY TRIAL COUNSEL'S MULTI-PLE FAILURES OF REPRESENTATION, INCLUDING HIS FAILURE TO SECURE CRUCIAL EVIDENCE FOR THE DEFENSE.

7. In a supplemental brief, accepted by the Court of Appeals, Dabish raised these additional issues:

I. THE DEFENDANT WAS DENIED A FAIR TRIAL BY REPEATED PROSECUTORIAL MISCONDUCT.

II.     THE ADMISSION OF EVIDENCE REGARDING MARI-
JUANA CULTIVATION DENIED DEFENDANT A FAIR
TRIAL.

III.    THE TRIAL COURT UNDULY IMPINGED ON DEFEN-
DANT'S RIGHT TO PRESENT A DEFENSE WHEN IT
REFUSED TO ALLOW THIS MEDICAL EXPERT TO
OFFER CERTAIN OPINION EVIDENCE REGARDING
THE NATURE OF THE DECEASED'S INJURIES.

8.     On August 13, 2013, The Michigan Court of Appeal, in an unpublished per curiam opinion affirmed (Docket No. 301622) (Appendix, Exhibit B).   The attorney on appeal was NC DeDay Larene.

9.     On January 31, 2014, the Michigan Supreme Court denied an application for leave to appeal which raised the same claims raised in the Michigan Court of Appeals (Docket No. 147801) (Appendix, Exhibit C).

10.     On March 31, 2015, Petitioner filed a motion for relief from judgment in the state trial court, requesting an evidentiary hearing on the issue of petitioner's competency, and ineffective assistance of trial and appellate counsel, raising the following claims:

I.     DEFENDANT DABISH WAS DEPRIVED OF HIS
RIGHT TO DUE PROCESS OF LAW AND A FAIR
TRIAL WHEN THE COUNTY JAIL ADMINISTERED
SIGNIFICANT AMOUINTS OF KLONOPIN, SERO-
QUEL, CELEXA AND TOPAMAX TOGETHER DUR-
ING HIS TRIAL, WHICH RENDERED HIM INCOMPE-
TENT TO STAND TRIAL.

II.     DEFENDANT DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY ON THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER.

III.    THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT IN HER CLOSING ARGUMENT, DEPRIVING DEFENDANT DABISH OF A FAIR TRIAL, BY ARGUING MATTERS NOT IN EVIDENCE AND IN AN INFLAMMATORY MANNER.

IV.     DEFENDANT DABISH WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) ALLOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (2) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (3) FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT IN THE CLOSING ARGUMENT, (4) AND FAILED TO OBJECT TO INADMISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD DEFENDANT SAY WITHOUT A FOUNDATION THAT THE WITNESS COULD IDENTIFY HIS VOICE.

V.      DEFENDANT DABISH HAS MET THE PROCEDURAL REQUIREMENTS OF GOOD CAUSE AND ACTUAL PREJUDICE UNDER MCR 6.508 (D) AND AN EVIDENTIARY HEARING IS REQUIRED.

11.     The attorney in the post-conviction proceedings was Craig A. Daly.

12.     On September 3, 2015, the Honorable Kevin S. Cox, successor judge, issued an Opinion denying Defendant's Motion for Relief from Judgment, for Oral Argument and for an Evidentiary Hearing (Appendix, Exhibit N).  The Order denying the motion was entered on September 4, 2015 (Appendix, Exhibit O).

13.     On April 28, 2016, the Michigan Court of Appeals denied a delayed application for leave to appeal which raised the same claims raised in the motion for relief from judgment (Docket No. 330727) (Appendix, Exhibit P).

14.     On March 7, 2017, the Michigan Supreme Court denied an application for leave to appeal raising the same claims raised in the Michigan Court of Appeals (Docket No. 153730) (Appendix, Exhibit Q).

15.     No other post-conviction proceedings have been held in state or federal court.

16.     The undersigned counsel are retained and court-appointed counsel is not being requested.

17.     Petitioner Dabish has exhausted his remedies available in the Michigan state courts. *28 U.S.C. §2254(b)(1)(A)*.

18.     Petitioner Dabish now seeks a Writ of Habeas Corpus from the Court.

19.     Petitioner Dabish is entitled to an order from this Honorable Court granting relief by issuing a writ of habeas corpus for the reason that he is presently in custody of the Michigan Department of Corrections and is being deprived of his liberty in violation of the Constitution of the United States, because:

> **I.      THERE WAS INSUFFICIENT EVIDENCE TO SUP-PORT THE TORTURE CONVICTION AND THE FELONY MURDER CONVICTION WHICH AL-LEGED TORTURE AS ITS PREDICATE OFFENSE.**

II.   **PETITIONER DABISH WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONOPIN, SEROQUEL, CELEXA AND TOPAMAX TOGETHER DURING HIS TRIAL, WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL.**

III.   **PETITIONER DABISH WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) FAILED TO PRESENT A CRITICAL WITNESS IN SUPPORT OF THE DEFENSE, (2) ALLOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (3) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (4) FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT IN HER CLOSING ARGUMENT, AND (5) FAILED TO OBJECT TO INADMISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD PETITIONER DABISH SAY WITHOUT A FOUNDATION THAT THE WITNESS COULD IDENTIFY HIS VOICE.**

IV.   **PETITIONER DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY OF THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER.**

V.   **THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT DEPRIVING PETITIONER DABISH OF A FAIR TRIAL.**

VI.   **PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ADMITTED PRIOR BAD ACTS EVIDENCE AND ALSO ADMITTED EVIDENCE OF MARIJUANA CULTIVATION.**

VII.   **THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO PRESENT A DEFENSE WHEN IT REFUSED TO ALLOW THIS MEDICAL EXPERT TO OFFER OPINION EVIDENCE REGARDING THE ORIGIN OF THE DECEASED'S INJURIES AND REFUSED TO ADMIT EVIDENCE OF THE DECEASED'S EMAILS UNLESS THE DEFENDANT AUTHENTICATED THEM IN FRONT OF THE JURY.**

VIII.   **THE TRIAL COURT DENIED PETITIONER DUE PROCESS OF LAW WHEN IT ADMITTED, OVER OBJECTION, EVIDENCE OF A PHONE CALL BETWEEN MR. DEMAYO AND THE PETITIONER, AND EVIDENCE OF A CALL MADE BY MR. DEMAYO TO THE WATERFORD POLICE DEPARTMENT.**

IX.   **ASSUMING THE APPLICATION OF ANY PROCEDURAL BAR TO CLAIMS RAISED IN THIS PETITION, DABISH HAS SHOWN GOOD CAUSE AND PREJUDICE TO OVERCOME ANY SUCH STATE PROCEDURAL RULE.**

X.   **PETITIONER DABISH IS ENTITLED TO A FEDERAL EVIDENTIARY HEARING.**

20.   Petitioner Dabish has attached hereto, his Brief in Support, which is incorporated by reference and sets forth in details the facts and law in support of this Petition.

21.   The Michigan Courts have adjudicated Petitioner's claims contrary to, or involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States and/or issued decisions based

on an unreasonable determination of the facts in light of the evidence presented in the state courts.  *28 U.S.C. §2254(d)(1)(2)*.

## III.  <u>RELIEF SOUGHT</u>

**WHEREFORE**, for all the foregoing reasons, Petitioner requests this Honorable Court grant him habeas relief and issue an unconditional writ of habeas corpus ordering that the judgment of conviction and sentence be vacated, or minimally conduct an evidentiary hearing.

Respectfully submitted,

/s/*Craig A. Daly*

**CRAIG A. DALY, P.C. (P27539)**
Attorney for Petitioner Dabish
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone:  (313) 963-1455
Fax:  (313) 961-4315
E-Mail:  4bestdefense@sbcglobal.net

/s/*Elizabeth L. Jacobs*

**ELIZABETH L. JACOBS (P24245)**
Co-Counsel for Petitioner Dabish
615 Griswold, Suite 1125
Detroit, Michigan 48226
Phone: (313) 962-4090
Fax: (313) 962-8068
Email: elzjacobs@aol.com

Dated:  March 10, 2017

-9-

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**PETER NORMAN DABISH, #786892**,

      Plaintiff,

                                     File No.

-vs-

                                     Hon.

**RANDALL HAAS, WARDEN,**
**MACOMB CORRECTIONAL FACILITY**,

      Defendant.

| **CRAIG A. DALY, P.C. (P27539)** | **ELIZABETH L. JACOBS (P24245)** |
|---|---|
| Attorney for Petitioner Dabish | Co-Counsel for Petitioner Dabish |
| 615 Griswold, Suite 820 | 615 Griswold, Suite 1125 |
| Detroit, Michigan 48226 | Detroit, Michigan 48226 |
| Phone:  (313) 963-1455 | Phone: (313) 962-4090 |
| Fax: (313) 961-4315 | Fax: (313) 962-8068 |
| Email:  4bestdefense@sbcglobal.net | Email: elzjacobs@aol.com |

**BRIEF IN SUPPORT OF**
**PETITION FOR WRIT OF HABEAS CORPUS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-xiv

STATEMENT OF QUESTIONS INVOLVED.. . . . . . . . . . . . . . . . . . . . . . . xv-xvii

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-18

STANDARD FOR HABEAS REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-122

    **I.**    **THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE TORTURE CONVICTION AND THE FELONY MURDER CONVICTION WHICH ALLEGED TORTURE AS ITS PREDICATE OFFENSE**. . . . . . . . . . . . . . . . . . . . . . . . . 20

    **II.**    **PETITIONER DABISH WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONOPIN, SEROQUEL, CELEXA AND TOPAMAX TOGETHER DURING HIS TRIAL, WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL**. . . . . . 37

    **III.**    **PETITIONER DABISH WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) FAILED TO PRESENT A CRITICAL WITNESS IN SUPPORT OF THE DEFENSE, (2) ALLOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (3) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (4) FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT IN HER CLOSING ARGUMENT, AND (5) FAILED TO OBJECT TO INADMISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD PETITIONER DABISH SAY WITHOUT A FOUNDATION THAT THE WITNESS COULD IDENTIFY HIS VOICE**. . . . . . . . . . . . . . . . . . . . . . . . . 51

**Page**

IV.   PETITIONER DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY OF THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER. . . . . . . . . . . . . . . . . 64

V.   THE PROSECUTOR ENGAGED IN EGREGIOUS MIS-CONDUCT DEPRIVING PETITIONER DABISH OF A FAIR TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

VI.   PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ADMITTED PRIOR BAD ACTS EVIDENCE AND ALSO ADMITTED EVIDENCE OF MARIJUANA CULTIVATION.. . . . . . . . . . . . . . . . . . . . . . . . . 85

VII.   THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO PRESENT A DEFENSE WHEN IT REFUSED TO ALLOW THIS MEDICAL EXPERT TO OFFER OPINION EVIDENCE REGARDING THE ORIGIN OF THE DECEASED'S INJURIES AND REFUSED TO ADMIT EVIDENCE OF THE DECEASED'S EMAILS UNLESS THE DEFENDANT AUTHENTICATED THEM IN FRONT OF THE JURY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

VIII.   THE TRIAL COURT DENIED PETITIONER DUE PRO-CESS OF LAW WHEN IT ADMITTED, OVER OBJEC-TION, EVIDENCE OF A PHONE CALL BETWEEN MR. DEMAYO AND THE PETITIONER, AND EVIDENCE OF A CALL MADE BY MR. DEMAYO TO THE WATERFORD POLICE DEPARTMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 113

IX.   ASSUMING THE APPLICATION OF ANY PROCEDURAL BAR TO CLAIMS RAISED IN THIS PETITION, DABISH HAS SHOWN GOOD CAUSE AND PREJUDICE TO OVERCOME ANY SUCH STATE PROCEDURAL RULE. . . 118

X.   PETITIONER DABISH IS ENTITLED TO A FEDERAL EVIDENTIARY HEARING.. . . . . . . . . . . . . . . . . . . . . . . . . 121

RELIEF REQUESTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

# TABLE OF AUTHORITIES

**Page**

## CONSTITUTIONAL PROVISIONS

*U.S. Const. Am. V.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
*U.S. Const. Am. VI.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 68
*U.S. Const. Am. XIV.* . . . . . . . . . . . . . . . . . . . . . . . 20, 38, 51, 65, 68, 73

## FEDERAL CASES

*Barker v. Yukins, 199 F.3d 867, 876 (6th Cir. 1990), cert denied,*
    *530 U.S. 1229 (2000)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 101

*Bates v. McCaughtry, 934 F.2d 99 (7th Cir.1991)*. . . . . . . . . . . . . . . . . . . . . . 34

*Battle v. United States, 419 F.3d 1292, 1298 (11th Cir. 2005)*. . . . . . . . . . . . . . 49

*Beck  Alabama, 447 U.S. 625, 633, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1990)*. . . . 71

*Bee v. Greaves, 744 F.2d 1387, 1393 (10th Cir. 1984)*. . . . . . . . . . . . . . . . . . . 41

*Bell v. Cone, 535 U.S. 685, 694-696, 122 S. Ct. 1843,*
    *52 L. Ed. 2d 914, 927 (2002)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Bennett v. Scroggy, 793 F.2d 772, 774-775 (6th Cir. 1986)* . . . . . . . . . . . . . . . . 66

*Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629,*
    *79 L. Ed. 1314 (1935).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 75

*Bishop v. United States, 350 U.S. 961, 76 S. Ct. 440, 100 L. Ed. 35 (1956)*. . . . . . 38

*Blackburn v. Foltz, 828 F.2d 1177, 1183 (6th Cir. 1987)*. . . . . . . . . . . . . . . . . . 58

*Boyd v. United States, 142 U.S. 450, 457-458, 12 S. Ct. 292,*
    *35 L. Ed. 1077 (1892).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

**Page**

*Boyle v. Million, 201 F.3d 711, 717 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . . . . . . . 83

*Bradshaw v. Richey, 546 U.S. 74, 76 (2005)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*. . . . . . . 72

*Broom v. Mitchell, 441 F.3d 392, 412 (6th Cir. 2006)*. . . . . . . . . . . . . . . . . . . . . 84

*Brown v. Konleh, 567 F.3d 191, 205 (6th Cir. 2009)*. . . . . . . . . . . . . . . . . . . . . . 36

*Brown v. Palmer, 441 F.3d 347, 351-52 (6th Cir. 2006)*. . . . . . . . . . . . . . . . . . . 21

*Browning v. Foltz, 837 F.2d 276, 280 (6th Cir. 1988)*. . . . . . . . . . . . . . . . . . . . . 66

*Bryson v. Anderson, 187 F.3d 193, 1201 (10th Cir. 1991)*. . . . . . . . . . . . . . . . . . 47

*Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003)*. . . . . . . . . . . . . . . . . . . . . . 86

*Byrd v. Collins, 209 F.3d 486, 535 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . . . . . . . 83

*Byrd v. Maricopa County Sheriff's Dept., 565 F.3d 1205, 1213 (9th Cir. 2009)*. . . 96

*Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633,*
    *86 L. Ed. 2d 231 (1985)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528,*
    *81 L. Ed. 2d 413 (1984)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Carver v. Staub, 349 F.3d 340 (6th Cir. 2003)*. . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Cavazos v. Smith, 565 U.S. 1, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011)*. . . . . . . 36

*Chambers v. Mississippi, 410 U.S. 284, 302-03, 93 S. Ct. 1038,*
    *35 L. Ed. 2d 297 (1973)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 99, 107

*Chapman v. California, 386 U.S. 18, 23, 87 S. Ct. 824,*
    *17 L. Ed. 2d 705 (1967)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**Page**

*Clinkscale v. Carter, 375 F.3d 430, 443 (6th Cir. 2004)*. . . . . . . . . . . . . . . . . . . 58

*Coleman v. Johnson, 132 S. Ct. 2060 (2012)*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Combs v. Coyle, 205 F.3d 269 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . . . . . . . . . 54, 58

*Cone v. Bell, 243 F.3d 961 (6th Cir. 2001)*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Cooper v. Oklahoma, 517 U.S. 348, 354, 146 S. Ct. 1373,*
        *134 L. Ed. 2d 498 (1996)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Couch v. Booker, 632 F.3d 241 (6th Cir. 2011)*         . . . . . . . . . . . . . . . . . . 59

*Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2146,*
        *90 L. Ed. 2d 636 (1986)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 98

*Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984), cert denied,*
        *469 U.S. 1226, 105 S. Ct. 1221, 84 L. Ed. 2d 361 (1985)*. . . . . . . . . . . . . . 58

*Cupp v. Naughten, 414 U.S. 141, 147 (1973)*. . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Dando v. Yukins, 461 F.3d 791 (6th Cir. 2006)*. . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Daniels v. Lafler, 501 F.3d 735, 741 (6th Cir. 2007)*. . . . . . . . . . . . . . . . . . . . . . 69

*Darden v. Wainwright, 477 U.S. 168, 182, 106 S. Ct. 2464,*
        *91 L. Ed. 2d 144 (1986)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Davis v. Woodford, 384 F.3d 628, 644 (9th Cir. 2004)*. . . . . . . . . . . . . . . . . . . . 49

*DeJonge v. Oregon, 299 U.S. 353, 57 S. Ct. 255, 81 L. Ed. 278 (1937)*. . . . . . . . 68

*Delli Paoli v. United States, 352 U.S. 232, 238; 77 S. Ct. 294;*
        *1 L. Ed. 2d 278 (1956)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868,*
        *40 L. Ed. 2d 43 (1974)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**Page**

*Dowling v. United States*, 493 U.S. 342, 352-353, 110 S. Ct. 6687,
    *107 L. Ed. 2d 708 (1990)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Drope v. Missouri*, 420 U.S. 162, 180, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975). . . 39

*Duncan v. Louisiana*, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). . . . 68

*Dusky v. United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). . . . . 39

*Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . 86

*Ellison v. United States*, 324 F.2d 710 (10th Cir. 1963). . . . . . . . . . . . . . . . . . . . . 49

*Estelle v. McGuire*, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). . . 86

*Evitts v. Lucey*, 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985). . . . . . . . 118

*Ford v. Georgia*, 498 U.S. 411, 111 S. Ct. 850, 121 L. Ed. 2d 935 (1991). . . . . . . 64

*Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . 119

*Fuller v. Anderson*, 662 F.2d 420 (6th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gedas v. United States*, 425 U.S. 80, 88, 96 S. Ct. 1330,
    *47 L. Ed. 2d 592 (1976)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Gill v. Cason*, 281 Fed. Appx. 522 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 22

*Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 83

*Godinez v. Moran*, 509 U.S. 389, 396, 113 S. Ct. 2680,
    *125 L. Ed. 2d 321 (1993)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Gordon v. Kelly*, 205 F.3d 1340 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001), cert denied,
    *535 U.S. 940 (2002)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

**Page**

*Griffin v. California, 380  U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965).* . . . 77

*Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010 (en banc).* . . . . . . . . . . . . 61

*Harrington v. Richter, 562 U.S. 86, 100, 131 S. Ct. 770,*
 *178 L. Ed. 2d 624 (2011)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hastings v. Yukins, 194 F. Supp. 2d 654, 670 (E.D. Mich 2002).* . . . . . . . . . . . . 39

*Henderson v. Kibbe, 431 U.S. 145, 154,97 S. Ct. 1730,*
 *52 L. Ed. 2d 203 (1977)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Higgins v. Renico, 470 F.3d 624, 630 (6th Cir. 2006).* . . . . . . . . . . . . . . . . . . . . 19

*Hodge v. Hurley, 426 F.3d 368, 378 (6th Cir. 2005).*  . . . . . . . . . . . . . . . . . . . . . 60

*Huddleston v. United States, 485 U.S. 681, 685, 108 S. Ct. 1496,*
 *99 L. Ed. 2d 771 (1988)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*In re Oliver, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L. Ed. 682 (1948).* . . . . . . . . . 107

*In re Winship, 397 U.S. 358,365, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)*. . . . . . . 20

*Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964)*. . . . . . . 109

*Jackson v. Virginia, 443 U.S. 307, 316-319, 99 S. Ct. 2781,*
 *61 L. Ed. 2d 560  (1979).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jalowiec v. Bradshaw, 657 F.3d 293, 301 (6th Cir. 2011)*. . . . . . . . . . . . . . . . . . . 19

*James v. Kentucky, 466 U.S. 341, 348-51, 104 S. Ct. 1830,*
 *80 L. Ed. 2d 346 (1984)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Jimena v. UBS AG Bank, Inc., 2011 WL 2551413 (ED Cal, 2011),*
 *affirmed, 504 Fed. Appx. 632; 2013 WL 223131 (CA 9)*. . . . . . . . . . . . . . . 112

*Jemison v. Foltz, 672 F. Supp. 1002 (ED Mich. 1987).* . . . . . . . . . . . . . . . . . . . . 58

**Page**

*Johnson v. Coyle, 200 F.3d 987, 991 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . . . . . . . . . 21

*Joseph v. Coyle, 469 F.3d 441, 454 (6th Cir. 2006)*. . . . . . . . . . . . . . . . . . . . . . 21, 60

*Joshua v. Dewitt, 341 F 3d 408, 441 (6th Cir. 2003)*. . . . . . . . . . . . . . . . . . . . . . . 119

*Lockhart v. Fretwell, 506 U.S. 364, 369, 1113 S. Ct. 839,*
       *122 L. Ed. 2d 180 (1993)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Lucas v. O'Dea, 179 F.3d 412 (6th Cir. 1999)*. . . . . . . . . . . . . . . . . . . . . . . . 60, 119

*Lundgren v. Mitchell, 440 F.3d 754, 778 (6th Cir. 2006)*. . . . . . . . . . . . . . . . . . . . 83

*Mackey v. Dutton, 217 F.3d 399, 413-14 (6th Cir. 2000)*. . . . . . . . . . . . . . . . . 40, 50

*Macias v. Makowski, 291 F.3d 447, 452 (6th Cir. 2002)*. . . . . . . . . . . . . . . . . . . . . 83

*Magana v. Hofbauer, 263 F.3d 542, 546-547 (6th Cir. 2001)*. . . . . . . . . . . . . . . . . 20

*Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003)*. . . . . . . . . . . . . . . . 20, 62, 122

*Matthews v. Abramajtys, 319 F.3d 780, 790 (6th Cir. 2003)* . . . . . . . . . . . . . . . . . . 53

*Matthews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883,*
       *99 L. Ed. 2d 54 (1988)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*McFarland v. Yukins, 356 F.3d 688, 697-98 (6th Cir. 2004)*. . . . . . . . . . . . . . . . . 119

*McGuire v. Ohio, 619 F.3d 623, 631 (6th Cir. 2010)*. . . . . . . . . . . . . . . . . . . . . . . . 22

*McKenzie v. Smith, 326 F.3d 721 (6th Cir. 2001)*. . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Medina v. California, 505 U.S. 437, 453, 112 S. Ct. 2572,*
       *120 L. Ed. 2d 353 (1992)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Michelson v. United States, 335 U.S. 469, 475- 476, 69 S. Ct. 213,*
       *93 L. Ed. 168 (1948)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

**Page**

*Middleton v. McNeil, 541 U.S. 433, 437, 124 S. Ct. 1830,*
  *158 L. Ed. 2d 201 (2004)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-69

*Miller v. Pate, 386 U.S. 1, 7, 87 S. Ct. 875, 17 L Ed 690 (1967)*. . . . . . . . . . . . . 72

*Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S. Ct. 7,*
  *157 L. Ed. 2d 263 (2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 26, 39,*
  *91 L. Ed. 2d 397 (1986)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64, 118

*Newman v. Metrish, 492 F. Supp. 2d 721 (E.D. Mich 2007), aff'd.,*
  *543 F.3d 793 (6th Cir. 2008)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 36

*Old Chief v. United States, 519 U.S. 172, 180-185, 117 S. Ct. 644,*
  *136 L. Ed. 2d 574 (1997)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76, 92, 113

*Paine v. Massie, 339 F.3d 1194,1200 (10th Cir. 2003)*. . . . . . . . . . . . . . . . . . . . . 54

*Parker v. Renico, 506 F.3d 444, 452 (6th Cir. 2007)*. . . . . . . . . . . . . . . . . . . . . . . 22

*Pate v. Robinson, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)*. . . . 38

*Pate v. Smith, 637 F.2d 1068, 1072 (6th Cir. 1981)*. . . . . . . . . . . . . . . . . . . . . . . . 48

*Renico v. Lett, 559 U.S. 356, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)*. . . . . . . . 22

*Richey v. Bradshaw, (On remand) 498 F.3d 344 (6th Cir. 2007)* . . . . . . . . . . . . . . 59

*Riggins v. Nevada, 504 U.S. 127, 143, 112 S. Ct. 1810,*
  *118 L. Ed. 2d 479 (1992)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704,*
  *97 L. Ed. 2037 (1987)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 100

*Rose v. Clark, 478 U.S. 570, 1206 S. Ct. 3101, 92 L. Ed. 2d 460 (1985)*. . . . . . . . 69

**Page**

*Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)* . . . . . . . . . . . . . . . . . . . . . 58

*Sanford v. Yukins, 288 F.3d 855 (6th Cir. 2002).* . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Searcy v. Berghuis, 549 Fed. Appx. 357 (6th Cir. 2013).* . . . . . . . . . . . . . . . . . . . . 63

*Sell v. United States, 539 U.S. 166, 185, 123 S. Ct. 2174,*
    *156 L. Ed. 2d 197 (2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Sierra v. Michigan Department of Corrections, 4 F.3d 1348,*
    *1355-56 (6th Cir. 1993).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir. 1992).* . . . . . . . . . . . . . . . . . . . 58

*Simmons v. United States, 390 U.S. 377, 394, 88 S. Ct. 967,*
    *19 L. Ed. 2d 1247 (1968)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*Smith v. Illinois, 390 U.S. 129, 88 S. Ct. 749, 10 L. Ed. 2d 956 (1986).* . . . . . . . . 75

*Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746,*
    *145 L. Ed. 2d 756 (2000)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007).* . . . . . . . . . . . . . . . . . . . . . . 20

*Strickland v. Washington, 466 U.S. 66, 104 S. Ct. 2052,*
    *80 L. Ed. 674 (1984).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 60, 118

*Sullivan v. Louisiana, 508 U.S. 275, 277, 113 S. Ct. 2078, 2080,*
    *124 L. Ed. 2d 182 (1993)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Taylor v. Illinois, 484 U.S. 400, 411, 108 S. Ct. 646, 98 L. Ed. 2d (1988).* . . . . . 100

*Tinsley v. Million, 399 F.3d 796, 802 (6th Cir. 2005).* . . . . . . . . . . . . . . . . . . . . . 53

*Tome v. United States, 513 U.S. 150, 156, 115 S. Ct. 696,*
    *130 L. Ed. 2d 574 (1995)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

**Page**

*Towns v. Smith, 395 F.3d 251 (6th Cir. 2005).* . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Barile, 286 F.3d 749, 759-762 (4th Cir. 2002)*. . . . . . . . . .  104-105

*United States v. Brown, 921 F.2d 1304, 1307 (DC Cir.1990)*. . . . . . . . . . . . . . . 96

*United States v. Bursey, 85 F.3d 293, 296 (7th Cir.1996).* . . . . . . . . . . . . . . . . . 97

*United States v. Carter, 236 F.3d 777, 784 (6th Cir. 2001).* . . . . . . . . . . . . . . . . 83

*United States v. Crawford, 239 F.3d 1086, 1091 (9th Cir. 2001)*.. . . . . . . . . . . . 107

*United States v. Cronic, 466 U.S. 648, 656, 104 S. Ct. 2039,*
        *80 L. Ed. 2d 65 (1984)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*United States v. Dixon, 185 F.3d 393, 400 (5th Cir. 1999).* . . . . . . . . . . . . . . . 105

*United States v. Enright, 579 F.2d 980, 984 (6th Cir. 1978).* . . . . . . . . . . . . . . . 110

*United States v. Kaufman, 109 F.3d 186 (3rd Cir. 1997)*. . . . . . . . . . . . . . . . . . . . 58

*United States v. Olano, 507 U.S. 725, 113 S. Ct. 1770,*
        *123 L. Ed. 2d 508 (1993)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Nixon, 418 U.S. 683, 709, 94 S. Ct. 3090,*
        *41 L. Ed. 2d 1039 (1974)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*United States v. Rea, 958 F.2d 1206, 1225 (2nd Cir.1991).* . . . . . . . . . . . . . . . . . 96

*United States v. Rodriguez-Estrada, 877 F.2d 153, 159 (1st Cir. 1989).* . . . . . . . . 79

*United States v. Rosa, 11 F.3d 315, 335 (2nd Cir. 1993).* . . . . . . . . . . . . . . . . . . . 96

*United States v. Scheffer, 523 U.S. 303, 118 S. Ct. 1261, 1264,*
        *140 L. Ed. 2d 413 (1998)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*United States v. Solivan, 937 F.2d 1146, 1150 (6th Cir. 1991).* . . . . . . . . . . . . . . 84

**Page**

*United States v. Two Eagles, 318 F.3d 785, 793 (8th Cir. 2003)*. . . . . . . . . . . . . 105

*United States v. United States Gypsum Co., 438 U.S. 422, 446, 98 S. Ct. 2864,*
*2878, 57 L. Ed. 2d 854 (1978)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. Whitted, 11 F.3d 782, 785-786 (8th Cir. 1993)*. . . . . . . . . . . . . 106

*United States v. Young, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)*. . . . . . 75

*Viereck v. United States, 318 U.S. 236, 247, 63 S. Ct. 561,*
*87 L. Ed 734 (1943)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S. Ct. 316, 92 L. Ed. 309 (1948)*. . . . 58

*Wade v. Armontrout, 298 F.2d 304 (8th Cir. 1986)*. . . . . . . . . . . . . . . . . . . . . . 58

*Walton v. Angelone, 321 F.3d 442, 459 (4th Cir. 2003)*. . . . . . . . . . . . . . . . . . . 49

*Walker v. Attorney General for the State of Oklahoma, 167 F.3d 1339,*
*1343 (10th Cir. 1999)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49-50

*Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920,*
*18 L. Ed. 2d 1019 (1967)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 99, 107

*Webb v. Smith, 224 Mich App 203, 209 (1997)*. . . . . . . . . . . . . . . . . . . . . . . . . 64

*Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527,*
*156 L. Ed. 2d 471 (2003)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 122

*Wiggins v. United States, 539 U.S. 510, 123 S. Ct. 2527,*
*156 L. Ed. 471 (2003)*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 118

*Wilson v. Cocoran, 562 U.S. 1, 131 S. Ct. 13, 16-17, 178 L. Ed. 2d 276 (2010)*. . 19

*Williams v. Bordenkircher, 696 F.2d 464, 467 (6th Cir. 1983)*. . . . . . . . . . . . 40, 43

**Page**

*Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S. Ct. 1495,
    146 L. Ed. 2d 389 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 60

*Williams v. Ward*, 110 F.3d 1508 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . . . 58

*Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590,
    115 L. Ed. 2d 706 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

## STATE CASES

*Commonwealth v. Spell*, 28 A.3d 1274 (Pa 2011). . . . . . . . . . . . . . . . . . . . . . 30

*People v. Aaron*, 409 Mich 672 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Blocker*, 393 Mich 501, 510 (1975). . . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Boswell*, No. 228359, 2001 WL 1464533, at *1
    (Mich. Ct. App., Nov. 16, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63

*People v. Bunton*, 2003 WL 21508500, *1-2 (Mich. App., 2003). . . . . . . . . . . . . 63

*People v. Carines*, 460 Mich 750, 766-767 (1999). . . . . . . . . . . . . . . . . . . . . 70

*People v. Cole*, (unpublished Docket No. 299969 (2012). . . . . . . . . . . . . . . . . 41

*People v. Fortson*, 202 Mich App 13, 19 (1993). . . . . . . . . . . . . . . . . . . . . . . 71

*People v. Freeman*, 149 Mich App 119, 121 (1985). . . . . . . . . . . . . . . . . . . . 66

*People v. Garfield*, 166 Mich App 66, 74 (1988). . . . . . . . . . . . . . . . . . . . . . . 41

*People v. Gillis*, 474 Mich 105, 438 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Hermiz*, 235 Mich App 248, 254 (1999). . . . . . . . . . . . . . . . . . . . . 64

*People v. Hearn*, 100 Mich App 749, 753 (1980). . . . . . . . . . . . . . . . . . . . . . 66

**Page**

*People v. Jenapp, 344 Mich App 361, 375 (2001)*. . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Kimble, 470 Mich 305, 315 (2004)*. . . . . . . . . . . . . . . . . . . . . . . . . . 118

*People v. Lucas, 393 Mich 522, 528-529 (1975)*. . . . . . . . . . . . . . . . . . . . . . . . 43

*People v. Mangia, 189 P.3d 880, 881 (2008)*. . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Martin, 61 Mich App 102, 108 (1975)*.. . . . . . . . . . . . . . . . . . . . . . . 40

*People  v. Mendoza, 468 Mich 527, 544 (2003)*. . . . . . . . . . . . . . . . . . . . . . . . 70

*People v. Mitchell, 301 Mich App 282, 286 (2013)*. . . . . . . . . . . . . . . . . . . . . . 70

*People  Newman, 107 Mich App 535 (1981)*. . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*People v. Peters, 205 Mich App 312, 316 (1994)*. . . . . . . . . . . . . . . . . . . . . . . 63

*People v. Pouncey, 437 Mich 382, 388 (1991)*. . . . . . . . . . . . . . . . . . . . . . . . . 71

*People v. Reed, 449 Mich 375, 378 (1993)*. . . . . . . . . . . . . . . . . . . . . . . . . . . 118

*People v. Rodriquez, 216 Mich App 329, 331-332 (1996)*.. . . . . . . . . . . . . . . . 114

*People v. Schaw, 288 Mich App 231, 233-234 (2010)*.. . . . . . . . . . . . . . . . . . . 24

*People v. Silver, 466 Mich 386, 393 (2002)*.. . . . . . . . . . . . . . . . . . . . . . . . . . 69

*People v. Smith, 425 Mich 98, 114-115 (1986)*. . . . . . . . . . . . . . . . . . . . . . . . 106

*People v. Steger, 546 P.2d 665, 669 (1979)* . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*People v. Swain, 288 Mich App 609, 631 (2010)*.. . . . . . . . . . . . . . . . . . . . . . 118

*People v. Ullah, 216 Mich App 669 (1996)*. . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*People v. Uphaus,* (On Remand) *278 Mich App 174, 186 (2008)*. . . . . . . . . . . . 119

**Page**

*People v. Visel, 275 Mich 77, 81 (1936).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

## FEDERAL STATUTES AND RULES OF EVIDENCE

*18 U.S.C. §4241.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
*28 U.S.C. §2254.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18, 22, 57, 111
*28 U.S.C. §2255(e)(1).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*FRE 104(c).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
*FRE 704(a).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
*FRE 801(d)(1)(B).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

## MICHIGAN STATUTES, COURT
## RULES, AND RULES OF EVIDENCE

*MCL 330.2020(1).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
*MCL 330.2022(1).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
*MCL 330.2024.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*MCL 330.2026(1).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*MCL 750.84* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
*MCL 750.85.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23, 27
*MCL 750.316 (1)(b).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23
*MCL 750.317.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
*MCL 768.29, MSA 28.1052.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
*MCL 768.27b.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*MCR 2.516(3).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
*MCR 6.125* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
*MCR 6.508.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-63, 120-121

*MRE 104(C).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
*MRE 401, 403, 404.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
*MRE 701, 702, 704.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
*MRE 801(d)(1)(B).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
*MRE 901(a).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

## STATEMENT OF QUESTIONS INVOLVED

**I.   WAS THERE INSUFFICIENT EVIDENCE TO SUPPORT THE TORTURE CONVICTION AND THE FELONY MURDER CONVICTION WHICH ALLEGED TORTURE AS ITS PREDICATE OFFENSE?**

Petitioner answers "Yes"
Respondent answers "No"

**II.   WAS PETITIONER DABISH DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONOPIN, SEROQUEL, CELEXA AND TOPAMAX TOGETHER DURING HIS TRIAL, WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL?**

Petitioner answers "Yes"
Respondent answers "No"

**III.   WAS PETITIONER DABISH DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) FAILED TO PRESENT A CRITICAL WITNESS IN SUPPORT OF THE DEFENSE, (2) ALLOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (3) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (4) FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT IN HER CLOSING ARGUMENT, AND (5) FAILED TO OBJECT TO INADMISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD PETITIONER DABISH SAY WITHOUT A FOUNDATION THAT THE WITNESS COULD IDENTIFY HIS VOICE?**

Petitioner answers "Yes"
Respondent answers "No"

**IV.   WAS PETITIONER DABISH DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY OF THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER?**

Petitioner answers "Yes"
Respondent answers "No"

**V.     DID THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT DEPRIVING PETITIONER DABISH OF A FAIR TRIAL?**

Petitioner answers "Yes"
Respondent answers "No"

**VI.     WAS PETITIONER DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ADMITTED PRIOR BAD ACTS EVIDENCE AND ALSO ADMITTED EVIDENCE OF MARIJUANA CULTIVATION?**

Petitioner answers "Yes"
Respondent answers "No"

**VII.     DID THE TRIAL COURT VIOLATE PETITIONER'S RIGHT TO PRESENT A DEFENSE WHEN IT REFUSED TO ALLOW THIS MEDICAL EXPERT TO OFFER OPINION EVIDENCE REGARDING THE ORIGIN OF THE DECEASED'S INJURIES AND REFUSED TO ADMIT EVIDENCE OF THE DECEASED'S EMAILS UNLESS THE DEFENDANT AUTHENTICATED THEM IN FRONT OF THE JURY?**

Petitioner answers "Yes"
Respondent answers "No"

**VIII.     DID THE TRIAL COURT DENY PETITIONER DUE PROCESS OF LAW WHEN IT ADMITTED, OVER OBJECTION, EVIDENCE OF A PHONE CALL BETWEEN MR. DEMAYO AND THE PETITIONER, AND EVIDENCE OF A CALL MADE BY MR. DEMAYO TO THE WATERFORD POLICE DEPARTMENT?**

Petitioner answers "Yes"
Respondent answers "No"

IX.   **ASSUMING THE APPLICATION OF ANY PROCEDURAL BAR TO CLAIMS RAISED IN THIS PETITION, HAS DABISH SHOWN GOOD CAUSE AND PREJUDICE TO OVERCOME ANY SUCH STATE PROCEDURAL RULE?**

Petitioner answers "Yes"
Respondent answers "No"


X.   **IS PETITIONER DABISH ENTITLED TO A FEDERAL EVIDENTIARY HEARING?**

Petitioner answers "Yes"
Respondent answers "No"

## STATEMENT OF FACTS

## PROCEDURAL BACKGROUND

Petitioner, PETER NORMAN DABISH, ("Dabish") was convicted of first-degree murder, *MCL 750.316(1)(b)*, second-degree murder, *MCL 750.317*, and torture, *MCL 750.85*, after a jury trial in the Third Judicial Circuit Court, County of Wayne.

On November 18, 2010, Dabish was sentenced to life without parole for the felony-murder conviction and 23 to 80 years for the torture conviction,[1]  by the Honorable Linda V. Parker, presiding.

The trial attorney was Domnick J. Sorise.

On his appeal of right, Dabish raised the following claims:

I.     THERE WAS INSUFFICIENT EVIDENCE TO PERMIT THE CHARGES OF TORTURE AND FELONY MURDER TO BE SUBMITTED TO THE JURY.

II.    THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY ALLOWING THE ADMIS-SION OF "OTHER ACTS" EVIDENCE THAT RENDERED DEFENDANT'S TRIAL FUNDAMENTALLY UNFAIR.

III.   THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED ITS DISCRETION BY REFUSING TO ALLOW THE DEFENSE TO AUTHENTICATE CRITICAL PIECES OF EVIDENCE ON A SEPARATE RECORD, AS PERMITTED BY MRE 104 (c), AND IN SO DOING VIOLATED DEFENDANT'S

---

[1]The trial court vacated the second-degree murder conviction which the jury returned as lesser offense of the premeditated-murder count.

CONSTITUTIONALLY-ASSURED RIGHTS OF DUE PRO-
CESS AND TO PRESENT A DEFENSE.

IV.     THE TRIAL COURT ERRED AS A MATTER OF LAW AND
        ABUSED ITS DISCRETION BY ALLOWING THE ADMIS-
        SION OF UNFAIRLY PREJUDICIAL EVIDENCE REGARD-
        ING A TELEPHONE CONVERSATION BETWEEN HIMSELF
        AND THE DECEASED'S FATHER, AND ALLOWING THE
        PROSECUTION TO BOLSTER THAT EVIDENCE BY MEANS
        OF AN INADMISSIBLE PRIOR CONSISTENT STATEMENT,
        AND IN SO DOING VIOLATED DEFENDANT'S CONSTITU-
        TIONALLY-ASSURED RIGHT TO DUE PROCESS OF LAW.

V.      DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE
        OF COUNSEL BY TRIAL COUNSEL'S MULTIPLE FAIL-
        URES OF REPRESENTATION, INCLUDING HIS FAILURE
        TO SECURE CRUCIAL EVIDENCE FOR THE DEFENSE.

In a supplemental brief, accepted by the Court of Appeals, Dabish raised these

additional issues:

I.      THE DEFENDANT WAS DENIED A FAIR TRIAL BY RE-
        PEATED PROSECUTORIAL MISCONDUCT.

II.     THE ADMISSION OF EVIDENCE REGARDING MARI-
        JUANA CULTIVATION DENIED DEFENDANT A FAIR
        TRIAL.

III.    THE TRIAL COURT UNDULY IMPINGED ON DEFEN-
        DANT'S RIGHT TO PRESENT A DEFENSE WHEN IT
        REFUSED TO ALLOW THIS MEDICAL EXPERT TO OFFER
        CERTAIN OPINION EVIDENCE REGARDING THE NATURE
        OF THE DECEASED'S INJURIES.

On August 13, 2013, The Michigan Court of Appeal, in an unpublished per curiam opinion affirmed (Docket No. 301622) (Appendix, Exhibit B).  The attorney on appeal was NC DeDay Larene.

On January 31, 2014, the Michigan Supreme Court denied an application for leave to appeal which raised the same claims raised in the Michigan Court of Appeals (Docket No. 147801) (Appendix, Exhibit C).

On March 31, 2015, Petitioner filed a motion for relief from judgment in the state trial court, requesting an evidentiary hearing on the issue of petitioner's competency, and ineffective assistance of trial and appellate counsel, raising the following claims:

I.    DEFENDANT DABISH WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONOPIN, SEROQUEL, CELEXA AND TOPAMAX TOGETHER DURING HIS TRIAL, WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL.

II.   DEFENDANT DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY ON THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER.

III.  THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT IN HER CLOSING ARGUMENT, DEPRIVING DEFENDANT DABISH OF A FAIR TRIAL, BY ARGUING MATTERS NOT IN EVIDENCE AND IN AN INFLAMMATORY MANNER.

IV.   DEFENDANT DABISH WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) ALLOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (2) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (3) FAILED TO OBJECT TO PROSECUTORIAL MISCON- DUCT IN THE CLOSING ARGUMENT, (4) AND FAILED TO OBJECT TO INADMISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD DEFENDANT SAY WITHOUT A FOUN- DATION THAT THE WITNESS COULD IDENTIFY HIS VOICE.

V.    DEFENDANT DABISH HAS MET THE PROCEDURAL REQUIREMENTS OF GOOD CAUSE AND ACTUAL PREJU- DICE UNDER MCR 6.508(D) AND AN EVIDENTIARY HEARING IS REQUIRED.

The attorney in the post-conviction proceedings was Craig A. Daly.

On September 3, 2015, the Honorable Kevin S. Cox, successor judge, issued an Opinion denying Defendant's Motion for Relief from Judgment, for Oral Argument and for an Evidentiary Hearing (Appendix, Exhibit N).  The Order denying the motion was entered on September 4, 2015 (Appendix, Exhibit O).

On April 28, 2016, the Michigan Court of Appeals denied a delayed application for leave to appeal which raised the same claims raised in the motion for relief from judgment (Docket No. 330727) (Appendix, Exhibit P).

On March 7, 2017, the Michigan Supreme Court denied an application for leave to appeal raising the same claims raised in the Michigan Court of Appeals (Docket No. 153730) (Appendix, Exhibit Q).

-4-

No other post-conviction proceedings have been held in state or federal court.

The undersigned counsel are retained and court-appointed counsel is not being requested.

Petitioner Dabish has exhausted his remedies available in the Michigan state courts. *28 U.S.C. §2254(b)(1)(A)*.

## FACTUAL BACKGROUND

This case involves the death of DIANA DeMAYO ("Ms. DeMayo") on March 11, 2010 after being taken from the Fort Shelby apartments in Detroit.[2]   What happened to Ms. DeMayo that led to her death was hotly contested at trial.   Medical examiners from Wayne County testified the death was caused by multiple blunt force to the head sustained by blows.   The prosecution argued that Dabish killed Ms. DeMayo because he was angry with her.   The defense argued that the injuries were a result of accidental falls due to drug and alcohol abuse, as well as a well-documented car accident, two days prior to her death.   A defense forensic expert testified the injuries that caused her death were not from blows to the head and that some of them were not sustained at or near the time of death.

---

[2]The Fort-Shelby Apartments were connected to the Double Tree Hotel and shared an entrance, as well as employees.

Dabish and Ms. DeMayo had known each other since high school (Vol. VI, p. 3).[3]  Ms. DeMayo had returned to Michigan in December of 2010 after attending college in Miami, Florida (Vol. V, p. 152, 155).  Ms. DeMayo was seeing a psychiatrist in Florida for anxiety and had been prescribed Xanax (Vol. V, p. 164-165).  Upon her return home, Ms. DeMayo and Dabish began spending time together and Edward DeMayo ("Mr. DeMayo") invited them to dinner on March 7, 2010 (Vol. V, p. 106).  They arrived late and apparently high, so Mr. DeMayo became angry with them (Vol. V, p. 108, 159).  He complained that Dabish was being disrespectful and reprimanded Ms. DeMayo (Vol. V, p. 111).  The evening ended in hostilities between Dabish and Mr. DeMayo (Vol. V, p. 108-11).

On March 8, 2010, Ms. DeMayo called her father and asked him to apologize to Dabish (Vol. V, p. 112).  Dabish also called Mr. DeMayo and complained about their treatment by Mr. DeMayo (Vol. V, p. 114).

On March 9th, 2010,  Dabish, who had been living in Waterford, Michigan, signed a lease for  an apartment at the Fort-Shelby Hotel in downtown Detroit (Vol. X, p. 30-31). The Shelby was connected to the Double Tree Hotel and shared an entrance, as well as employees.  That same day Mr. Dabish moved in and Ms. DeMayo  also began moving her clothing into the apartment.  When Mr. Dabish found

---

[3]Trial was held on October 4, 5, 6, 7, 8, 12, 13, 18, 19, 20, 21, 22, 25, 26, 28, 2010.  The transcripts are identified as Vol. I through XV, respectively.

out, he complained to the front office supervisor that someone had given a female permission to enter his apartment without his consent (Vol. V, p. 60-61). He was also was upset that Ms. DeMayo had allegedly given her phone number to the valet and he threatened to "kick somebody's ass." (Vol. IV, p. 60-62; Vol. VII, p. 83-84).

On March 10th, Mr. DeMayo had several telephone contacts with his daughter and Dabish. After noticing several 911 calls on her phone, he called and Ms. DeMayo sounded happy and had no explanation for the 911 calls (Vol. V, p. 120-122). Later, Dabish called on Mr. DeMayo's phone, allegedly made degrading comments about the dinner at his house, saying he was having anal sex with his daughter because he was mad at him (*Id.*). In subsequent calls, Dabish allegedly said Ms. DeMayo could not come to the phone because she was crying (Vol. IV, p. 127). However, Ms. DeMayo called her father and explained that she was alright and not harmed. For his part, Dabish apologized for his earlier calls, explaining that he had a few drinks (Vol. IV, p. 134). On March 11, 2010 around 9:20 a.m., Dabish called saying Ms. DeMayo had overdosed on Klonopin (Vol. IV, p. 139).

ERIC BROWN, the general manager of the family business, answered two calls on March 11, 2010, at around 5:03 a.m. and 5:13 a.m. from Dabish reporting "a situation" with a young lady in his apartment that he thought had overdosed. Dabish sounded scared and panicky. Brown told Dabish to put her in the shower and call EMS (Vol IV, 76-79).

Police officers ANGELA JACKSON and KENNETH LENTON were first on the scene at around 6:20 a.m (Vol. VII, p. 91-93; Vol. X p. 95). When Dabish opened the door to the apartment, he yelled at the officers to "get your ass in here because she's dying" (Vol. VII, p. 94). Dabish added, "the bitch tried to kill herself, she tried to OD" (Vol. VII, p. 95). Dabish was frantic, screaming, yelling and cussing (Vol. VII, p. 97). When they entered the apartment they saw a female in the living room with a little blood around her mouth and nose and breathing shallow (Vol. VII, p. 97-98). The woman's clothes were wet as were Dabish's clothes. The officers noticed blood on Dabish's clothes, the carpet and smeared on the bed (Vol. VII, p. 96-97). A kitchen cabinet door was broken (Vol. VII, p. 97-98). There was a prescription pill bottle on the island in the kitchen, but the police did not take it (Vol. VII, p. 106). Dabish said he had thrown all the knives from the kitchen out a window to keep DeMayo from killing herself, but no knives were found outside (Vol. VII, p. 102). Dabish also told the officers that he had fallen asleep and woke up to DeMayo walking around bleeding from the nose and mouth (Vol. VII, p. 103). He explained that he had put Ms. DeMayo in the shower to try to revive her and that did not help. He slapped her to wake her up and applied CPR and chest compressions in an attempt to revive her (Vol. VII, p. 112, 120).

Dabish also said that Ms. DeMayo had an argument with her father and because of him, she was going to kill herself (Vol. VII, p. 104, 114). Dabish gave inconsistent

-8-

accounts of his relationship with DeMayo, saying at the time "that girl is my life", but also telling the police he barely even knew her and had no contact information for her (Vol. VII, p. 103, 108). Dabish was briefly handcuffed at the apartment so the officers could conduct their investigation but he was subsequently released (Vol. VII, p. 110).

Two EMS technicians arrived at the apartment on the 11th, shortly after 6:30 a.m (Vol. IV, 160; Vol. VIII, p. 7). When ERIC HANSEN and AMORENA COLLINS knocked on the apartment door, Dabish opened the door and said "get the f--- in here" (Vol. IV, p. 163; Vol. VII, p. 8-9). Dabish was pacing back and forth, screaming, irate and "out of control" (Vol. IV, p. 164). Dabish pointed to Ms. DeMayo who was lying on a blanket in the living room (Vol. IV, p. 165). Dabish said she had stopped breathing and overdosed on his Klonopin (Vol. IV, p. 165-167). There was a drop of blood from her nose and abrasions on her head and chest (Vol. IV, p. 167, 177). Her face was purple in color and there was a weak pulse (Vol. IV, p. 168-170). Dabish pleaded with them to save Ms. DeMayo, explaining she took his Klonopin, she had tried to hurt herself and he had administered CPR (*Id.*, p. 11). However, Dabish could not locate the pill bottle at that time (Vol. IV, p. 168). The front of Dabish's shirt was also covered in blood (Vol. IV, p. 163, 169).

Collins first attempted to provide oxygen through a bag valve device, but was unsuccessful, so she inserted an endotracheal tube (Vol. IV, p. 141). Blood came up through the tube, which could come from the lungs or stomach if the tube was

-9-

displaced (Vol. IV, p. 281).   The endotracheal tube was not properly placed in the trachea and was removed at the hospital (Vol. IV, p. 119-120).

NICOLE DABISH, the mother of Peter Dabish testified that Ms. DeMayo and her son were friends since high school (Vol. VI, p. 6).   She helped her son and Ms. DeMayo move from Waterford to the apartment at Fort Shelby (Vol. VI, p. 24).  Dabish called her early the next morning saying Ms. DeMayo had overdosed and to come to the apartment (Vol. VI, p. 34).   When Dabish said he called 911, his mother instructed him to slap her in the face to revive her (Vol. VI, p. 69).   When she arrived at the scene, she was not able to enter the apartment, but saw Ms. DeMayo on a gurney (Vol. VI, p. 110).   She said Dabish then went to the hospital where Ms. DeMayo's father was (Vol. VI, p. 45).   Mrs. Dabish had seen Ms. DeMayo "high" "quite a few times" and saw her pill bottles in the Waterford apartment (Vol. VI, p. 128-129).

Medical testimony from DR. MARK HORNYAK, a neurosurgeon at Detroit Receiving Hospital, JERRY CHU, the Director of toxicology at the Detroit Medical Center, and Dr. LOKMAN SUNG, an assistant medical examiner at Wayne County was presented. Dr. Hornyak was consulted because of the head injuries to Ms. DeMayo (Vol. IV, p. 95-97).   A cat scan revealed a subdural hematoma with no meaningful prognosis and since she was in a deep coma, nothing could be done (Vol. IV, p. 98-99).   There were no skull fractures, but a small laceration above the eyebrow

-10-

was noted (Vol. IV, p. 113).  A urine toxicology screen was positive for benzodiaz-epine and cannabis (*Id.*).  Ethanol level was 42 (Vol. IV, p. 114).  The medical records indicated that Ms. DeMayo was not properly intubated when she arrived at the hospital and had ten minutes of "downtime", which contributed to her state of being brain dead (Vol. IV, p. 121-122).  Dr. Hornyak described the injury to the brain as caused by some sort of blunt force trauma, a "high velocity or high energy injury" commonly caused by high speed motor vehicle accidents or falls from heights or unprotected falls (Vol. IV, p. 104-106).  That would be compared to a "low energy injury" such as being struck with an object, for example a baseball bat (*Id.*).

Mr. Chu received blood and urine samples from Ms. DeMayo for analysis (Vol. V, p. 57-58).  The blood was negative for drugs, but had a blood alcohol level of .04, one-half the legal limit for driving (Vol. V, p. 61, 73).  The blood alcohol at the time of the incident may have been higher.  The urine tested positive for benzodiazepine, which includes Klonopin (Vol. V, p. 62-65).  It was also positive for cannabis (Vol. V, p. 84).

A urine test is more "sensitive" than a blood test because blood metabolizes quickly (Vol. V, p. 86, 88-89).  Klonopin is commonly used to treat panic disorders in adults (Vol. V, p. 52).

Dr. Sung performed the autopsy (Vol. VIII, p. 38).  Dr. Sung opined that the cause of death was  blunt force trauma,[4] caused by at least eight blows to the head (Vol. VIII, p. 38-39).   There was no defensive wounds but older bruises to the extremities were noticed.  The internal examination revealed a large hemorrhage on the left side of the dura covering the brain with bleeding directly into the brain (Vol. VIII, p. 64).  According to Dr. Sung, the injuries were "consistent with" the possibility of being caused by a hard slap, fist, kicking or being slammed against a surface and not a fall (Vol. VIII, p. 85-86, 114).  The exact cause of the injury could not be determined.  There were no skull fractures and no evidence that a weapon caused the injuries (Vol. VIII, p. 96).  There were no injuries to the scalp and the time that the bruising and abrasions were caused could not be determined either (Vol. IX, p. 9).

Evidence from the apartment was collected and analyzed.  Sgt. DAVID BABCOCK arrived at the scene on March 23, 2010, twelve days after the incident (Vol. VI, p. 148-149).  Babcock located a droplet of blood on the west wall of the living room, and  four drops of blood on the ceiling at the kitchen/dining room center line (which was an eight foot ceiling), all which matched by DNA testing, the blood of Ms. DeMayo (Vol. VI, p. 163-167; Vol. X, p. 9).  Also, blood spots in the bathroom, on a pillowcase and a pair of shorts matched Ms. DeMayo's blood (Vol. VII, p. 13-15; Vol. X, p. 9). A broken kitchen cabinet door, caused by multiple blows

---

[4]There was a single blow to the right shoulder and one to the right eye.

by an unknown object was also noted (Vol. X, p. 20-21, 29).  The door was negative

for blood, fiber or hair (Vol. X, p. 92).

Over objection, the prosecutor was allowed to call several woman who Dabish

had previous relationships or friendships with.  According to three women, MONICA

KADDIS, ALEXIS HOMICZ, and MELISSA KALLABAT, Dabish had been abusive

to them in the past (Vol. V, p.12-13; Vol. VI, p. 114-124; Vol. VII, p. 48-71).  No

charges were filed against Dabish by these women.

RACHEL MOODY, a roommate of Ms. DeMayo at Florida International in

Miami, spoke with Ms. DeMayo on March 7th in the evening (Vol. VII, p. 63-65).  Ms.

DeMayo sounded frantic and was screaming and according to Moody, Dabish was

screaming at her and laughing (*Id.*, p. 66).[5]

Over objection, the prosecution introduced evidence that on March 9th,

Waterford Township Police found a marijuana grow garden at the apartment occupied

by Dabish, which resulted in a misdemeanor ticket being issued (Vol. XI, p. 15-18,

34) Dabish had a medical marijuana card issued in May *(Id.,* p. 33, 35).

The defense called police officer JAMES JARRETT, of Waterford Township

who stated that Ms. DeMayo was issued a traffic violation on March 8th for a car

---

[5]An objection to hearsay was apparently overruled and Moody testified to what she said was
Dabish's voice without a foundation.

accident she had with another vehicle (Vol. XIV, p. 4-8). An airbag in her vehicle had been deployed in the accident, but no apparent injuries to her were noted (*Id.*)

Dr. LJUBISA DRAGOVIC, a forensic pathologist, neuropathologist, and current Medical Examiner for Oakland County reviewed the autopsy reports, findings and testimony prepared by the prosecution (Vol. XI, p. 79-89). Dr. Dragovic opined that the injury to DeMayo's right eye socket was not indicative of a slap or punch, but rather was consistent with her head striking the edge of a stationary object (Vol. XI, p. 92-96). The injury to her nose was consistent with a fingernail scrapping and the injury to her lower lip was not consistent with having been struck with a fist or slap (Vol. XI, p. 97-98). Instead, those injuries were consistent with a person forcibly grabbing her face and head (Vol. XI, p. 100-101). The knee injury was consistent with a fall and the bruises on the leg and hips appeared to be of different ages (Vol. XIV, p. 14-15). The shoulder injuries were consistent with a forceful squeeze rather than a punch or blow and none of the injuries to her face or body were fatal injuries (Vol. XIV, p. 17-21).

As far as the fatal head injuries, Dr. Dragovic testified that microscopic examination of the brain showed a healing process of the injury, a process present for a minimum of 24 to 36 hours prior to death (Vol. XIV, p. 32-33; Vol. XIII, p. 4). The subdural bleeding was the result of the head hitting something such as an unyielding surface (Vol. XIII, p. 10-12). Dr. Dragovic found three general areas of hemorrhaging

to the back of the decedent's head (Vol. XIII, p. 20-21).  The cause of death was blunt force trauma and complications (Vol. XIII, p. 381).  However, it was unclear if the injuries to the head were caused by falls or being pulled or propelled into something by another person (Vol. XIII, p. 40).

Dr. Dragovic testified that this was a suspicious death and so homicide is presumed in such cases. But he concluded that one cannot say in this case that this was a homicide because the person could have fallen down because of intoxication.  He also could not say what the manner of death was because there was not enough information.(Vol. XIII, p. 39-40).

In rebuttal, Dr. CARL SCHMITT, a forensic pathologist employed by Wayne County, contradicted Dr. Dragovic, saying that there was no evident healing process in the brain, or no way to accurately date a bruise (Vol. XIV, p. 53-56).  Dr. Schmitt could not tell what object struck Ms. DeMayo's head and disagreed with Dr. Dragovic regarding the cause of the facial injuries (Vol. XIV, p. 71-72).  Not surprisingly, Dr. Schmitt agreed with the findings of his colleague, Dr. Sung.

## POST-CONVICTION STATE COURT RECORD

Regarding the claim that Dabish was incompetent to stand trial and ineffective assistance of counsel for failing to raise incompetency, Dabish attached to his Motion for Relief from Judgment certain documents that form part of the state court record. The record included the Affidavit/Report and Curriculum Vitae of Dr. Randall L.

Commissaris, Affidavit of Nicole Dabish, Affidavit of Dominic J. Sorise, Affidavit of Peter Dabish, Affidavit of N.C. Deday LaRene, which are attached to this Petition as Exhibits F, G, H, I, J & M.

Dr. Commissaris reviewed the medical records of Dabish while Dabish was incarcerated in the Wayne County Jail from April through November of 2010, the period before, during and after the trial. Dr. Commissaris documented the various medications and amounts administered by the jail, which included Lithium, Klonopin, Seroquel XR, Celexa, Topamax, Lortab, Benadryl, Singulair and Zestril and their side effects. Dr. Commissaris noted that the doses for many of the medications were at or near the top of the therapeutic range normally administered and the side effects of the drugs when used in combination increased the side effects, such as sedation, drowsiness and confusion. Dr. Commissaris opined that the medication compromised Dabish's mental functioning to the extent of the legal proceedings or to rationally assist his attorney in his defense (Appendix, Exhibits F, G).

NICOLE DABISH stated that Dabish was upset, depressed, and anxious while incarcerated, sounded delusional, and saying things that were not rational. The medication provided by the jail made Dabish's voice and tone lethargic, his speech slow and slurred and that Dabish could not comprehend information about his case. During the trial, Dabish threatened to fire his attorney and take the witness stand, notwithstanding that he would often sit in court with a blank stare on his face. She

-16-

also believed that Dabish was unable to understand the nature of the legal proceedings and to assist his attorney in his defense (Appendix, Exhibit H).

Attorney Dominick J. Sorise described Dabish as an "emotional mess," with mood swings which were demonstrated by crying, complaining, being angry and nodding off during conversations. Sorise believed Dabish was reacting to a drug problem. When Sorise spoke to Dabish in the jail Dabish was confused, unhelpful and had difficulty comprehending the trial process and rules. Dabish could not recall events accurately to assist Sorise in preparing a defense. It was only after trial, that Sorise learned that Dabish was heavily medicated by jail authorities. Sorise now believes, with the information regarding the medication he was given, that he misconstrued Dabish's problems, in that Dabish was not just being difficult, but was, in fact unable to understand the proceeding and assist him due to the medication given to him (Appendix, Exhibit I).

Dabish avers that while in the county jail he was in a dreamlike state due to the medication. He felt disconnected from reality, and very foggy, experiencing mood swings and panic attacks. Dabish was unable to understand information supplied by his attorney, was unable to advocate a trial strategy or help his attorney in his defense. His thought process was delusional to the extent he could not comprehend what was happening in the trial. He has no recall of any plea negotiations or the consequences of going to trial. Subsequent to his sentence, the Michigan Department of Corrections

put Dabish on medication that allowed him to understand what had happened and to read the transcript of his trial (Appendix, Exhibit J).

N.C. Deday Larene, the appellate lawyer, reviewed the issues raised in the Motion for Relief of Judgment and conceded his failure to raise them was not a matter of strategy or professional judgment (Appendix, Exhibit M).

## STANDARD FOR HABEAS REVIEW

Federal law imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

*28 U.S.C. §2254(d).*

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"

*Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003)* (per

-18-

curiam) (quoting *Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)*); *Jalowiec v. Bradshaw, 657 F.3d 293, 301 (6th Cir. 2011)*. "[T]he 'unreasonable application' prong of *§2254(d)(1)* permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)* (quoting *Williams, 529 U.S. at 413*). However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins, 539 U.S. at 520-21* (citations omitted); see also *Williams, 529 U.S. at 409*.

The Supreme Court has clarified that *§2254(d)(2)* functions to allow "habeas petitioners to avoid the bar to habeas imposed with respect to federal claims adjudicated on the merits in state court by showing that the state court's decision was based on an unreasonable determination of the facts . . ." *Wilson v. Cocoran, 562 U.S. 1, 131 S. Ct. 13, 16-17, 178 L. Ed. 2d 276 (2010)*.

When a state court fails to consider an issue or does not specifically address whether the alleged error constitutes a denial of a petitioner's federal constitutional rights, the deference due under *28 U.S.C. §2254(d)* does not apply, and habeas review of such a claim is *de novo*. See *Higgins v. Renico, 470 F.3d 624, 630 (6th Cir. 2006)*

-19-

(quoting *Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003)*, and citing *Wiggins v. Smith, 539 U.S. at 534*).

[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin, 503 F.3d 488, 493 (6th Cir. 2007)*.

If there is a merits adjudication by the state courts, factual determinations are presumed to be correct. *28 U.S.C. §2254(e)(1)*. However, a petitioner may rebut the presumption by clear and convincing evidence that the state court determination was erroneous. *Magana v. Hofbauer, 263 F.3d 542, 546-547 (6th Cir. 2001)*.

## ARGUMENT

## I.   THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE TORTURE CONVICTION AND THE FELONY MURDER CONVICTION WHICH ALLEGED TORTURE AS ITS PREDICATE OFFENSE.

### A.   TEST AND CLEARLY ESTABLISHED SUPREME COURT LAW.

The Sixth Amendment right to a jury trial and the due process clause of the Fifth Amendment require that all the elements of the charged offense be proven beyond a reasonable doubt. *U.S. Const. Ams. VI, XIV*; *In re Winship, 397 U.S. 358,365, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)*. Specifically, the Constitution

prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *Id., at 364.*

The proof beyond a reasonable doubt standard has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Id., at 358-362.* It symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Id., at 372* (Harlan, J., concurring). It also "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. *397 U.S. at 363.* It impresses upon the fact finder the need to reach a subjective state of near certitude of the guilt of the accused, *397 U.S. at 372* (Harlan concurring).

In making its sufficiency decision, the Court must view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia, 443 U.S. 307, 316-319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*; *Johnson v. Coyle, 200 F.3d 987, 991 (6th Cir. 2000).* On habeas review, state law controls in determining what the elements of the offense are. *Joseph v. Coyle, 469 F.3d 441, 454 (6th Cir. 2006)*; *Brown v. Palmer, 441 F.3d 347, 351-52 (6th Cir. 2006).* But the minimum amount of evidence that the Due Process Clause requires to prove the

offense is purely a matter of federal law. *Coleman v. Johnson, 132 S. Ct. 2060 (2012)*; *McGuire v. Ohio, 619 F.3d 623, 631 (6th Cir. 2010).*

On this issue, the state appellate courts decision was objectively unreasonable. *Renico v. Lett, 559 U.S. 356, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)*; *28 USC 2254(d)(l).* When ". . . the jury's conclusion fails to conform to that of a rational jury, and where the Michigan Court of Appeal's contrary conclusion was unreasonable . . .," the petitioner is entitled to habeas relief. *Parker v. Renico, 506 F.3d 444, 452 (6th Cir. 2007).* The Sixth Circuit has granted habeas relief for insufficient evidence in a number of cases. *Gill v. Cason, 281 Fed. Appx. 522 (6th Cir. 2008)*; *Parker v. Renico, supra*; *Newman v. Metrish, 492 F. Supp. 2d 721 ((E.D. Mich 2007), aff'd., 543 F.3d 793 (6th Cir. 2008)*; *Brown v. Palmer, supra*; *McKenzie v. Smith, 326 F.3d 721 (6th Cir. 2001)*; *Fuller v. Anderson, 662 F.2d 420 (6th Cir. 1981).* In the present case, the state court appellate decision was contrary to clearly established Supreme Court law and it was an unreasonable determination of the facts in the light of the evidence presented.

## B.    STATE COURT APPELLATE DECISION.

In its conclusion, the Michigan Court of Appeals, which issued the last reasoned decision, held that the evidence when viewed in the light most favorable to the prosecution supported:

1.      an inference that defendant caused great bodily injury to Ms.
        DeMayo with an intent to cause cruel physical pain and suffering,
        and

2.      an inference that defendant had forcibly restricted or confined Ms.
        DeMayo within his apartment at the time the injuries were
        inflicted, and so she was within his custody or physical control.

(Appendix, Exhibit B, Mich COA Op. p. 4-6).

It arrived at these conclusions first by finding that the medical testimony was sufficient to establish that the victim suffered great bodily injury caused by blunt force trauma to her head and body which in turn caused internal injuries which led to her death (Appendix, Exhibit B, Mich COA Op. p. 4-5). The Court then went on to explain why it could infer that petitioner caused the injuries (*Id.*, p. 5).  And then finally why it could infer that the victim was within the petitioner's control or custody (*Id.*, p. 5-6).

## C.    DISCUSSION.

Petitioner was convicted of felony murder contrary to *MCL 750.316(l)(b)* which defines it as follows:

(b)      Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery, carjacking, breaking and entering of a dwelling, home invasion in the first or second degree, larceny of any kind, extortion, kidnapping, vulnerable adult abuse in the first or second degree under section 145n, torture under section 85 . . .

-23-

In this case, the only possible predicate felony was torture. Otherwise, the factual circumstances only show second degree murder.  The crime of torture is defined as follows:

> A person with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control commits torture. . .

*MCL 750.85(1)*.  The elements of the crime of torture are:  (1) defendant intended to cause cruel or extreme physical or mental pain and suffering, (2) defendant inflicted great bodily injury or severe mental pain or suffering, and (3) the victim was within the defendant's custody or physical control. *People v. Schaw, 288 Mich App 231, 233-234 (2010)*.

The proofs in this case were deficient on the torture charge.  The two elements which were not proved by the Jackson standard are the defendant's intent and whether the victim was under the defendant's custody or physical control.  Petitioner also does not concede the second element which is dependent on the first for its proofs.

Where the predicate felony for felony murder is not established, the only constitutionally sustainable verdict is second degree murder.

## 1.   THE PROSECUTION DID NOT PROVE THAT THE PETITIONER HAD THE INTENT TO CAUSE CRUEL OR EXTREME PHYSICAL OR MENTAL PAIN AND SUFFERING.

While the Michigan Court of Appeals' opinion identified the three elements of the "Torture" statue, as set forth in *People v. Schaw, supra,* it made no specific finding on the intent element, instead collapsing element (l) into element (2). It discussed in detail the medical evidence regarding the nature and severity of the trauma found by the medical examiner, from which it found that the victim had suffered great bodily injury, (Appendix, Exhibit B, Mich COA Op. p. 4-5). It discussed evidence which it held supported a finding that it was the defendant who caused the injuries. It referred to defendant's alternative explanations for the injuries and to the 404b acts offered by the prosecution (*Id.*, p. 5). It concluded with a discussion of the evidence supporting an inference that the defendant forcibly restricted the victim (*Id.*, p. 5-6). But, in a stand alone paragraph on page 5 before discussing the element of forcible restriction, the appellate court merely stated:

> Viewed in the light most favorable to the prosecution, the evidence supported an inference that defendant caused great bodily injury to Diana with an intent to cause cruel physical pain and suffering.

(Appendix, Exhibit B, Mich COA Op., p. 5).

While the discussion which preceded this statement did include a finding that certain "other acts" was "probative of defendant's intent to cause physical injury to Diana," *id.,* at 5, the Court of Appeals failed to make any such finding (as distinguished from its finding "that Diana's injuries qualified as "great bodily injury")

-25-

regarding the circumstances out of which the actual charges arose - and with good reason, since none was presented.[6]

While there is certainly no constitutional bar against the use of uncharged conduct in aid of proof of an element of a charged offense, it is surely inconsistent with the due process principles underlying *Winship* and *Jackson* - and an "unreasonable application" of those decisions to uphold a conviction *solely* on the basis that proof of uncharged conduct supports an essential element of the offense charged.

The Michigan Court of Appeals was forced to reach out to "other acts" evidence because, under any fairminded application of the *Jackson* standard, the record was simply barren of evidence of the intent required for conviction of the Michigan offense of "torture."

Under the torture statute, the necessary mental state is the intent to cause cruel or extreme physical or mental pain and suffering. In contrast, the mental state for second degree murder is malice which is defined as the intent to kill, the intent to commit great bodily harm less than murder, or the intent to do an act in wanton and wilful disregard of the strong likelihood that the natural tendency of such behavior is to cause great bodily harm or death. *People v. Aaron, 409 Mich 672 (1980).*  It is,

---

[6]The Court of Appeals' opinion does in fact suggest that evidence of  intent can be seen in the evidence suggesting that Mr. Dabish expressed anger at Ms. DeMayo "during the hours preceding" her death.  *Ibid.*  This testimony, of course, was both temporally and logically distinct from any evidence regarding any infliction of injury, and the Michigan Court's reliance on it evokes the conceptually similar error of conflating "intent" with "motive."

therefore, acting with cruelty that separates second degree murder from felony murder torture.

The word "cruel" is defined in the statute as follows: "(a) "Cruel" means brutal, inhuman, sadistic, or that which torments." *MCL 750.85(2)(a)*. This definition shows that "cruel" is something more than ordinary malice. In fact, in construing a similar statute,[7] the California Supreme Court noted that even savagery alone is insufficient proof of torture. *People v. Mangia, 189 P.3d 880, 881 (2008)*. The *Mangia* Court noted that severe injuries may also be consistent with the desire to kill, acting in the heat of passion, or an explosion of violence. *Id.*, at 906. The California Court rejected a finding of cruelty where the 73 year-old female victim had been repeatedly hit in the head with a blunt object, sustained defensive wounds to her hands, had minor wounds to her arms and shoulders, her hands and feet had been tightly bound, and there was evidence of bloodstains around her body, on the bookshelf, on the walls and coffee table, and on a nearby chair. *Id.*, at 886-887, 906. The Court stated that there was

---

[7] Unquestionably, for habeas purposes, a State court is the final arbiter of the construction of its own statutes, and petitioner's references to the decisions of other State courts, applying different (though similar) statutes, is not meant to suggest that the Michigan Court of Appeals misread its own statute, but rather to illustrate the kind of proofs that State courts, operating under the due process constraints illustrated by *Winship* and *Jackson,* properly weigh the evidentiary showings required by those similar statutes.

As to the pertinency of the California decisions cited in the text, it may be worth noting that the Michigan Senate Fiscal Analysis of the torture statute, specifically noted the similarity of the California enactment. *See,* Senate Fiscal Agency, Committee Summary, H.B. 5268 & 5269 (11/28/05), p. 2, https://www.legislature.mi.gov/documents/2005-2006/billanalysis/Senate/pdf/2005-SFA-5268-S.pdf, as viewed December 13, 2016.

nothing in the nature of the injuries to suggest that the defendant inflicted any of them in an attempt to torture the victim rather than to kill her. *Id.*, at 906.

The *Mangia* Court listed the kind of fact situations which had previously led it to conclude that a defendant had the intent to torture:

> . . . defendant 'methodically poured' oil on multiple portions of the victim's body; the defendant inflicted over 50 stab wounds all over the victim's body, and later told a friend that he persisted in stabbing the victim because it 'felt good' ; the defendant inflicted 81 stab wounds, only three of which were potentially fatal, and meticulously split the victim's eyelids with a knife; defendant made statements indicating he was angry at the victim, poured gasoline over her body, and set it alight; defendant inflicted eight unusual nonfatal stab wounds in the victim's flank before stabbing him to death and made statements implying that he inflicted those wounds in an effort to persuade the victim to open the safe; the defendant broke one victim's jaw before killing him and inflicted 'fairly superficial cuts that clearly were not intended to be lethal' in an attempt to persuade another victim to write a check payable to the defendant; the defendant severely beat the victim and inflicted a series of nonfatal 'incision-type stab wounds to her neck, chest and breast area' before strangling her; the defendant made incisions with 'a nearly scientific air' that demonstrated a calculated intent to inflict pain; evidence sufficient to show first degree torture-murder where the defendant kicked and beat the victim with a stick for a long period while he lay unresisting in the street; evidence sufficient to show first degree torture-murder where the defendant inflicted 41 knife wounds on the victim while she screamed, wrapped her in rugs and left her (still unconscious) in the trunk of his car for hours before throwing her down a ravine;

*Id.* at 189 P.3d 906-907 (citations omitted).

Compared to this parade of depraved unimaginable cruelties, the *Mangia* Court refused to find its defendant who only beat the 73 year old woman guilty of torture.

It found that along with admissions made to his sister, the evidence suggested that he may have intended to kill the woman so she could not survive to identify him as the person who robbed her.

As noted above, the Michigan Court of Appeals in discussing the elements made no finding on whether the prosecution had proven that the Petitioner intended to cause cruel and extreme physical or mental pain and suffering. It merely reiterated the injuries which the victim sustained. But it is the defendant's intent rather than the victim injuries which constitute proof on this element. That the intent element is the key is reflected by reference to *MCL 750.85(3)* which states that "proof that a victim suffered pain is not an element of the crime under this section."

This distinction is highlighted in *People v. Steger, 546 P.2d 665, 669 (1979)* where the Court stated:

> It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain . . . Rather it is the state of mind of the torturer, the cold-blooded intent to inflict pain . . . which society condemns. (Citations omitted).

Put another way, it is not a 'misguided, irrational, or totally unjustified' assault, beating or killing that constitutes torture. *Id.* at 671.

Moreover, the medical evidence in the case at bar relied on by the court and educed from the prosecution's own witnesses, does not support a finding of the kind of cruelty necessary for the statute. The expert witnesses found that the injuries were

inflicted over a short period of time, (Vol. VIII, P. 97), or appeared to have been contemporaneous with one another (Vol XIV, p. 83). There was nothing about them, including their fatality, which would support an inference beyond, at most, the malice required to establish second degree murder. Nor was there anything in the medical findings that suggested a pattern, plan, or effort to subject the victim to extended suffering, or the kind of pain or abuse required by the torture statute.

Pennsylvania uses a definition of torture similar to Michigan's but as an aggravator for the death penalty.  In *Commonwealth v. Spell, 28 A.3d 1274 (Pa 2011)*, the Pennsylvania Supreme Court found the evidence deficient because the prosecution failed to demonstrate that the injuries were inflicted over a protracted period of time:

> Although the victim was missing for more then 24 hours, there is no actual evidence regarding the duration of appellant's attack. It is possible the attack took hours, but it is equally possible it was complete in short order. There simply is no evidence to prove how long the assault lasted there is no proof that appellant engaged in a prolonged attack or a brief intense one. The Commonwealth's burden is not to prove what could have been - it must prove what actually was.
>
> *        *        *        *
>
> A careful review of the record shows there was no testimony or evidence regarding the order of injuries. Further, there was no evidence as to when in the series of blows the victim lost consciousness or died, or whether she was conscious or alive during the attack. It is possible she did not die until the end - it is equally possible, however, that she expired at the outset. As the Commonwealth cannot establish which is true, there was insufficient evidence for the jury to determine the victim was conscious during the attack.

*Id.*, at 1282-1284.

-30-

The *Spell* victim suffered an extremely large number of injuries, including "ten lacerations to her head and face, . two broken ribs, four bruises on her lower lumbar area, two bruises on the front of her left leg, bruising on the front of her left thigh and left calf, a bruise on her right buttock, and a bruise on her left shoulder." *Id.*, at 1281-1282.

In the case at bar, even the prosecution's medical experts acknowledged that their findings were consistent with the injuries to the deceased having been suffered within a short period of time (e.g., VIII, p. 97) or appeared to have been "contemporaneous" with one another (e.g., XIV, p. 83).  There was, in short, nothing about those injuries - including their fatality - which would support an inference beyond, at most, the kind of malice required to establish second degree murder.  There was nothing in the experts' findings that suggested any pattern, plan, or effort to subject Ms. DeMayo to extended suffering, or the kind of pain or abuse required by the torture statute.

In the case at bar, the injuries were obviously fatal, but there was no other physical or testimonial evidence that supplied proof on the missing intent element.  Even viewing the evidence in the light most favorable to the prosecution, there still was insufficient evidence to show that the petitioner inflicted the injuries with an intent to commit torture, rather than an intent to commit great bodily harm[8] or the intent to commit a felonious assault.

---

[8]Great bodily injury required by the torture statute is different and greater than the intent required under *MCL 750.84* which penalizes persons who commit the offense of assault with intent to commit great bodily harm less than murder.

Lastly, the jury in this case, in finding the defendant not guilty of premeditated murder and instead returning a verdict of guilty of second degree murder on the other count, shows that it rejected the mental state which would be nearer to the torture intent. So, the court of appeals decision was the result of an unreasonable determination of the facts in light of the evidence presented. And also an unreasonable application of, and contrary to the decisions in *Jackson* and *Winship*.

## 2.   THE PROSECUTION DID NOT PROVE THAT THE VICTIM WAS UNDER THE DEFENDANT'S CUSTODY OR PHYSICAL CONTROL.

The phrase "custody or physical control" is defined in the statute as follows:

(b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority . . .

*MCL 750.85(2)(b)*.  This definition contemplates the forcible restraint or restriction of the victim. No such restraint or restriction was shown here.

Ms. DeMayo also spoke with her father at 11:23 p.m. on March 10th.  He had called and Defendant answered the phone and passed it to Ms. DeMayo (Vol. V, p. 132).  Mr. DeMayo also testified that he turned off one of Diana's cell phone because it had suspicious 911 and 411 calls on it.  He told Diana that he was having one phone turned off (Vol. V, p. 19-123).  From the toxicology report it is clear that, Diana must have been very inebriated by this time. Mr. DeMayo even testified that Diana said

-32-

they had been drinking. And when he tried to get her to indicate in code if she needed help, she did not respond (Vol. V, p. 133, 135).  Whether she registered what her father said about turning off the phone is just a matter of conjecture.  The Michigan Court of Appeals even makes this finding (Appendix, Exhibit B, MI COA Op., p. 6). So although both of the cell phones were found with batteries removed, it is no more reasonable to infer that this was done in an effort to confine Diana than in an effort to figure out why a phone, all of sudden, stopped working. Was a battery not holding the charge?

About an hour later, at 12:20 a.m., on March 11th,  Diana called her father. They spoke and she told him she was sleepy (Vol. V, p. 136).

Petitioner called 911 at 3:19 a.m., but 911 registered it as a hang up (Vol. IX, p. 63-73).  At 5:03 a.m., he called an employee at the family business to ask what he should do (Vol. IV, p. 76-77).  At 6:19 a.m., Petitioner called 911 (Vol. IX, p. 63-73).

The only evidence (other than the fact that she was in Mr. Dabish's apartment - which, the testimony showed, she intended to share) to which the Michigan Court of Appeals could point as establishing the forcible restraint or restriction element of the offense of "torture" was Ms. DeMayo's supposed (although actually speculative) lack of access to a phone (Appendix, Exhibit B, Mich COA Op., p. 6).  This was an unreasonable application of the *Jackson/Winship* standard, because no reasonable fact-finder could conclude beyond a reasonable doubt that, as a matter of fact, that the

slender evidence regarding the telephones established Ms. DeMayo's forcible restriction or confinement.

Petitioner does not here argue that the Michigan Court of Appeals' decision misconstrues the state statutory requirement - indeed, such a claim is foreclosed by black letter habeas corpus jurisprudence[9] - but rather, that the Michigan Court unreasonably applied the *Jackson* standard of proof in order to hold that the bare-bones proof regarding the telephones sufficed to meet the state statutory standard.[10]

There is no proof that the defendant took the batteries out of the phone. There is no proof that defendant kept Diana from using his phone or putting the batteries back in her phone - and even if there were, the Michigan statute requires "the forcible restriction of a person's movements or forcible confinement of the person, " which

---

[9]"[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."*Bradshaw v. Richey, 546 U.S. 74, 76 (2005)*.

[10]The distinction is well illustrated by the decision of the Seventh Circuit in *Bates v. McCaughtry, 934 F.2d 99 (7th Cir.1991)*, cited with approval by the Sixth Circuit in *Sanford v. Yukins, 288 F.3d 855 (6th Cir. 2002)*. In that case, Judge Easterbrook posited "four situations in which a defendant might say that the evidence is insufficient," but only one in which habeas corpus relief might be granted, which he described as follows:

> State law defines the combination of elements X, Y, and Z as criminal.  (Perhaps X is killing, Y is intent to kill, and Z is lack of justification.)   The prosecutor and the state courts concede that X, Y, and Z are elements of the crime and agree with the defendant on their meaning.  Defendant contends that there is no basis on which the trier of fact could find Z.  The state court disagrees and convicts.

*Id.,* at 102.  This scenario, he explained, "is what the Court contemplated in *Jackson.*  The due process clause requires the state to prove, beyond a reasonable doubt, all of the elements of the offense it defines.  When the state attempts to evade this obligation, the writ of habeas corpus will issue."  *Ibid.*  This is precisely the situation presented by the case at bar.

upon its face is qualitatively different from simple lack of access to a telephone.  And there was simply *no* evidence of either "forcible restriction" or "forcible confine-ment." No evidence was offered that there were loud noises or that an altercation was occurring in the apartment. There was no proof that he barred her exit from the apartment. In short, there was no evidence from which to infer that Petitioner forcibly confined her or restricted her movements.

The Michigan Court of Appeals also found the 11:20 p.m. - 12:20 a.m. time period not relevant (Appendix, Exhibit B, Mich COA Op., p. 12).  Yet it found the time period relevant on the issue of the defendant's intent (*Id*. at COA Op 5).  This inconsistency goes beyond the standard of viewing the evidence in the light most favorable to the prosecution. It excluded evidence, the consideration of which, is necessary to a fair determination of the issues. This was not just an incorrect application of federal law, but an unreasonable application of it. It was also contrary to federal law.

The facts in this case are too sparse from which to conclude that the defendant forcibly confined or restricted the victim. The appellate courts decision was also the result of an unreasonable determination of the facts in light of the evidence presented in state court.  *Harrington v. Richter, 562 U.S. 86, 100, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)*.

# CONCLUSION

This case rests on circumstantial evidence. A habeas court must distinguish between sufficient circumstantial evidence and mere speculation, which may be perfectly reasonable yet constitutionally insufficient to support a conviction. *Newman v. Metrish, 543 F.3d 793, 796 (6th Cir. 2008)*. Here the Court must infer the intent element and the physical control element on the basis of mere speculation as to what happened in the apartment. The reasonable inferences can only be drawn by making great speculative leaps from blood drops, telephone calls, and injuries.  But such leaping is forbidden by the *Jackson* standard.

While it is true that where there are conflicting historical facts, the conflict must be resolved in favor of the prosecution.  *Jackson, 443 U.S. at 326*.  But, where there is an absence of evidence, there is no conflict to resolve. Consequently, the absence of evidence cannot constitute proof beyond a reasonable doubt.

The decision of the Michigan Court of Appeals finding the evidence sufficient was an unreasonable application of the holdings in *Jackson v. Virginia* and *In re Winship*.  "It is the responsibility of the jury - not the court - to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith, 565 U.S. 1, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011) (per curiam)*.  Thus this Court does not have to defer to it. *Brown v. Konleh, 567 F.3d 191, 205 (6th Cir. 2009)*. The

-36-

decision was also contrary to those decisions. In light of those Supreme Court decisions, the writ should issue.

## II. PETITIONER DABISH WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONO-PIN, SEROQUEL, CELEXA AND TOPAMAX TOGETHER DURING HIS TRIAL, WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL.

The conviction of a person while he is legally incompetent to stand trial violates due process.  At trial, a criminal defendant must have sufficient mental capacity to understand the purpose of the proceedings against him and to assist his counsel in his defense in a rational manner.  While the use of psychiatric/psychotropic medication is not strictly prohibited, the use of these drugs cannot significantly interfere with a defendant's ability to understand the proceedings and assist defense counsel.  From the time Dabish first arrived at the Wayne County Jail until his sentence, he remained in the mental health unit of the jail. During the trial in this case, Dabish was administered significant amounts of a cocktail of psychotropic medication, which included the powerful drugs Klonopin, Seroquel, Celexa and Topomax, combined with other drugs, which sedated him. The effects of these medications rendered Dabish incapable of understanding the nature of the case against him and to adequately communicate and assist his defense attorney at trial.  Just days before trial began, Dabish's lithium medication (a mood stabilizing drug) was abruptly dis-

continued, creating significant mood swings.  Side effects of the drugs given him created confusion, memory problems, made it difficult for him to pay attention and concentrate, made him feel depressed, disoriented, adversely affected his ability to recall important details of the incident and rationally respond to his attorney. Testimony during the trial and the affidavits of Dr. Randall L. Commissaris, an expert in pharmacology and toxicology, attorney Domnick J. Sorise, Peter Dabish and Nicole Dabish support that Dabish was incompetent to stand trial.  This petition presents a substantial issue going to the integrity of the convictions under which Dabish may be denied his liberty for the rest of his life.  As such, habeas relief from his convictions is warranted.  *U.S. Const. Am. XIV*.

## A.    CLEARLY ESTABLISHED FEDERAL LAW.

The United States Supreme Court long ago recognized that the conviction of a person while legally incompetent violates due process.  *Bishop v. United States, 350 U.S. 961, 76 S. Ct. 440, 100 L. Ed. 35 (1956)*.  That view has been consistently affirmed by the Court.  *Pate v. Robinson, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966)*; *Medina v. California, 505 U.S. 437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)*; *Godinez v. Moran, 509 U.S. 389, 396, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993)* ("A criminal defendant may not be tried unless he is competent.") The test of a defendant's competency to stand trial "must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding

-38-

and whether he has a rational as well as factual undertaking of the proceedings against him." *Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)* (*per curiam*).  See also, *Cooper v. Oklahoma, 517 U.S. 348, 354, 146 S. Ct. 1373, 134 L. Ed. 2d 498 (1996)*.

A habeas petitioner's mental competency claim "can raise issues of both substantive and procedural due process."  *Hastings v. Yukins, 194 F. Supp. 2d 654, 670 (E.D. Mich 2002)*.  A habeas petition may assert a procedural competency claim when the state trial court fails to conduct a competency hearing after the petitioner's mental competency is placed in issue.  Due process requires a trial court to inquire as to a defendant's competency when there is reason to doubt that the defendant is competent.  *Pate, 383 U.S. at 385*; *Godinez, 509 U.S. at 401*.

"[E]vidence of a defendant's irrational behavior, his demeanor at trial, any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone, may, in some circumstances, be sufficient."  *Drope v. Missouri, 420 U.S. 162, 180, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)*.

While there is no fixed rules that indicate that further inquiry is necessary, a habeas court should determine,

"[W]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed should have experienced

-39-

doubt with respect to competency to stand trial." *Mackey v. Dutton, 217 F.3d 399, 413-14 (6th Cir. 2000)*, quoting *Williams v. Bordenkircher, 696 F.2d 464, 467 (6th Cir. 1983)*.

Substantive due process rights of a criminal defendant are violated when he is tried while incompetent under the standards set forth by the United States Supreme Court. In that regard, the State of Michigan exacted certain rules and procedures to comply with the *Pate* dictates. *People v. Martin, 61 Mich App 102, 108 (1975)*.

In the present case, Dabish asserts that the state courts deprived him of both procedural and substantive due process.

### 1.     PROCEDURAL DUE PROCESS.

As noted, "[T]he failure to observe procedures adequately to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope, 420 U.S. at 172*. In order to protect this due process right the State of Michigan has enacted statutes and a court rule regarding a defendant's competency to stand trial. *MCL 330.2022(1)* provides, "a defendant who is determined incompetent to stand trial shall not be proceeded against while he is incompetent." *MCL 330.2020(1)* states that, although a defendant is presumed competent to stand trial, the court must determine whether "because of his mental condition" he is incapable of understanding the nature and object of the proceedings against him or unable to assist in his defense in a rational manner. *MCR*

*6.125* addresses the procedure in mental competency hearings. "The issue of incompetence to stand trial may be raised by the defendant, court, or prosecution." *MCL 330.2024*. The threshold for requiring a competency evaluation is low ("On a showing that the defendant may be incompetent . . ." *MCR 6.125(c)(1)*; *MCL 330.2026(1)*.

Evidence of incompetence may be raised *at any time* before, during and *after* trial. *People v. Cole*, (unpublished Docket No. 299969 (2012)), citing *People v. Blocker, 393 Mich 501, 510 (1975)* ("If there is evidence of incompetence, the issue must be decided. This is true whether … the evidence appears before, during or after trial.") and *People v. Garfield, 166 Mich App 66, 74 (1988)* ("Whether [a] defendant is competent to stand trial is an ongoing concern of the court, and the issue of competence may be raised at any time during or after trial" (emphasis added).

It is, of course, no secret that psychotropic medication can severely and adversely affect a person's mental state, ability to communicate, his outward appearance and curtail his right to effective assistance of counsel. In his concurring opinion in *Riggins v. Nevada, 504 U.S. 127, 143, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992)*, Justice Kennedy noted: "By administering medication, the State may be creating a prejudicial negative demeanor in the defendant making him look nervous and restless, for example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive …" Justice Kennedy acknowledged that the mind altering effect of

-41-

such medication could impinge on a defendant's right to effective assistance of counsel by rendering him unable or unwilling to assist in the preparation of his own defense. *Id*. at 144 (citing to *Gedas v. United States, 425 U.S. 80, 88, 96 S. Ct. 1330, 47 L. Ed. 2d 592 (1976)*. See also *Bee v. Greaves*, 744 F.2d 1387, 1393 (10th Cir. 1984) ("anti-psychotic drugs have the capacity to severely and even permanently affect an individual's ability to think and communicate."). In *Sell v. United States, 539 U.S. 166, 185, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003)*, the Supreme Court recognized that "[w]hether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence."

Finally, the fact that a competency hearing was not requested is not controlling. In *Pate*, the Supreme Court granted a writ for a state prisoner convicted of murder. Although there has been no formal request for a competency hearing, the Court found that the defendant had been denied his constitutional right to a hearing because the defendant had a history of "disturbed behavior" *86 S. Ct. at 842*. A "court has a constitutional duty to safeguard the right of a party to be tried for a crime only when mentally competent even if the individual does not ask for a hearing." *Chambers, 14 Mich App at 175*. A defendant whose competence is reasonably in doubt is constitu-

tionally entitled to a competency hearing, even if he has not requested one. *Drope, 420 U.S. at 180*; *Pate, 383 U.S. at 376-377.*

Once evidence of incompetence is shown after conviction, the trial court is obligated to hold an evidentiary hearing to determine whether a new trial is required. *People v. Lucas, 393 Mich 522, 528-529 (1975)* ("The only way an issue respecting competency can be determined is by a motion for new trial with supporting affidavits or evidence showing substance to the claim that defendant was incompetent at the time of the original trial…[is] to hold a hearing on the motion." Alternately, the failure to raise the issue of incompetence deprived Dabish of effective assistance of counsel. See, Argument IV, *infra*.

While "the [*Pate*] Court did not prescribe a general standard for determining whether the trial court should resort to evidentiary proceedings," the Sixth Circuit has set forth the test as being "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Williams v. Borden-kircher, 6963 F.2d 464, 467 (6th Cir. 1983)*. This test is consistent with the Supreme Court's standard of requiring a hearing when a court has a reason to doubt a defendant's competency. *Godinez, 509 U.S. at 401.*

In the present case, there was ample evidence at trial to place both the court and prosecutor on notice of the issue of competency. In his opening statement, defense

counsel referenced Dabish's use of Klonopin, a psychiatric/psychotropic medication (Vol. IV, p. 38). The prosecutor was in possession of jail calls, wherein Dabish spoke of being bipolar, which was confirmed by Nicole Dabish's testimony at trial (Vol. VI, p. 59). During that exchange at trial, the prosecutor responded, "I understand he is bipolar. . ." (Vol. VI, p. 64). Subsequently, Ms. Dabish testified that when she saw her son in jail, his speech was slow sometimes, then agitated, his voice was slurred and anxious in jail (Vol. VI, p. 83). Dabish would experience mood swings of being very upset and angry, to being depressed and trying to calm him down (Vol. VI, p. 75).

In post-conviction proceedings, Dabish provided more than sufficient additional evidence of incompetency to stand trial (as a substantive matter) to create a bonafide doubt as to his competency requiring an evidentiary hearing.

Dr. Randall L. Commissaris, an expert in pharmacology and toxicology, who specializes in the toxicology of drugs on behavior and drugs used in psychiatry, reviewed the medical records of Dabish during the period of his incarceration at the Wayne County Jail from April 2010 through November 18, 2010, which include the jury trial from October 4th through 28, 2010.[11] Of significance, Dr. Commissaris noted that Dabish's Lithium medication was "abruptly discontinued just days before the start of trial." Lithium is a mood stabilizing drug and when abruptly discontinued,

---

[11]Dr. Commissaris' Curriculum Vitae is attached in the Appendix as Exhibit G.

as opposed to a "dose-tapering approach", a patient is "at a high risk for significant mood swings".[12]  During trial, Dabish was administered significant amounts of psychiatric/psychotropic Klonopin, Seroquel XR, Celexa and Topomax, all at the same time.[13]  The side effects of these drugs include, sedation, depression, loss of orientation, sleep disturbance, slurred speech, tiredness, confusion, abnormal thinking and drowsiness.  Of importance, these drugs may effect a person's ability to recall and report important details, "to comprehend the nature of the proceedings against him and to communicate and assist his defense." In addition to these psychiatric/psychotropic medications, Dabish was given Lortab, Benadryl, Zestril and Singulair, which would contribute to feelings of drowsiness, sleepiness, dullness, anxiety and fatigue.  Of significance, Dr. Commissaris notes that the doses administered for these medications were at or near the top of the therapeutic range typically given to patients and that the drugs, working in combination, would produce a level of sedation, drowsiness and confusion that "would be greater than the sum of the individual agents". In conclusion, Dr. Commissaris opines that the cocktail of psychotropic and other medication would compromise Dabish's mental functioning to the point that he was not capable

---

[12]Dr. Commissaris' Affidavit/Report is attached in the Appendix as Exhibit F.

[13]According to the manufacturing of Celexa (Citalopram), it "is not approved for use in treating bipolar depression."

-45-

of understanding the nature of the legal proceedings against him or to rationally assist his attorney in his defense.

Dr. Commissaris' opinion is supported by testimony at trial.[14]  Nicole Dabish testified at trial that when she talked to Dabish when he was in jail, he had mood swings of being very upset and angry to being depressed and to trying to calm him down (Vol. VI, 75).  Dabish's speech would fluctuate from being slow and slurred to other times being agitated (Vol. VI, p. 83).  That in court testimony is supplemented by the affidavit of Ms. Dabish that Dabish was "upset, depressed and anxious", "could not comprehend what was going on in his case", "sounded delusional" had a voice that was "lethargic" "slow" "slurred and imprecise", "sat in court with a blank stare on his face" and wanted "to get up in the middle of the trial, take the witness stand and fire his attorney." (Appendix, Exhibit H).

Attorney Domnick J. Sorise has stated that Dabish had significant "mood swings" and would "nod off" occasionally while talking to him. At the jail when Mr. Sorise would visit him, Dabish "was not able to provide, or was confused about, information that could be helpful". Dabish would then become angry or upset and Sorise had "a difficult time getting Dabish to understand the court process."  Dabish

---

[14] Lay testimony is admissible on a defendant's mental capacity once a proper foundation is laid. *People v. Cole, 393 Mich 695, 711 (1969)* (lay testimony is admissible on issues of defendant's sanity with a sufficient foundation indicating acquaintance with and observation of the defendant); *People v. Hannum, 362 Mich 660, 665 (1961)*.

could not accurately recall or report information to Mr. Sorise, who attributed his memory problems to his past drug use.  Of significance, Mr. Sorise was not aware that Dabish was heavily medicated while being incarcerated at the jail. Mr. Sorise now is of the opinion that Dabish was so medicated that he could not fully appreciate and understand the issues or strategy of trial and assist him in his defense (Appendix Exhibit I).  The defendant's attorney is in the best position to determine whether a defendant is competent to stand trial. *Bryson v. Anderson, 187 F.3d 193, 1201 (10th Cir. 1991).*

Dabish avers that when he arrived at the Wayne County Jail, he was experiencing mood swings and panic attacks. He was given medication that "put me in a dreamlike state", causing him to feel "disconnected from reality and very foggy on the drugs". While on these drugs, he was unable to understand information from Mr. Sorise, unable to think about trial strategy or help him in a rational manner.  Dabish "could not understand what was happening to me about the case" and "kept firing my attorney . . . at least five times" but he would return the next day and continue. Additionally, any discussions about a plea with his attorney were incomprehensible. It was not until Dabish got to the MDOC and put on "correct medication" that he was able to understand what happened at trial by reading his transcripts (Appendix, Exhibit E).

## 2. THE STATE TRIAL COURT'S OPINION IS CONTRARY TO ESTABLISHED FEDERAL LAW AND IS ERRONEOUS AND UNREASONABLE.

The initial question for the court is whether a reasonable judge, given the trial and post-conviction record above, should have experienced doubt with respect to Dabish's competency. *Mackey, 217 F.3d at 413-14*. The Court should answer that question in the affirmative.

Initially, the state trial court erroneously relied on the *federal* statute regarding competency, citing to *18 U.S.C. §4241* (Op., p. 3-4). While the trial court correctly points out that the issue of competency was not raised *prior* to conviction, the trial court failed to recognize established law, cited by Petitioner Dabish, that the issue of competency may be raised *after* trial and "must be decided." See *Blocker, 393 Mich at 510*; *Garfield, 166 Mich App at 74*; *Drope, 420 U.S. at 180*; *Pate, 383 U.S. at 376-77*; *Pate v. Smith, 637 F.2d 1068, 1072 (6th Cir. 1981)* ("It is firmly established in this circuit that a retrospective determination [of competency] may satisfy the requirements of due process . . ."). As such the state court judge's ruling denying the hearing was contrary to clearly establish federal law of the Supreme Court. See, *Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)*. In fact *Drope* teaches that one salient fact may necessitate a competency hearing. *420 U.S. at 180*, and *the question whether competency to stand trial could be raised in post-conviction*

habeas proceedings was established long ago.  *Bishop, 350 U.S. at 961*; *Ellison v.*

*United States, 324 F.2d 710 (10th Cir. 1963).*

Additionally, the trial court's attempts to discount Dr. Commissaris's findings

are misplaced.  Whether the individual drugs exceeded therapeutic levels is not

determinative.  As Dr. Commissaris, a highly qualified expert noted, it was the

combination of the use of these drugs at high levels that would compromise Dabish's

mental ability to the point he was unable to understand and participate in his trial.

Moreover, the state trial court *ignored* the affidavits of Dabish's lawyer and his

mother, who corroborated the incompetency claim.  ("[A]n individual raising a

procedural competency claim is held to a lower burden of proof than one raising a

substantive competency claim . . . [T]o prevail on a procedural competency claim

petitioner need not establish facts sufficient to show he was actually incompetent or

to show he was incompetent by a preponderance of the evidence."); see also *Battle v.*

*United States, 419 F.3d 1292, 1298 (11th Cir. 2005)*; *Davis v. Woodford, 384 F.3d*

*628, 644 (9th Cir. 2004)*; *Walton v. Angelone, 321 F.3d 442, 459 (4th Cir. 2003).*  In

fact, a state court that "fails to give proper weight to the information suggesting

incompetence" violates the Constitution.  *Drope, 420 U.S. at 179.*  In short, the state

court erroneously and unreasonably ignored facts which created a "bonafide doubt"

in Dabish's competency.  *Walker v. Attorney General for the State of Oklahoma, 167*

*F.3d 1339, 1343 (10th Cir. 1999).*  Dabish is entitled to habeas relief under *§2254 (d)(1)* or *(d)(2).*

### 3.   SUBSTANTIVE DUE PROCESS.

Dabish asserts that his substantive due process rights were also violated because he was tried while incompetent.  This question addresses the ultimate factual question of Dabish's competence to stand trial, as separate from the procedural question above. In that regard, factual findings of competence by a state court will be upheld unless there is clear and convincing evidence to the contrary.  *28 U.S.C. §2255(e)(1)*; *Mackey v. Dutton, 217 F.3d 399, 412 (6th Cir. 2000).*  However, the state court trial judge did *not* make an actual finding that Dabish was competent to stand trial. Instead, the state trial judge relied on the failure of the court, trial counsel, the Petitioner or "any of the health providers" to determine that Dabish was incompetent during the trial (Appendix, Exhibit N, p. 4-5).  The state court judge concluded it would be "difficult" to find Petitioner incompetent because a competency hearing was never requested and the trial judge was not on notice of any competency issue (*id.* p. 6-7).  Thus, the state trial court erroneously and unreasonably conflated the procedural and substantive due process rights when competency is raised.  In other words, a defendant has a due process procedural right to a hearing *and determination* on the issue of compentency ever *after* a conviction. See, *Blocker, 393 Mich at 510*; *Garfield, 166 Mich App at 74*. No such determination was made in this case.  The state court's reliance on the

absence of a competency hearing *during* trial is directly contrary to the Supreme Court's rulings in*, Drope, 420 U.S. at 180* and *Pate, 383 U.S. at 376-377*.  For the reasons set forth above, there is specific substantial, and real doubt about Dabish's competency requiring habeas relief.

In summary, it is clear that Dabish did not have sufficient mental ability to understand the nature and object of the proceedings or assist his attorney in his defense due to the significant amount of multiple psychiatric/psychotropic drugs administered by the jail.  Before and during trial, he was unable to understand the consequences of a trial and his options for a different resolution.  He certainly could not testify or engage in any plea negotiations which deprived him of his constitutional right to testify in his own behalf.  See *Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2037 (1987)* ("The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution.  It is one of the rights that are essential to due process of law in a fair adversary process").  As such, Dabish was incompetent to stand trial and habeas relief from his convictions is warranted  *U.S. Const., Am. XIV*.

**III.    PETITIONER DABISH WAS DENIED HIS RIGHT TO EFFEC-TIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) FAILED TO PRESENT A CRITICAL WITNESS IN SUPPORT OF THE DEFENSE, (2) ALLOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (3) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (4) FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT IN HER**

**CLOSING ARGUMENT, AND (5) FAILED TO OBJECT TO INAD-
MISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD
PETITIONER DABISH SAY WITHOUT A FOUNDATION THAT
THE WITNESS COULD IDENTIFY HIS VOICE.**

Through a series of omissions, defense counsel deprived Dabish of his constitutional right to effective assistance of counsel.  Trial counsel failed to present Felicia Able, a critical defense witness.  Trial counsel allowed his client to be tried and convicted even though he was incompetent to stand trial (See, Argument II, *infra*).  While arguing a theory of accident and presenting evidence to support it, counsel failed to request a supporting instruction (See, Argument IV, *infra*). The prosecution violated the Petitioner's right to a fair trial in her closing argument without objection (See, Argument V, *infra*).  Finally, a witness repeated prejudicial statements allegedly made by Dabish without a foundation, or objection, compounding the errors by counsel.  As such, Petitioner is entitled to habeas relief from his convictions.

## A.    LEGAL STANDARDS OF EFFECTIVE ASSISTANCE OF COUNSEL.

It is well-settled that the right of a state criminal defendant to the effective assistance of counsel for his defense at trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.  *Wiggins v. United States, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 471 (2003)*; *Strickland v. Washington, 466 U.S. 66, 104 S. Ct. 2052, 80 L. Ed. 674 (1984)*.

Generally, to establish ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms; (2) that there is a reasonable possibility that, but for counsel's error, the result of the proceedings would have been different or that the resultant proceedings were fundamentally unfair or unreliable. *Bell v. Cone, 535 U.S. 685, 694-696, 122 S. Ct. 1843, 52 L. Ed. 2d 914, 927 (2002)*. "[T]he focus, should be on whether the result of the trial was fundamentally unfair or unreliable." *Tinsley v. Million, 399 F.3d 796, 802 (6th Cir. 2005)*, quoting *Lockhart v. Fretwell, 506 U.S. 364, 369, 1113 S. Ct. 839, 122 L. Ed. 2d 180 (1993)*.

The two part requirement of Strickland, deficient performance and prejudice test, requires a defendant to demonstrate that his attorney's performance, "fell below an objective standard of reasonableness" and "that there is a reasonable probability that . . . the result of the proceedings would have been different," but for his attorney's errors. *466 U.S. at 688, 694*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Id*. at 694. The Sixth Circuit in *Matthews v. Abramajtys, 319 F.3d 780, 790 (6th Cir. 2003)* defined the term "reasonable probability," noting that "the evidence was not overwhelming, so that there is a reasonable probability of a different outcome with effective counsel." The Court added:

-53-

Of course, a "reasonable probability" does not mean a certainty, or even a preponderant likelihood, *id at 694, 104 S. Ct. 2052.*

Regarding a claim of trial strategy a defendant must overcome the presumption that the challenged conduct or omission could be "considered sound trial strategy," *Strickland*, 466 U.S. at 689.  A mere claim of "trial strategy" cannot defeat a claim of ineffective assistance when the "strategy" is not reasonable or is a matter of negligence.  *Cone v. Bell, 243 F.3d 961 (6ᵗʰ Cir. 2001)*; *Combs v. Coyle, 205 F.3d 269 (6ᵗʰ Cir. 2000)*; *Paine v. Massie, 339 F.3d 1194,1200 (10ᵗʰ Cir. 2003).*

## 1.   TRIAL COUNSEL FAILED TO OFFER TESTIMONY FROM FELICIA ABLE CONCERNING HER OBSERVATIONS OF DIANA DEMAYO FROM MIDNIGHT TO 1:00AM ON MARCH 11.

Counsel's performance denied Petitioner his constitutional right to present his own witnesses to establish a defense. The right is a fundamental element of due process of law, *Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).* This right includes a meaningful opportunity to present a complete defense. It is protected under the compulsory process clause as well as the confrontation clause of the sixth amendment.  *Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2146, 90 L. Ed. 2d 636 (1986).*

Appellate counsel raised this issue on direct appeal by asking the Michigan Court of Appeals to remand this case to the trial court so an evidentiary hearing could be held. This motion was denied for "failure to persuade the Court of the necessity of

-54-

remand at this time" (Appendix, Exhibit A, COA order).  In support of the motion, Petitioner offered an affidavit from Ms. Able and from Petitioner (Appendix, Exhibits D, E).

This issue was then raised in the brief on direct appeal in the Michigan Court of Appeals and again in the application for leave to appeal filed in the Michigan Supreme Court.

Prior to trial, Petitioner told trial counsel that Felicia Able, an employee of the Fort Shelby Apartments, had delivered room service twice between midnight and 1:00 a.m. on March 11th.  She went inside the apartment on both occasions and she spoke with Ms. DeMayo on both occasions.  Able stated that Ms. DeMayo did not appear to be in pain, did not appear to be afraid, and did not appear to be confined against her will (Appendix, Exhibit E).

The Michigan Court of Appeals incorrectly held that the decision to call witnesses is simply a matter of trial strategy.  It cited to state cases which held that ineffective assistance of counsel may only be established by the failure to call witnesses if it deprives the defendant of a substantial defense.  It then held that given the time line which also included a 12:46 a.m. call to a locksmith, Diana "had not yet been injured during the time frame of Able's visits, Able's testimony would not have provided defendant with a substantial defense." (Appendix, Exhibit B, MI COA Op., p. 12).

-55-

Felicia Able's testimony would serve two purposes.  First, it would show that Ms. DeMayo was not being physically confined by Petitioner.  Second, it would show that Petitioner was neither mistreating nor torturing Ms. DeMayo.  Thus it would have rebutted the speculative proofs on two elements of the offense.  Therefore, her testimony would have been a substantial defense.

That the time frame does not overlap with the 3:19am call does not detract from the evidence. The Court of Appeals found relevant, even the earlier calls 11:20 p.m.-12:20 a.m., from the defendant to Mr. DeMayo and from Mr. DeMayo to Ms. DeMayo, on the issue of his intent.  It cannot then skip an hour and hold occurrences in that hour not relevant because the evidence contradicts the prosecution's theory (Appendix, Exhibit B, p. 5).  That would be fundamentally unfair.

Counsel's failure to call Felicia Able as a witness constituted a deficient performance.  The loss of the substantial defense her testimony would have provided meets the prejudice prong of the *Strickland* test. There was a reasonable probability that with Able's testimony the outcome of this case would have been different.

The Court of Appeals erred when it found counsel's strategy sound. It cannot be argued that a strategy which deprives the defendant of a substantial defense is either sound or objectively reasonable. *Strickland, 466 U.S. at 689.*

-56-

The decision of the Court of Appeals was an unreasonable application of and contrary to the decision in *Strickland*. The decision was also an unreasonable determination of the facts in light of the evidence presented. *28 USC 2254(d)(2)*.

## 2.   FAILURE TO INVESTIGATE PETITIONER'S INCOMPETENCE.

The failure to investigate and present this evidence deprived Petitioner of a due process and a fair trial.  According to jail records, the psychiatric social worker contacted attorney Sorise on June 14, 2010 advising him that Dabish had not been referred for a forensic examination.  Mr. Sorise reportedly responded that the case was so complex that it was taking time to get the (necessary) information.  Additionally, Sorise concedes there were sufficient circumstances to require him to seek a competency hearing before and during trial.  According to Sorise, when he met Dabish in jail, Dabish was unable to provide helpful information, was confused and it was difficult to get Dabish to understand the trial process and rules or to recall events.  Unfortunately, Sorise was unaware of the heavy medication Dabish was being administered.  In any event, Sorise was on sufficient notice to raise the competency issue (Appendix, Exhibit I).  This evidence is sufficient to undermine confidence in the outcome of this case.  *Strickland, 466 U.S. at 694*.

Proper investigation and preparation requires counsel to interview and produce the necessary witnesses and pursue other information which support a valid defense.

*Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir. 1992)* (Counsel ineffective when he knew of a potentially exculpatory gun residue report yet counsel failed to investigate adequately.); *Towns v. Smith, 395 F.3d 251 (6th Cir. 2005)*; *Blackburn v. Foltz, 828 F.2d 1177, 1183 (6th Cir. 1987)*; *Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)* (Counsel ineffective where he knows of another person's purported confession, but fails to investigate). A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments. Counsel must make "an independent examination of the facts, circumstances, pleadings and laws involved . . ." *Von Moltke v. Gillies, 332 U.S. 708, 721, 68 S. Ct. 316, 92 L. Ed. 309 (1948).* This includes pursuing "all leads relevant to the merits of the case." *Blackburn v. Foltz, supra at 1183*; *Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984), cert denied, 469 U.S. 1226, 105 S. Ct. 1221, 84 L. Ed. 2d 361 (1985)*; *Sims v. Livesay, 970 F.2d 1575, 1580-81 (6th Cir. 1992)*; *Combs v. Coyle, 205 F.3d 269, 287-88 (6th Cir. 2000)*; *Clinkscale v. Carter, 375 F.3d 430, 443 (6th Cir. 2004)* (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance); *Jemison v. Foltz, 672 F. Supp. 1002 (ED Mich. 1987)*. The failure to adequately prepare and present a defense requires reversal. *United States v. Kaufman, 109 F.3d 186 (3rd Cir. 1997)*; *Williams v. Ward, 110 F.3d 1508 (10th Cir. 1997)*. In *Wade v. Armontrout, 298 F.2d 304 (8th Cir. 1986)*,

the Court found counsel's failure to present defendant's alibi defense constituted ineffective assistance of counsel.

More recently in *Couch v. Booker, 632 F.3d 241 (6th Cir. 2011)*, the Sixth Circuit affirmed the district court's decision to grant habeas relief due to ineffective assistance of trial counsel who failed to investigate a causation defense and because the state court's contrary conclusion violated the standards set forth in the AEDPA.

The failure to investigate and present an expert in this case was objectively unreasonable and prejudiced Petitioner's right to a fair trial and present his defense. *Dando v. Yukins, 461 F.3d 791 (6th Cir. 2006)* (trial counsel failed to consult expert and investigate validity of duress defense required habeas relief); *Richey v. Bradshaw, (On remand) 498 F.3d 344 (6th Cir. 2007)* (counsel ineffective for failing to consult experts that fire was accidental).

Defense counsel was constitutionally ineffective in this case by allowing Dabish to be tried when he was incompetent to stand trial.

### 3.   FAILURE TO REQUEST AN ACCIDENT IN-STRUCTION.

As noted, defense counsel explicitly informed the trial court that accident was a theory of defense and presented evidence to support it. Given that the defense was accident and there is a standard jury instruction, the failure to request the instruction is objectively unreasonable.  Dabish was prejudiced because he is entitled to a jury

instruction which supports his theory.  Dabish is entitled to habeas relief on this basis alone.

The failure to request an accident instruction in this case was ineffective assistance of counsel. *Joseph v. Coyle, 469 F.3d 441, 460 (6th Cir. 2006)* (defense lawyers have a constitutional obligation to investigate and understand the law) citing to *Williams v. Taylor, 529 U.S. 362, 395, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)*; and *Strickland v. Washington, 466 U.S. 668, 690, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)*; *Lucas v. O'Dea, 179 F.3d 412 (6th Cir. 1999)* (trial counsel's failure to object to a prejudicial jury instruction and appellate counsel's failure to raise the issue on direct appeal constituted ineffective assistance of appellate counsel).

### 4.      FAILURE TO OBJECT TO PROSECUTOR'S MISCONDUCT.

Trial counsel had a duty to protect Dabish from arguments that were prohibited (See Argument V, *infra*).  The failure to object constitutes ineffective assistance of counsel.  *Hodge v. Hurley, 426 F.3d 368, 378 (6th Cir. 2005)*.

### 5.      FAILURE TO OBJECT TO INADMISSIBLE EVIDENCE WITHOUT A FOUNDATION.

During the prosecution's case, Rachel Moody, a roommate of Ms. DeMayo in Florida, testified she was speaking with Ms. DeMayo by phone on March 7th (Vol. VII, p. 63-65). According to Moody, Ms. DeMayo sounded frantic and was screaming (*Id.*).  Although Moody had never met or spoken with Dabish before, Moody testified,

-60-

without objection, that Dabish was screaming and laughing at Ms. DeMayo in the background (*Id.*).  The failure to object by defense counsel was clearly deficient performance.

### 6.   CUMULATIVE EFFECT.

Although the specified deficiencies all individually show ineffective assistance of counsel, when taken together, a new trial is mandated under the standards promulgated in *Strickland, supra*.  Finally, although the general issue of ineffective assistance of counsel was raised in the appeal of right, grounds 2, 3, 4 and 5 had not been previously raised or decided.  However, the state court's reliance on a procedural bar is erroneous and unreasonable.

### B.   THE STATE TRIAL COURT'S PROCEDURAL RULING IS ERRONEOUS AND UNREASONABLE.

The state trial court erroneously asserted *res judicata* and law of the case to avoid addressing all the merit claims in post-conviction proceedings (Claims III 2, 3, 4, 5, 6, *infra*).  Neither doctrine applies to a new "ground" not presented and decided previously, as Dabish asserted in the trial court, citing to the language of *MCR 6.508(D)(2)*.[15]

---

[15]To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court decision disposing of the claim."  *Guilmette v. Howes, 624 F.3d 286, 291 (6th Cir. 2010) (en banc)*.

The state court's ruling is clearly wrong, both factually and legally. *MCR 6.508(D)(2)* precludes relief only if the "grounds for relief . . . were decided against the defendant on direct appeal." (emphasis added).  In any event, because the state trial judge refused to address the merits of these claims, review is *de novo* without the deferential standard of the AEDPA.  *Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003)*; *Clinkscale, 375 F.3d at 436.*

The Michigan Court of Appeals in two unpublished opinions has specifically held that two distinct factual claims do not constitute the same "ground" even though the claim is based on the same legal theory.  In *People v. Boswell, No. 228359, 2001 WL 1464533, at *1 (Mich. Ct. App., Nov. 16, 2001)* the Michigan Court of Appeals rejected the prosecution's argument that *MCR 6.508(D)(2)* barred the defendant from raising a new claim of ineffective assistance of counsel where he had raised a number of ineffective assistance of counsel claims on direct appeal stating:

> The prosecution first argues that defendant's motion for relief from judgment was barred by MCR 6.508(D)(2) because defendant had raised the argument of ineffective assistance of counsel in a prior appeal. Indeed, this Court's review of defendant's prior appeals reflects that *defendant raised numerous ineffective assistance of counsel claims* and claim that the trial court erred by not questioning defendant and his brother about the joint legal representation. Petitioner asserts that *MCR 6.508(D)(2) does not preclude this particular appeal because he has not previously raised these exact issues*. Giving defendant the benefit of the doubt, *we can agree* that defendant did not previously argue that his representation by the same attorney who was defending his brother constitutes a conflict of interest (emphasis added).

Likewise in *People v. Bunton, 2003 WL 21508500, *1-2 (Mich. App., 2003)* the Court held that *MCR 6.508(D)(2)* did not preclude a defendant's challenge of the admission of her statement in her Motion for Relief From Judgment, notwithstanding the fact that she also challenged the admission of her statement on direct appeal because each was predicated on a distinct set of facts and circumstances:

> Petitioner did challenge the admission of her statement in her prior appeal to this Court. However, that challenge was based on a contention that the statement was coerced and not voluntary. Petitioner did not previously contend that her statement was the fruit of an illegal arrest. Therefore, the "ground for relief" asserted in this motion for relief from judgment is not the same as that asserted in her prior appeal. As a result, *MCR 6.508(D)(2)* does not preclude relief on this ground.) (Appendix, Exhibit F).

The Sixth Circuit Court of Appeals in its unpublished opinion in *Searcy v. Berghuis, 549 Fed. Appx. 357 (6th Cir. 2013)*, relying in part upon the Michigan Court of Appeals unpublished decision in *People v. Boswell, No. 228359, 2001 WL 1464533, at *1 (Mich. Ct. App., Nov. 16, 2001)* found that two distinct factual claims relying on the same legal theory ineffective assistance of counsel, are not the same ground under *MCR 6.508(D)(2)* precluding a finding that his claim was procedurally barred.

The trial court's reliance on the law of the case doctrine is also misplaced. The trial court cited to *People v. Peters, 205 Mich App 312, 316 (1994)*, which correctly stated that "the doctrine applies only to those questions specifically determined in the

-63-

prior decision and to questions necessarily determined to arrive at the prior decision".

Not only must the same specific question be involved, the same facts must have been

adjudicated. *Webb v. Smith, 224 Mich App 203, 209 (1997)* ("The law of the case

mandates that a court may not decide a legal question differently where the facts

remain materially the same"); *People v. Hermiz, 235 Mich App 248, 254 (1999)*.

In short, the state cannot invoke the procedural default doctrine for this claim

because the state court's reliance on the perceived procedural rule was not "a firmly

established and regularly followed state practice . . . interposed by a state to prevent

subsequent review . . . of a federal constitutional claim. *Ford v. Georgia, 498 U.S.*

*411, 423-24, 111 S. Ct. 850, 121 L. Ed. 2d 935 (1991)* (quoting *James v. Kentucky,*

*466 U.S. 341, 348-51, 104 S. Ct. 1830, 80 L. Ed. 2d 346 (1984)*.  The state court's

refusal to address the merits on this claim requires *de novo* review of the claim with

AEDPA deference.  Alternatively, cause and prejudice to overcome any procedural

default is established by ineffective assistance of counsel and the actual merits of the

claim.  See, *Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 26, 39, 91 L. Ed. 2d 397*

*(1986)*.

## IV. PETITIONER DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY OF THE DEFENSE OF ACCIDENT AND VOLUN- TARY MANSLAUGHTER.

A basic and controlling issue in this case was what caused the injuries leading

to Ms. DeMayo's death. The forensic experts for the prosecution could not determine

-64-

the exact cause of the blunt force injuries to her.  The prosecution witnesses testified that the injuries were caused by some blunt force trauma, consistent with being struck or slammed against a surface.  The defense expert concluded that the injuries, some of which were not recent, were consistent with falls or the head hitting a very hard surface.  Dabish told officers at the scene that he had put Ms. DeMayo in the shower and slapped her, in an attempt to revive her.  Just three days before her death, Ms. DeMayo was in a car accident.  A defense theory was that the deceased suffered head injuries in the car accident, from falling from an overdose and from the defendant slapping her to revive her.  Thus, her death was accidental, both in its cause and the Defendant's lack of intent to kill.  There was clear and sufficient evidence to support an instruction on accident.  Both sides argued extensively about whether the cause of death and about the injuries were intentionally caused by Dabish, or were caused accidently and without an intent necessary for murder.  Although defense counsel failed to request the standard jury instructions on accident, the trial judge had an independent duty to *sua sponte* instruct the jury.  The defense requested instructions on the lesser offense of voluntary and involuntary manslaughter. The trial court, contrary to the law, only agreed to instruct on involuntary manslaughter.  Since these instructions were critical to a fair trial, a new trial is warranted.  *U.S. Const. Am. XIV.*

It has long been settled that a criminal defendant has a due process right guaranteed by the United States Constitution to have the trial judge clearly and

-65-

concisely instruct the jury on the law relevant to the specific charges and defenses at trial so that the jurors understand and can apply the law to the facts of the case.  See, e.g. *Delli Paoli v. United States, 352 U.S. 232, 238; 77 S. Ct. 294; 1 L. Ed. 2d 278 (1956)*; *Browning v. Foltz, 837 F.2d 276, 280 (6th Cir. 1988)*.

By statute and court rule the state trial judge had an independent duty to properly instruct the jury on the law applicable to the case.  *MCL 768.29, MSA 28.1052*; *MCR 2.516(3)*[16]; *People v. Ullah, 216 Mich App 669 (1996)*.  This duty exists even absent a request.  *People v. Visel, 275 Mich 77, 81 (1936)*; *People v. Hearn, 100 Mich App 749, 753 (1980)*; *People v. Freeman, 149 Mich App 119, 121 (1985)*.  These requirements establish a due process right to have the jury properly instructed.  *Bennett v. Scroggy, 793 F.2d 772, 774-775 (6th Cir. 1986)* (the trial court's decision "must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process".)

In the present case what exactly happened to Ms. DeMayo that led to her death was a matter of conflicting evidence and one which was hotly contested by both sides.  The defense elicited both lay and expert testimony to support a theory of accidental death, both in terms of some outside force (i.e. the car accident and falls) as well as Dabish's attempts to revive her may have contributed to her head injuries.  Dr.

---

[16]The court rule and statute provide that ". . . the court shall instruct the jury as to the applicable law and issue presented by the case" and may instruct the jury on a point of law when it materially aids the jury with or without a request.

Hornyak, the neurosurgeon at Detroit Receiving Hospital who consulted on Ms. De

Mayo's treatment testified that the injuries  to her brain were caused by some sort of

blunt trauma, a "high velocity or high energy injury" commonly caused by high speed

motor vehicle accidents or a fall (Vol. IV, p. 104-106).  Dr. Sung, who performed the

autopsy, could not determine the cause of the head injuries, but opined they were

consistent with being struck or slammed against a surface, rather than a fall (Vol. IV,

p. 64).  Ms. DeMayo was in a car accident on March 8th, which caused her air bag to

deploy (Vol. XIV, p. 4-8).  Dr. Dragovic, the defense forensic expert, testified that the

head injuries occurred two or three days before death and were consistent with falls

or being propelled into an object (Vol. XIV, p.14-40).  Dabish told responding officers

that he had put Ms. DeMayo in the shower and slapped her repeatedly to revive her

from an apparent overdose (Vol. IX, p. 112).  Defense counsel repeatedly referred to

Ms. DeMayo's altered state, falling and that slapping "was not evidence of intent to

kill" in his closing argument (Vol. XV, p. 78, 81-82, 85-86, 90).   After closing

arguments, when discussing the need for a corrective instruction, defense counsel

made clear that accident was a theory of the defense.

> "Your Honor, part of our theory in this case is that this actually started
> from an accident, that she had a car accident or might have fallen and
> had an accident"  (Vol. IX, p. 135).

Thus, the evidence and argument of counsel put the court on notice of the clear

duty to *sua sponte*  instruct the jury on accident, as provided by the standard jury

instructions CJI 7:1:01, Murder: Defense of Accident (Involuntary Acts) and CJI 7: 1:02 Murder: Defense of accidents (not knowing consequences of act).[17]  *U.S. Const. Ams. V, VI, XIV*; *DeJonge v. Oregon, 299 U.S. 353, 57 S. Ct. 255, 81 L. Ed. 278 (1937)*.  "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  *Matthews v. United States, 485 U.S. 58, 63, 108 S. Ct. 883, 99 L. Ed. 2d 54 (1988)*.  Since a defendant has a constitutional right to present a defense (*U.S. Const. Ams. VI, XIV*) an instructional error that directly effects his defense infringes on his due process right to present a defense and right to a jury trial.  *Barker v. Yukins, 199 F.3d 867, 876 (6ᵗʰ Cir. 1990), cert denied, 530 U.S. 1229 (2000)*, citing to *Sullivan v. Louisiana, 508 U.S. 275, 277, 113 S. Ct. 2078, 2080, 124 L. Ed. 2d 182 (1993)* and *United States v. United States Gypsum Co., 438 U.S. 422, 446, 98 S. Ct. 2864, 2878, 57 L. Ed. 2d 854 (1978)* (holding that a jury instruction which effectively took from the jury the issue of intent improperly invaded the jury's fact-finding function); *Duncan v. Louisiana, 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968)* (a criminal defendant has the right to have the jury determine guilt or innocence).

Supreme Court precedent clearly establishes that "[i]n a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement." *Middleton v. McNeil, 541 U.S. 433, 437,*

---

[17]Currently, these jury instructions are Michigan CJI 2d 7.1 and 7.2, respectively.

*124 S. Ct. 1830, 158 L. Ed. 2d 201 (2004)*; *Joseph v. Coyle, 469 U.S. F.3d 441, 464 (6th Cir. 2006)*.  The failure to give an instruction that is supported by the evidence will justify habeas relief when the absence rendered the trial fundamentally unfair. *Daniels v. Lafler, 501 F.3d 735, 741 (6th Cir. 2007)*, citing to *Cupp v. Naughten, 414 U.S. 141, 147 (1973)*.  In short the failure to give a requested instruction supported by the evidence must be so inform that they render the entire trial fundamentally unfair. *Henderson v. Kibbe, 431 U.S. 145, 154,97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977)*.

Under federal law, unpreserved constitutional claims are reviewed for manifest injustice or a miscarriage of justice, and whether the error is harmless beyond a reasonable doubt.  *United States v. Olano, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)*; *Chapman v. California, 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)*.  Instructional errors that render the determination of Dabish's guilt or innocence unfair and unreliable require a new trial.  *Rose v. Clark, 478 U.S. 570, 1206 S. Ct. 3101, 92 L. Ed. 2d 460 (1985)*.  It is not harmless error for the trial court to fail to instruct on the defense of accident because "[n]ot to give [the jury] and instruction that allowed them to agree with defendant's view of the events… undermines the reliability of the verdict." *People v. Silver, 466 Mich 386, 393 (2002)*. The failure to instruct on accident as a defense is a miscarriage of justice that undermines the reliabilty of the verdict and was not harmless.

-69-

Alternatively, application of the plain error test requires that (1) the error occurred, (2) the error was plain, and (3) the plain error affected the substantial rights of the defendant. *People v. Carines, 460 Mich 750, 766-767 (1999)*; *People v. Jenapp, 344 Mich App 361, 375 (2001)*. Here, the error in not instructing on the defense theory of accident supported by the evidence is both plain and obvious, meeting the first two (2) requirements. Nor can there be any question that the failure to give the instruction affected Petitioner's constitutional and statutory right to have the jury instructed consistent with his defense. At no time was the jury instructed that accident was a complete defense and that the prosecutor had to prove beyond a reasonable doubt that the death was not an accident. Alternatively, the failure to request the accident instructions constitutes ineffective assistance of counsel (See, Argument III, *infra*).

Defense counsel requested that the jury be instructed on both voluntary and involuntary manslaughter (Vol. XIV, p. 95). However, the court refused to instruct on voluntary manslaughter (*Id*. 99) and the jury was instructed only on involuntary manslaughter (Vol. XV, p. 173). Both involuntary and voluntary manslaughter are necessarily lesser included offenses of murder and must be given if supported by the evidence. *People v. Mendoza, 468 Mich 527, 544 (2003)*; *People v. Gillis, 474 Mich 105, 438 (2006)*; *People v. Mitchell, 301 Mich App 282, 286 (2013)*. Voluntary manslaughter is defined as the act of killing, although intentional, that was committed

-70-

under the influence of passion or in the heat of blood, produced by an adequate or reasonable provocation and before a reasonable time has elapsed for the blood to cool and is the result of temporary excitement. *Mendoza, 468 Mich at 535*; *People v. Fortson, 202 Mich App 13, 19 (1993)*.  Murder and voluntary are both forms of homicides, however the elements of provocation that characterizes the offense of voluntary manslaughter separates it from murder.  *People v. Pouncey, 437 Mich 382, 388 (1991)*.[18]  In the present case, a rational view of the evidence  supports the requested instruction of voluntary manslaughter.  The phone calls between Mr. DeMayo and Dabish, the testimony of the hotel employees about DeMayo having permission to enter his apartment without his consent, being upset that DeMayo was helped with her luggage by a male clerk, and threatening to "kick his ass" all support the instruction.  In fact, much of the prosecutor's theory was that Dabish killed DeMayo out of anger.  As such, the instruction was sufficiently supported to be given and the trial court's refusal requires habeas relief.[19]

### A.   THE STATE TRIAL COURT'S OPINION IS BOTH ERRONEOUS AND UNREASONABLE.

---

[18]Because voluntary manslaughter requires proof of intent, accident is a defense to voluntary manslaughter.  *People  Newman, 107 Mich App 535 (1981)*.

[19]Instructing a jury on a lesser included offense "affords the jury a less drastic alternative than the choice between conviction of the offense charged and acquittal."  *Beck  Alabama, 447 U.S. 625, 633, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1990)*.  A trial judge is required to instruct on a lesser included offense if a rational view of the evidence supports the instruction, *id at 636 n. 12*.

The essence of the trial court's conclusions on this claim is that since the jury found Dabish guilty of intentionally causing the death and torture, the judge was not required to instruct on voluntary manslaughter and accident (Op., p. 10-11).  Given the Petitioner's conviction the trial court added, there could be no prejudice from the omission to instruct the jury, *id*.  The reasoning is, of course, hardly convincing and quite obtuse.  A conviction by a jury, without proper instruction does not excuse the failure to properly instruct the jury.  To the contrary, it is the very failure of the duty to properly instruct the jury, that left them without the proper alternatives.  Given the trial court's logic, it does not matter how the jury is instructed, so long as there is a conviction, the conviction stands.  This Court should grant habeas relief.

## V.   THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT DEPRIVING PETITIONER DABISH OF A FAIR TRIAL.

The United States Supreme Court has established the proposition that the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution cannot tolerate a state criminal conviction where the prosecutor's conduct and overall trial tactics were such as to deprive a criminal defendant of his fundamental right to a fair trial.  *Caldwell v. Mississippi, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985)*; *Miller v. Pate, 386 U.S. 1, 7, 87 S. Ct. 875, 17 L Ed 690 (1967)*; *Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)*; *Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 43 (1974)* (A

prosecutor can deny a defendant's right to a fair trial by making improper remarks that infringe on a defendant's constitutional rights or by making remarks that "so impact [ ] the trial with unfairness as to make the resulting conviction a denial of due process"). Prosecutor's must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)*.

In the present case, the cumulative effect of the prosecutor's misconduct before the jury in order to obtain a conviction denied Petitioner Dabish his right to a fair trial. *U.S. Const. Am. XIV*.

## A. THE PROSECUTOR IMPROPERLY ELICITED TESTIMONY RELATING TO THE INVESTIGATION OF THE CASE AND TO HER OWN INVOLVEMENT WITH WITNESSES TO INVOKE THE WEIGHT OF HER OFFICE AND TO BOLSTER HER CASE.

The prosecutor unfairly and improperly used the leverage of her position as a representative of the government, to shift the jury's focus from a neutral and detached appraisal of the competing evidence to an emotional response. She injected her own experiences into the case, thus acting as an unsworn witness. She also asked the jury to decide the case based on the defendant's character and based on her own bald speculation that he was going to flee. She attacked the integrity of counsel and of defense witnesses.

-73-

First, the prosecutor  elicited testimony from the officer in charge of the case describing the process whereby search and arrest warrants were obtained, pointing to the fact that judges were involved in their issuance. More significantly, she pointed to her own role and the role of the Wayne County Prosecutor's office in obtaining the two warrants (Vol. XI, p. 38-40).

Second, she gratuitously identified herself as "a past member of Power House Gym" by asking  Eric Brown, an employee of the Dabish family business whom Peter Dabish called on the morning of March 11, 2010, if he recognized her (Vol. IV, p. 75).

Third, the prosecutor repeatedly impeached witnesses by referring to the fact that she had taken statements from them at her office (Vol. VII, p. 50; Vol. X, p. 36-37, 51).  This was improper impeachment which also made her an unsworn witness.

Lastly, in rebuttal argument, in illustrating the probative weight she wished the jury to attach to two of the "other acts" witnesses applications for Personal Protection Orders against the defendant, she informed the jury "I've been in a lot of relationships, I ain't never had to get a PPO on anybody" (Vol. XV, p. 99).  Not only does this bolster the prosecution's case, the prosecutor also became an unsworn and uncross-examined witness, denying petitioner his Sixth Amendment right to confront and cross examine this witness.

-74-

The Michigan Court of Appeals found that if there were errors they were not prejudicial and did not affect the defendant's substantial rights (Appendix, Exhibit B, MI COA Op., p. 15-16). But clearly Petitioner's right to confront and cross examine the witnesses against him is a substantial right and this right was violated by the prosecutor's testimony concerning her own relationships. *Smith v. Illinois, 390 U.S. 129, 88 S. Ct. 749, 10 L. Ed. 2d 956 (1986)*. That it was offered in the rebuttal argument, allowing the defendant no chance to challenge it, exacerbated the violation.

The prosecutor throughout the trial insinuated herself into the record and brought her participation in the investigation of the case to the jury's attention, seeking thereby to bolster her proofs with the weight of her office, and to improperly curry favor with the jury. The use of bolstering is not a legitimate means of obtaining a conviction. It is instead a method "calculated to produce a wrongful conviction." *Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)*.

The prosecutor's conduct hindered the jury's ability to judge the evidence fairly. *United States v. Young, 470 U.S. 1, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985)*.

### B.   IT WAS IMPROPER FOR THE PROSECUTOR TO ELICIT TESTIMONY ABOUT LAW ENFORCEMENT EFFORTS TO LOCATE THE DEFENDANT WHEN, IN FACT, HE HAD TURNED HIMSELF  INTO THE POLICE.

The prosecutor presented irrelevant evidence from which she wanted the jury to infer that the defendant had fled the jurisdiction, when, in fact, he voluntarily

surrendered to the police at his lawyer's office (Vol. X, p. 119). She elicited extensive testimony from the officer in charge of the case regarding how he had communicated with various agencies, including the United States Department of State. He had Mr. Dabish's passport "flagged," and he had a "flyer . . . posted at all international crossings," and "at all airports throughout the United States," and had informed the joint Detroit Police/United States Marshals Fugitive Apprehension Team that Petitioner was wanted (Vol. XI, p. 40-46).

The Michigan Court of Appeals found the evidence marginally relevant but said it did not rise to the level of misconduct. It found that the evidence was part of the history of the case and the jury knew the defendant turned himself in (Appendix, Exhibit B, MI COA Op., p. 16). But in *Old Chief v. United States*,[20] the Court held that the effect of unfair prejudice outweighs ordinary relevance.

The prosecution's evidence on this point, described as marginally relevant by the Court of Appeals, had NO PROBATIVE VALUE. Yet the prejudicial impact on the presumption of innocence was great. The jury would, as the prosecution wanted it to, infer a consciousness of guilt from even the whisper that the defendant was hard to find and from which an inference of flight would be made.

C.    IT WAS IMPROPER TO QUESTION NICOLE DABISH ABOUT HER ASSISTANCE IN CONTACTING AT-TORNEYS FOR DEFENDANT, ABOUT

---

[20]*519 U.S. 172, 180-185, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).*

-76-

## DEFENDANT'S PRIOR CONVICTION FOR DRIVING UNDER THE INFLUENCE OF INTOXICATING LIQUOR, AND ABOUT HIS STAY AT A REHABILITATION FACILITY.

The Court of Appeals found no error because the trial court instructed the jury to disregard questions concerning the DUI's, sustained an objection to evidence of court-ordered treatment, and stated it did not understand why questions concerning the witness' assistance in his defense were improper (Appendix, Exhibit B, MI COA Op., p. 16).

In her direct examination of defendant's mother, the prosecutor delved into contacts Mrs. Dabish had with attorneys on behalf of herself and her son, including efforts to coordinate the gathering of information and also to research defense strategies. Peter Dabish was held in the Wayne County Jail without bond while awaiting trial, and she was serving, in effect, as his conduit to the outside world (Vol. VI, p. 14, 30-31, 59-68, 78).   This testimony was a comment on defendant's exercise of his right to counsel in violation of his Sixth Amendment right.   Comment on the exercise of a constitutional right is forbidden because it burdens the exercise of it. *Griffin v. California, 380  U.S. 609, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965)*.

The prosecutor also used her examination of Mrs. Dabish to improperly inject into the proceedings the defendant's prior DUI conviction and the fact that it had resulted in a court-ordered stint in "rehab" for his "problems" with drugs and alcohol

(Vol. VI, p. 132-134).  A follow-up question, as to "what lead him to be in court, was it related to the pills?" was stricken by the trial judge, but the suggestion was made and the damage done.  The next day, defense counsel moved for a mistrial on the basis of this questioning, which the trial judge, though pronouncing herself "troubled" by the "unfortunate reference," denied (Vol. VII, p. 3-10).   The Court of Appeals decision finding no error was  an unreasonable application of and contrary to the decision in *Old Chief, supra.*

Lastly,  the court of appeals unreasonably applied a plain error analysis to this error but the defense had moved for a mistrial concerning the direct examination of Mrs. Dabish (Appendix, Exhibit B, MI COA Op., p. 16).

### D.   THE PROSECUTOR REPEATEDLY OBJECTED DURING DOCTOR DRAGOVIC'S  TESTIMONY TO INTERRUPT ITS FLOW, AND THEN IMPROPERLY ATTACKED THE DOCTOR DURING CLOSING ARGUMENT.

The Court of Appeals found that some of the prosecution's objections were sustained and that others were made in good faith. It also found that the arguments were fair when viewed in context (Appendix, Exhibit B, MI COA Op., p. 16-17).

The medical testimony was crucial to the success or failure of the prosecution's case.  In an effort to discredit defense attacks on the medical testimony, it  adopted an incredibly aggressive and overzealous method of interference during the direct testimony of the defendant's medical expert. The prosecutor's repeated (and

-78-

frequently overruled) objections resulted in  no less than eight bench conferences. This conduct so significantly interrupted the flow of this crucial testimony that defense counsel moved, unsuccessfully, for a mistrial because of its disruptiveness. *See, e.g.,* (Vol XII, p. 6-7,  20, 23, 27, 36; Vol. XIII, p. 8, 10, 12, 26, 28, 34, 35, 36, 49-56).

In her closing argument, the prosecutor  reserved particular vituperation for Dr. Dragovic, piling *ad hominem* attacks on him, and characterizing him as part of a defense strategy to "throw dirt" in the jury's eyes.  For example, she suggested that he "attempt[ed] to create false impressions in your mind," (Vol. XV, p. 24-25), "provided a means of distraction," *(Id.*, at 25),  "is focusing your attention away from the real heart of what was going on . . . to throw dirt in another direction," *(Id.,* at 26), and that "[h]is whole testimony was just brought in here to distract you from what went on in that apartment"  *(Id.*, at 27).

*Ad hominem* attacks are manifestly improper.  As the First Circuit noted in *United States v. Rodriguez-Estrada, 877 F.2d 153, 159 (1st Cir. 1989)*, "the prosecutor's obligation to desist from the use of pejorative language and inflammatory rhetoric is  every bit as solemn as his obligation to attempt to bring the guilty to account."  Here, the prosecutor's attacks on Dr. Dragovic violated this principle.

More important, these repeated attacks along with the denigration of the defense violated the restrictions placed on prosecutors by the Supreme Court.  In *Berger, 295*

*U.S. at 88*, the Court stated that a prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done . . . He may prosecute with earnestness and vigor, indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones."   The Court also declared that  "A personal attack by the prosecutor on defense counsel is improper." *Young, 470 U.S. at  7, 9.*

### E.   MISCONDUCT IN HER CLOSING ARGUMENT AND QUESTIONING OF A WITNESS.

In her rebuttal the assistant prosecutor argued as follows:

MS. LINDSEY: Common sense versus nonsense. That's the choice you have here. Common sense versus nonsense. And let's just look at how you can tell the difference.

If I may, Mr. Dabish, can I have your fist, please?
Boom, side of the head. Boom, other side of the head. Again, boom, boom, boom, back of the head. He emphasized the size of the fist and how much damage that fist would do. Common sense versus nonsense.

(Vol. XVI, p. 28, 93).

The prosecutor, taking Dabish's fist, then engaged in an outrageous demonstration, by striking her head repeatedly with his fist.

The prosecution added:

-80-

The defenselessness of the victim indicates intent to kill. This is not a situation where you have two big bruising men in a barroom brawl. You have a woman weighing all of 114 pounds soaking wet, five one, and you have Mr. Peter Dabish. You can see how big he is. You can see how much he weighs. You can see how big his hands are (Vol. XV, p. 28, 30).

During direct examination of Courtney Petty, an employee of the Double Tree

Hotel, the prosecutor asked:

BY MS. LINDSEY, CONT'D: [Emphasis supplied.]

Q.     Did you encounter or see Mr. Dabish, the next day after the 10th?
A.     Yes.
Q.     And where did you see him at?
A.     In the hotel lobby.
Q.     And was there a young female there; a female in the lobby?
A.     With him or—
Q.     Okay. Do you know somebody name Janay? [*sic*]
A.     Yes.
Q.     Okay. And who is Janay? [*sic*]
A.     She works at the front desk.
Q.     Okay. And do you know her full name?
A.     Janay [*sic*] Fowler.
Q.     Okay. And she was working at the front desk?
A.     Yes.
Q.     And did you see Mr. Dabish doing anything in relationship to Ms. Fowler?
A.     Yes.
Q.     What was he doing?
A.     Cussing her out.
Q.     Did you hear specifically what he said to her?

MS. REED: Objection, your Honor, as to relevance.  This is after the next day.

MS. LINDSEY: Judge, his demeanor around the time of the crime.  I think, is sufficient, it's part of the res gestae.

THE COURT: I'll allow it. Overruled.

(Vol. XV, p. 13, 83-84).

Each of these arguments were unsupported by any evidence or were outright false statements.

None of the forensic experts for the government or the defense could provide, with any degree of reasonable medical certainty, the cause of the blunt force trauma to the deceased. Clearly, there was no testimony or evidence that the deceased died due to being struck by Petitioner's *fists*. Before the jury in a very inflammatory demonstration, the prosecutor took Petitioner's fists and mislead the jury to believe that defendant struck ("Boom") both sides of her head, and the back of the head.

The prosecution also mislead the jury by arguing that the relative size of the parties and the "defenselessness" of the deceased showed an "intent to kill". This inflammatory and prejudicial argument is contrary to the law and "common sense".

Finally, by claiming that Petitioner "cussed out" Ms. Fowler, who was working the front desk of the hotel, as part of the "res gestae" of the crime, the prosecutor again misled the jury (and the judge). The incident with Ms. Fowler did not occur on March 10, 2010, but rather a week after that.[21] Clearly, the prosecutor had Ms. Fowler's police statement and would have been aware of its contents.

---

[21]Appendix, Exhibit K - Statement of Janae Nicole Fowler, and Exhibit L - Hotel Invoices.

-82-

It is well settled that it is misconduct for a prosecutor to misstate the evidence or to assume the existence of prejudicial facts not in evidence. *Darden v. Wainwright, 477 U.S. 168, 182, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)*; *Gordon v. Kelly, 205 F.3d 1340 (6th Cir. 2000)*. Although a prosecutor may argue reasonable inferences from the evidence (*Byrd v. Collins, 209 F.3d 486, 535 (6th Cir. 2000)*), a prosecutor may not misstate the evidence. *United States v. Carter, 236 F.3d 777, 784 (6th Cir. 2001)*. It is "improper for a prosecutor, during closing arguments, to bring to the attention of the jury any purported facts not in evidence and are prejudicial." *Byrd, 209 F.3d at 535.*

On habeas review, the standard to be applied when analyzing claims of prosecutorial misconduct is whether the conduct was so egregious so as to render the entire trial fundamentally unfair. *Lundgren v. Mitchell, 440 F.3d 754, 778 (6th Cir. 2006)*; quoting *Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)*; *Sierra v. Michigan Department of Corrections, 4 F.3d 1348, 1355-56 (6th Cir. 1993)*. The Sixth Circuit employs a two-part test to determine whether prosecutorial misconduct requires relief. *Girts v. Yanai, 501 F.3d 743, 758-59 (6th Cir. 2007)*. First, the court must determine if the challenged statements are improper. *Macias v. Makowski, 291 F.3d 447, 452 (6th Cir. 2002)*; *Boyle v. Million, 201 F.3d 711, 717 (6th Cir. 2000)*. In evaluating whether the prosecution's comments violated the defendant's due process rights, the court should then examine:

(1) whether the comments were isolated or pervasive; (2) whether they were deliberately or accidentally placed before the jury; (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant; (4) whether the prosecutor manipulated or misstated the evidence; (5) the strength of the overall evidence establishing guilt; (6) whether the remarks were objected to by counsel; and (7) whether a curative instruction was given by the court.

*Sierra v. Michigan Department of Corrections, supra, at 1355-56*; *Broom v. Mitchell, 441 F.3d 392, 412 (6th Cir. 2006)*.  However, "[t]here are instances where a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."  *United States v. Solivan, 937 F.2d 1146, 1150 (6th Cir. 1991)*.

In the present case, the prosecutor's misconduct rendered the trial fundamentally unfair, warranting habeas relief.

## CONCLUSION

The prosecutor's conduct in this case implicates precisely the kind of risks that the Court has frequently recognized when examining claims of prosecutorial misconduct. Her conduct was unfairly calculated to inflame the passions and prejudices of the jury which was an unreasonable application of and contrary to the clearly established law found in *United States v. Young, supra, at 8 n. 5*.  It asked the jury to decide defendant's guilt or innocence on an improper basis which was an unreasonable application of and contrary to the clearly established law found *Old Chief v. United States, 519 U.S. at 180-181*.  It is also fundamentally unfair for a

prosecutor to embark on a course of conduct calculated to persuade the jury to decide the case on the basis of something other than the facts before it. *Viereck v. United States, 318 U.S. 236, 247, 63 S. Ct. 561, 87 L. Ed 734 (1943)*. The *Viereck* Court relied on the *Berger* formulation, "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about  a just one." *Berger, 295 U.S. at 88*. Yet this is precisely what each of the trial prosecutor's excesses did in this case.  Further, the prosecutor's conduct was not the result of an invited error. *Young, 470 U.S. at 12*.

Taken individually,  and together, these instances of overzealous  misconduct by the trial prosecutor violated defendant's right to a fair trial. The state court of appeals decision was contrary to and an unreasonable application of the firmly established Supreme Court law, identified above.

## VI.   PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ADMITTED PRIOR BAD ACTS EVIDENCE AND ALSO ADMITTED  EVIDENCE OF MARIJUANA CULTI-VATION.

### A.   INTRODUCTION.

The United States Supreme Court recognizes, as a general principle, that when an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it will violate the due process clause.  In essence, admission of evidence in a state court proceeding denies due process when it renders the trial fundamentally unfair.

*Ege v. Yukins, 485 F.3d 364, 375 (6th Cir. 2007)*; (habeas relief warranted based on erroneous evidentiary ruling that is "so egregious that it results in a denial of fundamental fairness."); citing to *Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)* and *Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003)*.  See also, *Chambers v. Mississippi, 410 U.S. 284, 302-03, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)*; *Sowders, 34 F.3d at 360*.  On direct appeal, application of the correct standard would lead this Court to conclude that the errors were not harmless beyond a reasonable doubt.  In this case, Dabish has shown that admitting the evidence "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency." *Dowling v. United States, 493 U.S. 342, 352-353, 110 S. Ct. 6687, 107 L. Ed. 2d 708 (1990)*.

## B.   RELEVANT FACTS.

### 1.   PRIOR BAD ACTS INVOLVING WOMEN.

Over objection made during pretrial motions,  the trial judge allowed testimony regarding other acts evidence involving  Alexis Homicz under Rule 404(b) and other acts evidence involving  Melissa Kallabat, and  Monica Kaddis  under *MCL 768.27b*.  Their  testimony may be briefly  summarized as follows:

- Ms. Homicz testified that during the period December 2006 - January 2007, she learned that Mr. Dabish had become involved in a relationship with her long-time friend Olivia Hahn. She called

Ms. Hahn to talk about it, apparently to warn her against him (Vol. VI, p. 114-115, 118). Later that same day, she testified, Mr. Dabish called her boyfriend and arranged a meeting at a gas station, in the course of which, she testified, he accosted her in an "angry" and "intimidating" way, called her a "bitch," and told her that her friendship with Olivia was "over; her and I are no longer allowed to be in contact," told her that he "never hit a girl in my life," apparently to contradict what she told Olivia. He then hit her a "hard smack" across the face, laughing, and poured the contents of a water bottle over her, hit her again with a fist, spit on her at least five times, and threw her car keys at her hitting her in the neck. *Id.,* at 117-121. She also testified that after she left the gas station, Mr. Dabish called her and told her that he didn't care if she called the police, because he would be out in three months and would find her. *Id.,* at 121. She did, however, call the police, and also applied for a Personal Protection Order against him. *Ibid.* No personal protection was ever offered into evidence.

- Melissa Kallabat's testimony concerned an incident in 2005, while she was in what she agreed was "a dating relationship" with Peter Dabish," which resulted in her making a police report (Vol. VII, p. 48). According to the report, dated May 16, 2005, which was read as past recollection recorded in light of her professed lack of memory of the incident,[22] Mr. Dabish, whom she described as her "ex-boyfriend," asked her to come to his house because they "needed to talk." When she told him she "had to leave early . . . he got upset," "started swearing," "calling [her] names," "shut his window, closed his blinds . . . spit on [her] about five times and locked the doors," preventing her from leaving." *Id.,* at 70. She further reported that he grabbed her by her arm, shoved her on the bed, and poured a can of soda on her hair and face as she ran out of the room. *Ibid.*

---

[22]The prosecution elicited testimony that Ms. Kallabat had initially refused to accept service of her trial subpoena, and only did so after consulting with a lawyer, and that when she thereafter met with the trial prosecutor said that she was fearful about testifying (Vol. VII, p. 50). However, she explained she was afraid of the media coverage.

- Monica Kaddis described her relationship with Peter Dabish as "a friendship," but acknowledged that in 2006 she sought a Personal Protection Order against him at the insistence of her mother, which the trial court admitted, over objection, and which presupposes a relationship or prior relationship beyond friendship. (Vol. V, p. 12-13, 44).  Apparently, the petition arose from an incident in October, 2006, in which the defendant, frustrated that Ms. Kaddis was not responding to his calls, came to her place of work, and, speaking loudly, grabbed her telephone and threw it to the floor. *Id.,* at 18-20. Thereafter, she testified, in December, 2006, the defendant began to make a series of harassing telephone calls to her and to her friends and family in an effort to get her to communicate with him.  *Id.,* at 22.  In these calls, she said, he would threaten to start false rumors,  ruin her reputation through false Internet postings, and ultimately to hurt (which she explained meant to embarrass) her family if she reported his actions. At one point, she recalled, in order to try to re-establish contact with her, he falsely reported that he had been shot five times. *Id.,* at 22-26, 31.

## 2.    OTHER ACT INVOLVING MARIJUANA CULTIVATION.

Over objection, the prosecution also offered evidence that defendant was growing marijuana at his Waterford Apartment (Vol. XI, p. 3-6, 14-18).   The prosecution offered the testimony of Detroit Police Officer Kenneth Lenton regarding his observations of the Double Tree apartment on the morning that Diana DeMayo was taken to the hospital, including the fact that the defendant Peter Dabish was "extremely agitated and irritated, and smelled as if he had alcohol on his breath" (Vol. X, p. 104).  On cross-examination, defense counsel brought out that he had located a

female's property in one bedroom, and that he had "noted" in his report "that that property smelled like marijuana" (Vol. X, p. 111).

The next morning, the prosecution proposed to admit evidence of a "marijuana grow operations" which was found in the apartment that the defendant had recently vacated. The prosecution argued that the "fact that the defense opened the door yesterday by asking Officer Lenton about whether Diana DeMayo's clothing or personal belongings in the apartment smelled like marijuana. And we're putting him on to offer an alternative explanation for why they smell like marijuana" (Vol. XI, p. 3). The trial judge allowed the evidence over defense objections based on the lack of notice as required by *MRE 404(b)*, and that it would be "misleading" and unfairly prejudicial, given other evidence of Ms. DeMayo's marijuana use (Vol. XI, p. 4-6). The trial judge ruled:

> THE COURT: . . . The Court does not find it to be prejudicial. I find it to be relevant, certainly more probative than prejudicial, and I think that it's right that the door was opened as a result of the reference in the police report regarding the smell of marijuana on Ms. DeMayo's clothing. All right. That's the Court's ruling.

(Vol. XI, p. 6).

## C.    STATE APPELLATE COURT DECISION.

As to the other acts evidence involving the three women, the Michigan Court of Appeals found that the testimony of Monica Kaddis and Melissa Kallabat was

more probative than prejudicial on the issue of the defendant's intent under *MRE 403*
(Appendix, Exhibit B, MI COA Op., p. 6-7).

As to the evidence offered by Alexis Homicz, the state Court of Appeals found
that under *MRE 404(b)*, it was relevant to show the manner in which defendant sought
to control his relationships with women or to perceived threats to the relationship, and
it was relevant to show defendant's state of mind on the night that Ms. DeMayo died
(*id*, p. 7-8).

The state Court of Appeals found that evidence of defendant's marijuana
growing operation at his Waterford Apartment was relevant under *MRE 401* because
it offered an alternative explanation for why Ms. DeMayo's clothes smelled of
marijuana to rebut the defense contention that she hurt herself falling down because
of a drug-induced state.  It was therefore, according to the court,  offered for a non-
character purpose. The Court also found that the evidence was admissible because
defense counsel had "opened the door"(*id*, p. 17).

## D.    DISCUSSION AND CLEARLY ESTABLISHED SUPREME COURT LAW.

Clearly established Supreme Court law states that however depraved the
defendant is, he has a right to be tried only on competent evidence and only for the
offense charged. *Boyd v. United States, 142 U.S. 450, 457-458, 12 S. Ct. 292, 35 L.
Ed. 1077 (1892)*.  Thus, the *Boyd* Court enunciated the principle that in our system of

-90-

jurisprudence, propensity evidence is barred because it is inimical to the most basic notions of fairness.

Since *Boyd*, the Supreme Court has permitted evidence of prior bad acts pursuant to various statutes and evidentiary rules for limited purposes. But the legal principle, that a man is not tried for bad character but for charged offenses, still stands. Other acts evidence which has marginal probative value and which is not relevant to Defendant's guilt or innocence on the charged offense is considered unfairly prejudicial. *Michelson v. United States, 335 U.S. 469, 475- 476, 69 S. Ct. 213, 93 L. Ed. 168 (1948)*. Such evidence of bad character merely establishes a probability of guilt. It unfairly attacks the presumption of innocence and lowers the government's burden of proof.

Further, the Supreme Court noted that Federal Rule of Evidence 404(b) generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge, or intent. The acts must be similar to be admissible. *Huddleston v. United States, 485 U.S. 681, 685, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988)*.

One limitation on this evidence is found in Rule 403 which excludes relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence." The term "unfair prejudice" speaks to the capacity of marginally relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged. See generally, 1 J. Weinstein, M. Berger, & J. McLaughlin, Weinstein's Evidence P403[03] (1996) (discussing the meaning of "unfair prejudice" under Rule 403). The Committee Notes to Rule 403 explain, "'Unfair prejudice within this context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States, 519 U.S. 172, 180, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997)*.

As to the Alexis Homicz evidence, the nature and context of the conduct alleged in the case at bar is far different from that which Ms. Homicz described: a public display of pique, involving petty assaults - drenching with water, the angry return of her car keys, and two slaps through a car window. Indeed, the *only* commonality between Ms. Homicz's accusations and those out of which this appeal arises is the allegation that when angry, Mr. Dabish slapped a woman, and this is hardly the kind of concentricity of which a "common plan, scheme, or system" can be found. Indeed, the evidence proved nothing but Mr. Dabish's propensity to anger and aggression, and should have been excluded on that basis.

These acts were not similar to the acts that were determined to have caused Ms. DeMayo's injuries. Under these circumstances, the evidence of defendant's past anger

could only serve the improper purpose of demonstrating that he had the bad character or propensity to harm. The prosecutor did not use the evidence of defendant's anger for any other reason *except* to make an impermissible propensity argument.   The improper admission of the evidence was highly prejudicial.

The statute under which the trial court admitted the testimony of Monica Kaddis and Melissa Kallabat, *MCL 768.27b*, provides in pertinent part that when "the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403."

The statutory threshold for the admission of "other acts" evidence starts with relevancy.  The familiar test of "relevance," from Rule 401 is, of course,  whether the evidence in question has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   While this standard is not a high one, it is not without significance in this case because it raises the following questions:

What that translates to are questions such as these:

- whether the alleged fact that Peter Dabish grew so frantic in his efforts to contact  Monica Kaddis that he broke her telephone and threatened to embarrass her and her family if she didn't return his calls makes it more probable that he either planned and executed

the murder of Diana DeMayo or secretly confined and tortured her to death? and

- whether the alleged fact that Peter Dabish spit on Melissa Kallabat when she tried to leave a conversation he forced on her, ineffectually locked her in a room to prolong the conversation, and then poured soda on her when she left nonetheless makes it more probable that he either planned and executed the murder of Diana DeMayo (who had, of course, come willingly to his home) or secretly confined and tortured her to death?

The answer to these questions must be in the negative. Thus, the evidence fails the relevance test of Rule 401. The evidence is also not similar under Rule 404(b). And of course it violates the proscriptions of Rule 403, which provides that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Because the evidence reveals Petitioner to be very disrespectful of women in general, it had the effect of luring the jury into finding guilt based on an emotional reaction to these acts alone, divorced from the facts of this case. Unfair prejudiced ensued.

As to the grow operation, the Court of Appeals found the evidence relevant under Rule 401 because it offered an alternative explanation for the smell of marijuana on Diana DeMayo's clothing. This would mean that her clothes did not smell of

-94-

marijuana because she smoked it but because she had been at a place where marijuana was grown. It also found that the defense had opened the door to this evidence (Appendix, Exhibit B, MI COA Op., p. 17)

In actuality, it was the prosecution which introduced the matter of marijuana into evidence. On its direct examination of Edward DeMayo, the prosecution elicited testimony to the effect that when he complained about Peter Dabish and his daughter being "high" at the ill-fated family dinner, Mr. Dabish had responded that "he had a medical marijuana card" and therefore "had the right to be high." Vol. V, p. 109-110.[23]

The prosecution had argued for admissibility of the "grow" evidence under the doctrine of curative admissibility because it claimed that the defense opened the door. But, in rebuttal, the trial prosecutor used the evidence not for the above purpose but to show a consciousness of guilt on Mr. Dabish's part. She argued Mr. Dabish's reaction to the cultivation evidence to emphasize what she referred to as "conscious-ness of guilt," and, accordingly, of guilt itself. Thus, his denials of involvement in the "grow operation" should convince the jury to disbelieve the denials of guilt he repeatedly made when reporting Ms. DeMayo's condition to the authorities:

---

[23]Oddly when, in response to the testimony which the trial court allowed regarding the discovery of th "grow operation," the prosecution successfully objected to attempted to proffer his Michigan medical marijuana card on cross-examination on the basis that it was "hearsay." Vol. XI, pp. 31-33.

. . . if he was operating a marijuana grow operation and he knew it was wrong, even when he knows he has done wrong he takes actions to avoid responsibility...

\* \* \* \*

. . . he lied to the police officers to avoid responsibility for something that counsel brought out was a misdemeanor. So, ladies and gentlemen, if this man is going to lie to avoid responsibility on a misdemeanor, you don't think he is not going to lie to avoid responsibility on a murder.

(Vol. XV, p. 98). This, of course, is too tenuous a connection.

The appellate court's error was in finding that the door had been opened.  The doctrine of curative admissibility is applicable  where "the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission."  *Byrd v. Maricopa County Sheriff's Dept., 565 F.3d 1205, 1213 (9th Cir. 2009).*  "To be admissible under this doctrine, the evidence that allegedly 'opened the door' must in fact have been inadmissible.  Properly admitted evidence does not open the door to inadmissible evidence."*United States v. Rosa, 11 F.3d 315, 335 (2nd Cir. 1993)* (citing *United States v. Rea, 958 F.2d 1206, 1225 (2nd Cir.1991)*; *United States v. Brown, 921 F.2d 1304, 1307 (DC Cir.1990)*.  The trial court's reliance on the prosecution's claims of "opening the door" was therefore obviously misplaced, as there was nothing improper about the questioning regarding the smell of marijuana on Ms. DeMayo's clothing.

-96-

Even if the doctrine of curative admissibility somehow *did* apply, "the Rules of Evidence do not simply evaporate when one party opens the door on an issue." *United States v. Bursey, 85 F.3d 293, 296 (7th Cir.1996)* (citations omitted). Here, the evidence in question met none of the criteria of admissibility set forth in *MRE 404(b)*, and went far beyond the matter of defendant's use of marijuana. It introduced evidence of a criminal enterprise, the manufacturing of marijuana, which was uncharged, and entirely distinct, both factually and legally, from the actual charges against him. And it also introduced evidence of dishonesty and false statements entirely separate from anything concerning the matters at issue which permitted the prosecution to argue the defendant's propensity for dishonesty even though he had not testified.

Evidence of a marijuana cultivation in the middle of a murder trial was an unfairly prejudicial attack on the defendant's character.

## CONCLUSION

One of the dangers inherent in the admission of extrinsic offense evidence is that the jury may have convicted the defendant not for the offense charged but for the extrinsic offenses. And another very real danger is that the jury was less willing to give the benefit of the rules which are intended to protect all defendants equally to a person who had conducted himself as disagreeably as Peter Dabish was said to have. This is precisely the kind of "unfair prejudice, confusion of the issues, or misleading

the jury" with which *MRE 403* is concerned, and precisely why the admission of the "other acts" evidence denied defendant a fair trial.

In affirming the trial court's admission of this evidence, (Appendix, Exhibit B, MI COA Op., p. 7-8, 17 ), the Court of Appeals simply ignored these principles. All these bad acts were used to attack the defendant's general character which was not in issue. The government painted defendant as a bad man thus unfairly diluting the presumption of innocence and lowering its own burden of proof in the process. The concept of fundamental fairness was absent from defendant's trial.

The Michigan Court of Appeals decision on the admissibility of all of these acts was an unreasonable application of and contrary to clearly established supreme court law established in *Boyle*, *Dowling,* and *Old Chief.*

## VII. THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO PRESENT A DEFENSE WHEN IT REFUSED TO ALLOW THIS MEDICAL EXPERT TO OFFER OPINION EVIDENCE REGARDING THE ORIGIN OF THE DECEASED'S INJURIES AND REFUSED TO ADMIT EVIDENCE OF THE DECEASED'S EMAILS UNLESS THE DEFENDANT AUTHENTICATED THEM IN FRONT OF THE JURY.

### A. THE FEDERALLY ESTABLISHED RIGHT.

The Compulsory Process and Due Process Clauses of the Constitution establish a right in a defendant to present a defense. *Crane v. Kentucky, 476 U.S. 683, 691, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).* The Supreme Court has described this right "as among the minimum essentials of a fair trial" and "few rights are more fundamental

than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi, 410 U.S. 284, 296, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)*.  The Court recognizes the right not only as "a fundamental element of due process," but also essential to a fair trial because it allows the defendant to place his version of the facts "to the jury so it may decide where the truth lies." *Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)*.  The exclusion of evidence by the defense undermines the truth seeking function of the criminal justice system because it intentionally distorts the case at the risk of misleading the jury into convicting an innocent person.  Excluding the accused's evidence on an affirmative defense is a peculiarly ironic and inappropriate way to further "the search for truth." Instead, it inhibits the search for truth and renders the trial an ex parte proceeding in which only the prosecution's case is presented.  See, *United States v. Nixon, 418 U.S. 683, 709, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974)*.  The Supreme Court has thus clearly established that the Constitution guarantees a criminal defendant "a meaningful opportunity to present a complete defense" so that the prosecutor's case is subject to and "survive the crucible of meaningful adversarial tasking." *California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)*; *Crane v. Kentucky, supra, 476 U.S. at 691-692*; *United States v. Cronic, 466 U.S. 648, 656, 104 S. Ct. 2039, 80 L. Ed. 2d 65 (1984)*.

The cases also recognize that the right to present a defense is not absolute. *Taylor v. Illinois, 484 U.S. 400, 411, 108 S. Ct. 646, 98 L. Ed. 2d (1988)*; *Rock v. Arkansas, 483 U.S. 44, 55, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)*. Reasonable restrictions may require the right to "bow to accommodate other legitimate interests in the criminal trial process." *Rock v. Arkansas, id. at 55*. However, the exclusion of exculpatory evidence may not be "arbitrary or disproportionate to the purpose they are designed to serve" so as to "infringe upon a weighty interest of the accused." *United States v. Scheffer, 523 U.S. 303, 118 S. Ct. 1261, 1264, 140 L. Ed. 2d 413 (1998)*. State evidentiary rulings which "significantly undermine fundamental elements of the accused's defense" violate the Constitution. *Scheffer, id.* A limitation which "implicate any significant interest of the accused" and precludes the presentation of a fair and complete defense, can violate due process. *Scheffer, id.* In addition, the Court has held that "where constitutional rights directly affecting the ascertainment of guilt are implicated" evidentiary rules may not be validly applied, as "to defeat the ends of justice". *Chambers v. Mississippi, supra, 410 U.S. at 302*. In short, the Constitution imposes a limitation upon state evidentiary rules because the state may not deny an accused in a criminal trial the right to a fair opportunity to defend against the state's accusations. *Id*.

The Sixth Circuit Court addressed the right of a criminal defendant "to have a meaningful opportunity to present a complete defense," "a full and vigorous defense"

in the case of *Barker v. Yukins, 199 F.3d 867 (6th Cir. 1999), cert denied, 530 U.S. 1229, 120 S. Ct. 2658, 147 L. Ed. 2d 273 (2000)*.   Barker claimed that her constitutional right to a jury trial was denied by an erroneous jury instruction on her defense that the Michigan Supreme Court found harmless.   In granting a writ of habeas corpus, this Court found that the trial court invaded the province of the jury, deprived Barker of her right to a jury trial, and that her "due process right to present a full defense" was substantially impaired.   *199 F.3d at 875.*

> Instead of having a meaningful opportunity to present a full and vigorous defense, then, Petitioner's claim of self defense was significantly impeded and her due process rights to present a defense severely prejudiced.   *199 F.3d at 876.*

Finally, appellate courts are precluded from passing on the merits of the defense.   "We do not, of course, pass on the strength or merits of that defense."   *Crane v. Kentucky, supra at 692*.   In *Barker, supra*, this Court clearly reminded appellate courts that the Sixth Amendment protects a defendant's right to a jury trial and that the jury, not the judges, must make the determination of guilt or innocence by weighing the evidence and making credibility determinations.

> It is neither the proper role for a State Supreme Court, nor for this Court, to stand in the place of the jury, weighing competing evidence and deciding that some evidence is more believable than others.   *Id. at 874-75.*

## B.    COURT OF APPEALS DECISION.

In regard to the expert witness's opinion testimony, the state appellate court held that  the trial court's ruling limiting  Dr. Dragovic's testimony did not infringe on the defendant's right to offer testimony because  the proposed testimony concerned a matter of law (Appendix, Exhibit B, MI COA Op., p. 17-18).

Further, as to the emails, the state appellate court found that defendant did not show how his testimony could have authenticated them (*id*).

In these two instances,   the rulings were applied arbitrarily and disproportionately to defeat the defendant's right to present a complete defense. The Michigan Court of Appeals unreasonably applied clearly established Supreme Court law and also issued rulings contrary to that clearly established law to uphold this limitation on the defense.

## C.    DISCUSSION.

The prosecution contended that Ms. DeMayo died, not from  a drug overdose, but from  multiple blunt force trauma to the head inflicted by Mr. Dabish.  The defense contended that Ms. DeMayo was depressed and took too many Klonopin and drank too much in an effort either to kill herself or to mentally escape her problems. Her injuries were the result of a loss of equilibrium attributable to a head injury suffered in a car accident two days earlier and from her drug and alcohol abuse. Petitioner admitted slapping her in the face in an effort to revive her.

1.    **A PETITIONER'S RIGHT TO PRESENT A COMPLETE DEFENSE WAS VIOLATED WHEN THE TRIAL COURT LIMITED THE SCOPE OF THE EXPERT WITNESS' OPINION CONCERNING THE ORIGIN OF THE DECEASED'S INJURIES.**

Prior to trial, the defense sent the prosecution an offer of proof as to Dr. Dragovic's testimony.  It read as follows:

> External examination of the body provides no indications or indicators of torture, which forensic pathology defines as the infliction of severe and cruel bodily injury and/or mental pain, particularly as a punishment, or means of persuasion. . . . Internal examination provides no indicia of torture, as previously defined.

(Proffer, October 11, 2010, p. 2, 3).

The prosecution filed a Motion in Limine, arguing *inter alia,* that Dr. Dragovic should not be allowed to testify "whether Diana DeMayo's body provides any indicators of torture because  it is a legal conclusion," or that it "showed no indicators of torture as defined by forensic pathology, [since] [h]ow forensic pathology defines torture is irrelevant to this case."  (People's Motion in Limine  ¶ 9(c)). The trial judge agreed holding that Dr. Dragovic's medical opinion  as to whether or not there had been any torture as evidenced by any injuries was a legal conclusion solely within the province of the jury. The Court stated that it would instruct the jury on the legal definition of torture (Vol. XI,  p. 76-77).

In the course of Dr. Dragovic's testimony, the trial judge also applied this ruling

to exclude the expert's opinion as to whether certain of the wounds observed on Ms.

DeMayo's body were "deadly or potentially fatal" in character:

> Q.    (By Mr. Sorise) Thank you, Doctor.  Doctor, we have examined
>        or went through a number of external injuries or contusions.  The
>        combination of these, consider them all together, your opinion as
>        to whether they were deadly or potentially fatal?
> A.    The injuries that we have discussed so far do not reflect deadly
>        force type of nature that --
>
> MS. LINDSEY: Your Honor, I'm going to object.
>
> *   *   *
>
> THE COURT: Ladies and gentlemen, thank you for your patience. And
> what we're going to do is I'm going to strike the last portion of the
> witness's statement where there was a reference to deadly force, and I'm
> going to ask Mr. Sorise to just rephrase the question.  (Vol. XII, p. 20).

The state appellate court held that the trial court's ruling limiting Dr. Drago-

vic's testimony did not infringe on the defendant's right to offer testimony because

the proposed testimony concerned a matter of law (Appendix, Exhibit B, MI COA

Op., p. 17-18).

It is a general rule that a witness may not testify on questions of law because

it is the trial court's responsibility to determine the applicable law.  But the mere fact

that an expert's opinion uses terminology similar to that of a legal standard does not

transform a factual assertion into a legal one.  Nor is the expert's opinion disqualified

because the opinion tracks the statutory language.  *e.g. United States v. Barile, 286*

-104-

*F.3d 749, 759-762 (4th Cir. 2002)*; *United States v. Two Eagles, 318 F.3d 785, 793 (8th Cir. 2003)*(expert's opinion not disqualified merely because the language is also found in the statute where the meaning is not different from its usage in common parlance). It is under these principles, for instance, that expert witnesses are ordinarily allowed to express their opinions on whether or not a defendant is "insane," even though the term "insanity" is a legal term, not a medical one. *United States v. Dixon, 185 F.3d 393, 400 (5th Cir. 1999).* So application of the rule against legal conclusions only requires that an expert witness refrain from providing a definition of the legal terms for the jury.

Here, the trial judge, however, foreclosed Dr. Dragovic's testimony on factual issues which he was uniquely qualified as a forensic pathologist to offer, which would help the jury determine facts under *MRE 701* and *702*, and which were central to the case. The first was whether, in his opinion, the medical evidence demonstrated "the infliction of severe and cruel bodily injury and/or mental pain." The second was whether certain of the injuries were potentially "deadly or fatal." Both of these factual conclusions lay at the center of the issues presented by the proofs, and Dr. Dragovic's expertise clearly allowed him to opine on them.

A witness is not forbidden from offering an opinion or inference which embraces an ultimate issue to be decided by the trier of fact. *MRE 704.* This state rule of evidence mirrors *FRE 704(a).* The only difference between these two rules is that

in a federal criminal trial,  an expert may not testify to an opinion or inference as to whether a defendant did or did not have the mental state or condition constituting an element of the crime charged. *FRE 704(b)*. So when the Michigan Court of Appeals decided this issue, its decision was not circumscribed by subsection (b) found in the federal rule.

Further, this rule does not bar a witness from  testifying to *factual* conclusions, no matter how closely they approach the questions to be determined by the jury and even though they may employ similar language as the legal standards under which the jury will decide those questions.

Thus, for example, in *People v. Smith, 425 Mich 98, 114-115 (1986)*, the Michigan Supreme Court held that a physician should have been permitted to offer his opinion "concerning whether a complainant was penetrated against her will," because "[t]he doctor's opinion was grounded upon objective evidence . . . and [t]he use of force or coercion is relevant in this case in light of defendant's claim that the acts were consensual."

The proposed testimony, in the case at bar,  did not, as the trial judge thought, invade the province of the jury.  It did not tell the jury what factual conclusion to draw.  Nor did it touch on an issue reserved exclusively for a jury, such as the credibility of witnesses. *United States v. Whitted, 11 F.3d 782, 785-786 (8ᵗʰ Cir.*

*1993)*.  Nor did it embrace legal conclusions reserved exclusively for the court. *United States v. Crawford, 239 F.3d 1086, 1091 (9th Cir. 2001)*.

Rather, the defense proposed to offer factually-based expert opinion on an issue which was central to the charges against the defendant. Its exclusion improperly impaired the defendant's right to present a defense, which "is one of the 'minimum essentials of a fair trial.'" *Chambers v. Mississippi, supra at  294*, citing *In re Oliver, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L. Ed. 682 (1948)*; *Washington v. Texas, supra at 19*.

> **2.    PETITIONER'S RIGHT TO PRESENT A COM-
> PLETE DEFENSE WAS VIOLATED WHEN THE
> COURT EXCLUDED 1) EVIDENCE OF EMAILS
> WHICH SHOWED THAT THE DECEASED HAD
> TRIED TO COMMIT SUICIDE BY INGESTING
> TOO MANY KLONOPIN,  AND 2) EVIDENCE
> THAT HER INJURIES WERE THE RESULT OF
> HER ACCIDENTALLY FALLING BECAUSE
> SHE WAS SO INEBRIATED FROM THE OVER-
> DOSE.**

The defense proffered two emails written by and sent by Ms. DeMayo to Dabish.  The first was sent on  Sunday, February 21, 2010 at 8:44pm from Diane using the address  DeMayo<deeskiweeskiog@gmail.com. It read as follows:

> I am fucked...u are right..damaged goods due to my crazy bitch status...
> noone will ever understand im driving myself crazy im a dissapoint-
> ment...will u pick me up from airport I  need to come "home" even tho
> my dad basically kicked me out of the house. I dono im not looking for
> sympathy I know u have bigger problems but ya just wanted to say im

driving my self crazy but I think ur the only person in the world that
could maybe understand me. we meed to talk

The second was sent on Sunday, March 7, 2010 at 11:48pm from

dianademayo5@yahoo.com.  It read as follows:

I don't know y phones offf hmm I need u please come help me I think I
took to many

(Emails).

These two emails showed that the deceased was depressed and had taken an

overdose of Klonopin in the past in order to harm herself.  This evidence would

support the defense that on the night in question, the victim voluntarily ingested the

drugs in another effort to commit suicide.

The emails were relevant and crucial to the defense in several ways.  They

corroborated the testimony of defendant's mother that Diane was depressed (Vol. VI,

p. 145). She was drinking. And at the Waterford apartment, the police found

marijuana and a bottle of pills with Diana's name on it (Vol. VI, p. 129). More

significantly,  the evidence corroborated Dabish's belief that Ms. DeMayo had taken

an overdose of  Klonopin which explains why he put her in the shower and slapped

her to revive her. He told the responding officers and EMS attendants this. The

prosecution contended that Dabish was being untruthful. The email evidence rebutted

the prosecution's allegation of fabrication.

The prosecution also offered testimony concerning the victim's future plans to move to California to pursue an acting career (Vol. VI, p. 104, 107, 108). The Court allowed into evidence an encouraging e-mail message from a professor which was forwarded by her to Mr. Gendron, a witness at trial. The Court instructed the jury that they might consider the message as evidence of her "state of mind. That is, what she was thinking about the future" (Vol. VI, p. 102-113). This evidence was offered to rebut the defense claim that Ms. DeMayo was depressed and had taken the pills in a suicide attempt. But both of the excluded e-mails corroborated the defense theory proving that the defense was neither an afterthought nor a ruse.

Prior to trial, defendant asked for an evidentiary hearing outside the presence of the jury so that he could authenticate the emails. The right to "a separate hearing, in the absence of the jury, at which he may testify regarding authenticity, without waiving his right to decline to take the stand during jury trial proceedings" is acknowledged in *Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964)*. See also *MRE 104(c)* which is identical to *FRE 104(c)*. *Jackson* and the rules indicate that in order to protect the right of an accused not to testify, due process requires that he be given the option to testify out of the presence of the jury on preliminary matters.

Under *MRE 901(a)*, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a

finding that the matter in question is what its proponent claims." The "sufficient to support a finding" language of the rule is "a classic restatement of the prima facie test." *United States v. Enright, 579 F.2d 980, 984 (6th Cir. 1978)*.

The state trial court found the emails relevant but excluded them because they could not be authenticated as having actually been written by and sent by DeMayo. The trial court ruled that the defendant must take the stand in front of the jury to authenticate the deceased's emails. And the Defendant would not be allowed to authenticate them outside the presence of the jury. (Vol. XIII, p. 155; XIV, p. 17-37, 41-48).

After the court had announced its ruling, defense counsel suggested that the authentication the trial judge required might be had as to one of the e-mails through the defendant's mother, to whom he had forwarded it (Vol. XIV, p. 42-45). The trial judge, however, rejected the proposal, and the trial prosecutor chimed in that the only avenue open to the defense if it wanted to get the e-mails into evidence was to testify. (Vol. XIV, p. 46).

The defendant exercised his privilege not to testify at trial.

On appeal, the defense argued that the trial court forced the defendant to choose between two constitutional rights, the right to present evidence and the right to remain silent. The state appellate court found that defendant did not show how his testimony could have authenticated the emails (Appendix, Exhibit B, MI COA Op., p. 10-11).

-110-

It concluded that defendant never offered proof that he could authenticate the emails. However, both the trial judge and the prosecutor did not see that defendant's testimony was insufficient on the issue.  The Court of Appeals unreasonably erred in avoiding decision on the constitutional issue and since the state court did not reach this issue, this Court does not have a decision to which it must defer under *28 U.S.C. 2254(d)(1)*.

The appellate court also did not take into account that one of Diana DeMayo's emails was placed in evidence through a stipulation requested by the prosecution, during Louis Gendron's testimony. The email was sent to him on March 8th and it was from her Deeskiweeskiog account.  It forwarded an email from Professor Leavitt.  Her email was a comment on the professor's email in which he encouraged her to go to California.  Her comment read as follows: "He's so right and inspirational, OMG. I need to get my ass out there"[24]  (Vol. IV, p. 102-107).

This email is similar to the emails the defendant wanted  to offer into evidence. The similarity, the use of the same email address for one of them, and the prosecutor's stipulation on an email from that account should have helped to authenticate the emails defendant offered.  *MRE 901(b)(3)* permits authentication by comparison and also, by analogy, subsection (6) permits authentication by phone calls. Upon

---

[24]This is taken from the transcript so if there were misspellings, they were changed by the court reporter.

-111-

admission, it would have been up to the jury to give the emails what weight it wanted to. These evidentiary rules mirror their federal counterpart.

The court of appeals reliance on the civil case of *Jimena v. UBS AG Bank, Inc., 2011 WL 2551413 (ED Cal, 2011), affirmed, 504 Fed. Appx. 632; 2013 WL 223131 (CA 9)*, meant that it did not consider the defendant's Fifth and Sixth Amendment constitutional rights in making its decision.[25] Thus these evidentiary rulings were applied arbitrarily and disproportionately to unfairly deny Petitioner his right to present a complete defense.

The defendant's right to present a defense includes, of course, the right to offer important admissible evidence. Here, the ruling of the trial court, which was in plain violation of the applicable state evidentiary rules, forced the defendant to choose between foregoing his right to present the evidence in question or sacrificing his Fifth Amendment right to remain silent. It is, as Mr. Justice Harlan put it, speaking for the Court in *Simmons v. United States, 390 U.S. 377, 394, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)* "intolerable that one constitutional right should have to be surrendered in order to assert another." Yet that is precisely what happened here.

In concluding that the defendant would have to testify as to the provenance of the emails before the jury, the trial judge denied the defendant the opportunity which the law clearly affords him to have the benefit of this crucial evidence placed before

---

[25]See Appendix, Exhibit B, MI COA Op., p. 10, footnote #4.

the jury without sacrificing his Fifth and Sixth Amendment rights. Consequently, in light of the clearly established supreme court law which holds that the right to present a defense and confront witnesses transcends state evidentiary rules, it was error to exclude the emails.

## VIII. THE TRIAL COURT DENIED PETITIONER DUE PROCESS OF LAW WHEN IT ADMITTED, OVER OBJECTION, EVIDENCE OF A PHONE CALL BETWEEN MR. DEMAYO AND THE PETITIONER, AND EVIDENCE OF A CALL MADE BY MR. DEMAYO TO THE WATERFORD POLICE DEPARTMENT.

### A. THE STATE COURT DECISION.

The Court rejected the defense contention that evidence of the first phone call was more prejudicial than probative under *MRE 403*. Instead, it found that it was relevant to prove the defendant's state of mind, his demeanor, and the events surrounding the death, since it was made within hours preceding Ms. DeMayo's death (Appendix, Exhibit B, MI COA Op., p. 11).

As to the audiotape of Mr. DeMayo's phone call to the Waterford Police Department, the Court found that the call was made shortly after the first phone call with the defendant and before he knew that Diana was injured or killed. Thus, it was made before he had any motive to fabricate (*id.*).

### B. CLEARLY ESTABLISHED SUPREME COURT LAW.

Even relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *Old Chief, 519 U.S. at 174 (l997)*.

Prior consistent statements are excluded unless they are shown to have been made before a motive to falsify arose or before any improper influence arose. *Tome v. United States, 513 U.S. 150, 156, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995)*; *FRE 801(d)(1)(B)*. MRE 801(d)(1)(B) is identical to its federal counterpart.  *People v. Rodriquez, 216 Mich App 329, 331-332 (1996).*

## C.    DISCUSSION.

Prior to trial the defense asked the state court to exclude evidence of a phone call made by Petitioner to Mr. DeMayo.  The Court without explanation denied that motion, but  granted the prosecution's motion to play the audiotape of a call between Mr. DeMayo and the Waterford Police Department and was made after the original call with Petitioner.  In it, Mr. DeMayo  described the substance of that first phone call with Petitioner, including the anal sex references. (MH, p. 39-41).

In admitting the latter call, the trial judge found that Mr. DeMayo did not have a motive to lie or embellish or  to secure a conviction because certainly Ms. DeMayo was alive at the time he made the phone call to the Waterford Police Department (MH, p. 40).   Mr. DeMayo described the defendant as loud, mean, and mad. He then testified  as follows:

> Prosecutor:   What happens next? What does he say next?
> DeMayo:       It was a break and then he said -- excuse me. He said, do
>               you know what I'm going to do to Diana now; I'm going to
>               fuck her up the ass cause I'm pissed at you.
> Prosecutor.   And he said it loud like that?

DeMayo.     Second time louder.
Prosecutor.  So he said  –
DeMayo.     He said it twice.

(Vol. V, p. 124-125).

The statements attributed to Peter Dabish by Mr. DeMayo are, of course, shocking and inflammatory.  At the same time, their relevance to the matters at issue were marginal at best.  While defendant's words regarding anal sex were offensive and insulting to Edward DeMayo, and certainly belittling to his daughter, they were not threats to cause her physical harm or injury.

In fact, the call was made because the defendant wanted to complain about Mr. DeMayo's treatment of him at the Sunday night dinner.  This is the clear the implication of the "cause I'm pissed at you" language reported by Mr. DeMayo.  He complained loudly that "you treated me like shit last night," that "Diana's problems are all caused by you," "[p]reaching" and  ending with "fuck you," (Vol. V, p. 114), and followed, an hour later, by an apology from the defendant, that "I've had a few drinks; I'm really sorry if I said anything that wasn't right." (Vol. V, p. 134).

The statements are insults flung in anger at the deceased's father.  Their probative value, insofar as the charged offenses concerning Diana DeMayo was, at best, slender. The prosecution  did not contend that Peter Dabish tortured or killed her to get back at her father.  The statements should clearly have been held inadmissible

-115-

on relevance grounds alone, and also on considerations of unfair prejudice under *MRE 403*, because of their enormously inflammatory character.

Moreover, the additional admission of the second call, Edward DeMayo's call to the Waterford Police Department, in the course of which he was heard to repeat the alleged anal intercourse remark, could only have served to unfairly underscore it for the jury.

As to the second call, the conclusion that there was no motive to fabricate or embellish is completely contradicted by the evidence. Mr. DeMayo's bias against Peter Dabish was already in existence at the time of the call. DeMayo did not like Petitioner at first sight because he showed up late and high to the Sunday dinner. Their relationship grew openly hostile in that phone conversation, which involved a "lecture" by Petitioner about how Mr. DeMayo was raising (or treating) his daughter, placed blame on him for her problems, and ended with 'fuck you' and a hang up. Mr. DeMayo did not like Petitioner, and was loath to see his daughter with him. This is not an uncommon motive for bending or adding words, or embellishing them to obtain police assistance.

The transcript of the call, which was admitted as Exhibit 41, demonstrates that Mr. DeMayo was already motivated to fabricate in several ways by claiming that defendant threatened to rape his daughter, which he did not advance at trial (i.e., Vol. V, p. 183), by asserting that she and Mr. Dabish did not have a romantic relationship

contrary to his trial testimony that he knew they were spending nights together,  (e.g.,

Vol. V, p. 157),  and by stating that she was living with him, when in fact she was

spending her time with Peter:

| | |
|---|---|
| OPERATOR: | Does she live with him? |
| CALLER: | She does not live with him.  She lives with me. |
| OPERATOR: | Is she, is she still seeing him? |
| CALLER: | She is not his boyfriend, they just, they had just been friends and he came over the house to meet me the other day. |

(*Ibid*).

The trial court not only erred as a matter of law in admitting this testimony and

evidence, the error exposed the jury to some of the most provocative and disturbing

allegations against the defendant, and in so doing poisoned the evidentiary well so as

to render his trial fundamentally unfair.

Conversely, if Mr.  DeMayo has serious concerns for his daughter's safety, then

there too is the motive to embellish to get the police to go to the apartment to see if

his daughter is safe. Mr. DeMayo mistakenly called the Waterford Police Department

because he did not know that his daughter was at the new apartment in Detroit.

## CONCLUSION

Both *Old Chief* and *Tome* are clearly established Supreme Court law. They

control the admission of evidence that imperils a criminal defendant's right to a fair

trial under the Due Process Clause. The state appellate court's opinion on these two

phone calls was an unreasonable application of and contrary to the decisions in these two cases.

## IX.   ASSUMING THE APPLICATION OF ANY PROCEDURAL BAR TO CLAIMS RAISED IN THIS PETITION, DABISH HAS SHOWN GOOD CAUSE AND PREJUDICE TO OVERCOME ANY SUCH STATE PROCEDURAL RULE.

### A.   GOOD CAUSE.

A criminal defendant has the right to effective assistance of appellate counsel on his appeal as of right. *Evitts v. Lucey, 469 U.S. 387, 395-397, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985)*. A defendant established "good cause" for failing to present a claim on the appeal as of right under both state and federal law by showing ineffective assistance of appellate counsel. *People v. Kimble, 470 Mich 305, 315 (2004)*; *People v. Reed, 449 Mich 375, 378 (1993)*; *People v. Swain, 288 Mich App 609, 631 (2010)*; *Murray v. Carrier, 477 U.S. 478, 488-89, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)*. A claim of ineffective assistance of counsel is analyzed under the two-prong test set forth in *Strickland v. Washington, 466 U.S. 668 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)* to establish deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id. at 688; Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 47 (2003); Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)*. "[T]he test of ineffective assistance of appellate counsel is the same as that applicable to a claim of ineffective

assistance of trial counsel." *People v. Uphaus,* (On Remand) *278 Mich App 174, 186 (2008).* To establish prejudice, the defendant "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra, at 694; Wiggins, supra, 123 S. Ct. at 2535; Williams, supra, at 391-391.*

In the appellate context, a defendant must show that there is "a reasonable probability, but for counsel's unreasonable failure . . . he would have prevailed on his appeal." *Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000)*; *Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001), cert denied, 535 U.S. 940 (2002).*

The courts have not hesitated to find ineffective assistance of appellate counsel for failing to raise important and obvious appellate issues. *Franklin v. Anderson, 434 F.3d 412 (6th Cir. 2006)*; *McFarland v. Yukins, 356 F.3d 688, 697-98 (6th Cir. 2004)*; *Carver v. Staub, 349 F.3d 340 (6th Cir. 2003)*; *Joshua v. Dewitt, 341 F 3d 408, 441 (6th Cir. 2003)*; *Lucas v. O'Dea, 179 F.3d 412, 419 (6th Cir. 1999).*

In the present case, appellate counsel's performance was deficient in failing to raise the meritorious claims set forth in this petition.  Appellate counsel, Mr. Larene has stated, by way of affidavit, that he has seen the issues raised in this motion and did not raise them as a matter of strategy or professional judgment (Appendix, Exhibit J).

Had the attorney raised these claims, there is a reasonable probability that they would have prevailed on appeal and a new trial would have been ordered.  As such, good cause has been shown.

### B.   ACTUAL INNOCENCE.

Initially, *MCR 6.508(D)(3)* permits the court to waive the cause requirement "if it concludes that there is a significant possibility that the defendant is innocent of the crime."   However, "this standard does not require absolute certainty about the defendant's guilt or innocence," but only "that it is more likely than not that no reasonable juror would have found the defendant guilty beyond a reasonable doubt." *People v. Swain, 188 Mich App 609, 638-640 (2010)*.  In fact, all the evidence, old and new, incriminating and exculpatory, must be considered.  *House v. Bell, 547 U.S. 518, 538, 126 S. Ct.  2064, 165 L. Ed. 2d 1 (2006)*.  In short, the rule only requires a "gateway" showing of actual innocence to be heard on the merits.  *Id. at 536-537; Swain, 288 Mich App at 636-637*.

Had the case been properly presented with expert testimony, without improper arguments from the prosecutor, with effective assistance of counsel, and the jury having been correctly instructed on accident, there is a significant possibility that Petitioner is, in fact, innocent.  This Court, in the alternative should waive the good cause requirement.

## C.    PREJUDICE.

In a jury trial conviction, a defendant meets the actual prejudice in two ways: (1) but for the error, the defendant would have had a reasonably likely chance of acquittal, or (2) an irregularity is offensive to the maintenance of a sound judicial process that the conviction cannot stand, regardless of its effect on the outcome of the case. *MCR 6.508(D)(3)(b)(ii) and (iii).*

To a large extent, prejudice is established through the merits of the underlying claims as set forth in each post-conviction claim. *Wiggins v. Smith, 539 U.S. at 676.* Again, a trial with a properly presented defense, without prosecutorial misconduct, with effective assistance of counsel, and a jury properly instructed, a jury could reasonably acquit Petitioner.   Alternatively, the constitutional violations that defendant suffered are so offensive to a sound judicial system, that whether this Court concludes they impacted the outcome of the case, relief should be granted.

## X.    PETITIONER DABISH IS ENTITLED TO A FEDERAL EVIDEN-TIARY HEARING.

There can be no question that the state courts failed to adequately develop a record on effective assistance of trial and appellate counsel, as required by law, and that Petitioner has diligently sought to develop the factual basis for the habeas claim. Only the state is responsible for the lack of a complete record as Petitioner requested a hearing at each stage of the proceedings.   Thus, an evidentiary hearing is not

precluded.  See *Holland v. Jackson, 542 U.S. 649, 652-53, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004); Brown v. Smith, 551 F.3d 424, 429 (6th Cir. 2008)*.  It is only when the state court has adjudicated a claim on the merits, that the federal court is /*bound by the state court record.  *Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 587 (2001)* ("[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petition must overcome the limitations of *§2254(d)(1)* on the record that was before that state court."); *Ballinger v. Preslesnik, 709 F.3d 558, 561 (6th Cir. 2013)*; *Williams, 529 U.S. at 420*; *Campbell v. Vaughn, 209 F.3d 280, 285 (3rd Cir. 2000)*.  Petitioner Dabish has acted with sufficient diligence in the state court to meet the standard set forth in *28 U.S.C. §2254(e)(2)*.

In his post-conviction motion for relief from judgement, Petitioner raised claims of ineffective assistance of trial and appellate counsel (Claims IV and V).  The state trial judge relied, erroneously, on state procedural grounds to deny these claims and therefore they are not merits adjudications subject to the limitations of *Pinholster*. Additionally, those claims are not subject to the AEDPA deference, applying the *Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991)* "look through" doctrine to the last reasoned state court decision, in this case, the state trial court opinion.  Review is *de novo*.  *Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2577, 156 L. Ed. 2d 471 (2003); Maples v. Stegall, 340 F.3d 433, 437 (6th Cir. 2003)*.

## RELIEF REQUESTED

**WHEREFORE**, for the foregoing reasons, Petitioner requests this Court grant

a writ of habeas corpus, or minimally, conduct an evidentiary hearing.

Respectfully submitted,

/s/*Craig A. Daly*

**CRAIG A. DALY, P.C. (P27539)**
Attorney for Petitioner Dabish
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone:  (313) 963-1455
Fax:  (313) 961-4315
E-Mail:  4bestdefense@sbcglobal.net

/s/*Elizabeth L. Jacobs*

**ELIZABETH L. JACOBS (P24245)**
Co-Counsel for Petitioner Dabish
615 Griswold, Suite 1125
Detroit, Michigan 48226
Phone: (313) 962-4090
Fax: (313) 962-8068
Email: elzjacobs@aol.com

Dated:   March 10, 2017