UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER NORMAN DABISH,

Petitioner,

-vs-

CONNIE HORTON, Warden

Respondent.

DCT# 17-cv-10782
Hon. Gordon J. Quist

_____/

## AFFIDAVIT OF COMPLIANCE

COUNTY OF WAYNE  )
                                        )ss
STATE OF MICHIGAN)

Craig A. Daly, being first duly sworn, deposes and says:

1.   That I am counsel in the above captioned case.

2.   On March 6, 2019, this Court entered an order (ECF #14) staying the habeas corpus proceedings before it so that Petitioner could return to the Circuit Court of the County of Wayne, State of Michigan, to file a motion for relief from judgment based on newly discovered scientific evidence.

3.   The order was conditioned on the filing of that motion within 30 days of the entry of March 6, 2019 order.

4.   On March 28, 2019, I filed the Motion for Relief from Judgment in the case of People v Peter Norman Dabish, LCT 10-004848-01-FC, in the Circuit Court for the County of Wayne, State of Michigan.

5. The claims raised in that motion are as follows:

    I.    A SUCCESSIVE MOTION FOR RELIEF FROM JUDGMENT IS PERMITTED WHERE THERE IS A CLAIM OF NEW EVIDENCE AND WHERE THERE IS A SIGNIFICANT POSSIBILITY THAT THE DEFENDANT IS INNOCENT OF THE CRIME.

    II.    THIS COURT SHOULD CONDUCT AN EVIDENTIARY HEARING ON THE NEWLY DISCOVERED SCIENTIFIC EVIDENCE AND ON INEFFECTIVE ASSISTANCE OF BOTH TRIAL AND APPELLATE COUNSEL WHERE DEFENDANT'S OFFER OF PROOF INCLUDES SCIENTIFIC EVIDENCE TO SUPPORT HIS CLAIM OF INNOCENCE AND ALSO THE AFFIDAVITS OF FORMER COUNSEL.

    III.    THE PROCEDURAL REQUIREMENTS OF MCR 6.508(D)(3) HAVE BEEN MET.

6. A copy of that motion is attached to this affidavit.

Further deponent saith not.

                               CRAIG A. DALY

Subscribed and sworn to before me this 28 day of March, 2019.

_____
Notary Public
My commission expires:

Melinda D. Zawal
Notary Public of Michigan
Oakland County
Expires 06/18/2023
Acting In the County of Wayne

| STATE OF MICHIGAN<br>__ Third Judicial Circuit Court<br>__ Criminal Division | PRAECIPE<br>FOR<br>MOTION | CASE NO.<br><br>**10-004848-01-FC** |
|---|---|---|

THE PEOPLE OF THE STATE OF MICHIGAN,

　　　　　-VS-

　**PETER NORMAN DABISH**　　　　　　
　　　　　　　　　Defendant

TO THE ASSIGNMENT CLERK:

　　Please place a (here state nature of motion in brief Form) **Successive Motion for Relief**

**from Judgment and for Evidentiary Hearing Pursuant to MCR 6.502(G)(2)**　　　　　.

on the Motion Docket for **_To Be Determined_** before Judge____**Kevin S. Cox**　　___

Date:　**March 28, 2019**　　　

　　　　　　　　　　　　　　　　　**CRAIG A. DALY, P.C. (P27539)**　　
　　　　　　　　　　　　　　　　　Attorney for Defendant　　　　Michigan State Bar #
　　　　　　　　　　　　　　　　　**615 Griswold, Suite 820**　　　
　　　　　　　　　　　　　　　　　Address
　　　　　　　　　　　　　　　　　**Detroit, MI 48226　　(313) 963-1455**
　　　　　　　　　　　　　　　　　City/State/Zip　　　　　　Telephone #

NOTE: UNDER MCR 2.107(c)(1) or (2)

## CERTIFICATE OF SERVICE

(7 Days notice required)

　　I certify that on　**March 28, 2019** I served a copy of the attached motion and praecipe
upon the Wayne County Prosecutor, Criminal Division by electronic means via MiFile.

　　　　　　　　　　　　　　　　/s/*Craig A. Daly*　　　　　　
　　　　　　　　　　　　　　　　**CRAIG A. DALY, P.C. (P27539)**
　　　　　　　　　　　　　　　　Attorney for Defendant

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff,

-vs-                                  LCT 10-004848-01-FC
                                            Hon. Kevin S. Cox

PETER NORMAN DABISH

        Defendant.

_____/

**SUCCESSIVE MOTION FOR RELIEF FROM JUDGMENT
AND FOR EVIDENTIARY HEARING PURSUANT TO MCR 6.502(G)(2)**

        Defendant, PETER NORMAN DABISH, by and through his counsel, Craig A. Daly and Elizabeth L. Jacobs, asks this Court to grant this successive motion for relief from judgment and schedule an evidentiary hearing on the issues of newly discovered evidence, innocence, and the ineffective assistance of trial and appellate counsel for the following reasons:

        1.    Defendant PETER NORMAN DABISH, ("Dabish") was convicted by a jury of first-degree murder, MCL 750.316 (1)(b), second-degree murder, MCL 750.37, and torture, MCL 750.85, after a jury trial in the Third Judicial Circuit Court, County of Wayne.  He is presently incarcerated at:

Peter Dabish #786892
Chippewa Correctional Facility
4269 West M. 80
Kincheloe, MI. 49784

2.     On November 18, 2010, Dabish was sentenced to life without parole for

the felony-murder conviction and 23 to 80 years for the torture conviction. The

second degree murder conviction was vacated. The trial attorney was Dominick J.

Sorise.

3.     The judge presiding at the trial and who imposed sentence was the

Honorable Linda Parker.

## PREVIOUS APPELLATE PROCEEDINGS

4.     Defendant's attorney on direct appeal was Deday LaRene.

5.     On his appeal of right, Dabish raised the following claims:

I.     THERE WAS INSUFFICIENT EVIDENCE TO PERMIT
THE CHARGES OF TORTURE AND FELONY MUR-
DER TO BE SUBMITTED TO THE JURY.

II.     THE TRIAL COURT ERRED AS A MATTER OF LAW
AND ABUSED ITS DISCRETION BY ALLOWING THE
ADMISSION OF "OTHER ACTS" EVIDENCE THAT
RENDERED DEFENDANT'S TRIAL FUNDAMEN-
TALLY UNFAIR.

III.     THE TRIAL COURT ERRED AS A MATTER OF LAW
AND ABUSED ITS DISCRETION BY REFUSING TO
ALLOW THE DEFENSE TO AUTHENTICATE CRITI-
CAL PIECES OF EVIDENCE ON A SEPARATE RE-
CORD, AS PERMITTED BY MRE 104(c), AND IN SO

-2-

DOING VIOLATED DEFENDANT'S CONSTITUTION-
ALLY-ASSURED RIGHTS OF DUE PROCESS AND TO
PRESENT A DEFENSE.

IV.    THE TRIAL COURT ERRED AS A MATTER OF LAW
AND ABUSED ITS DISCRETION BY ALLOWING THE
ADMISSION OF UNFAIRLY PREJUDICIAL EVI-
DENCE REGARDING A TELEPHONE CONVERSA-
TION BETWEEN HIMSELF AND THE DECEASED'S
FATHER, AND ALLOWING THE PROSECUTION TO
BOLSTER THAT EVIDENCE BY MEANS OF AN
INADMISSIBLE PRIOR CONSISTENT STATEMENT,
AND IN SO DOING VIOLATED DEFENDANT'S
CONSTITUTIONALLY-ASSURED RIGHT TO DUE
PROCESS OF LAW.

V.    DEFENDANT WAS DENIED THE EFFECTIVE ASSIS-
TANCE OF COUNSEL BY TRIAL COUNSEL'S MULTI-
PLE FAILURES OF REPRESENTATION, INCLUDING
HIS FAILURE TO SECURE CRUCIAL EVIDENCE FOR
THE DEFENSE.

6.    In a supplemental brief, accepted by the Court of Appeals, Dabish raised

these additional issues:

I.    THE DEFENDANT WAS DENIED A FAIR TRIAL BY
REPEATED PROSECUTORIAL MISCONDUCT.

II.    THE ADMISSION OF EVIDENCE REGARDING MARI-
JUANA CULTIVATION DENIED DEFENDANT A FAIR
TRIAL.

III.    THE TRIAL COURT UNDULY IMPINGED ON DEFEN-
DANT'S RIGHT TO PRESENT A DEFENSE WHEN IT
REFUSED TO ALLOW THIS MEDICAL EXPERT TO
OFFER CERTAIN OPINION EVIDENCE REGARDING
THE NATURE OF THE DECEASED'S INJURIES.

-3-

7.    On August 13, 2013, The Michigan Court of Appeal, in an unpublished per curiam opinion affirmed (Docket No. 301622).  All prior decisions of the courts are  contained in the Appendix to the original motion for relief from judgment  and are in this Court's court file.

8.    On January 31, 2014, the Michigan Supreme Court denied an application for leave to appeal which raised the same claims raised in the Michigan Court of Appeals (Docket No. 147801).

9.    On March 31, 2015, Petitioner filed a motion for relief from judgment in the state trial court, requesting an evidentiary hearing on the issue of petitioner's competency, and ineffective assistance of trial and appellate counsel, raising the following claims:

> I.    DEFENDANT DABISH WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONOPIN, SEROQUEL, CELEXA AND TOPAMAX TOGETHER DURING HIS TRIAL, WHICH RENDERED HIM INCOMPETENT TO STAND TRIAL.
>
> II.    DEFENDANT DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY ON THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER.
>
> III.    THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT IN HER CLOSING ARGUMENT,

-4-

                  DEPRIVING DEFENDANT DABISH OF A FAIR TRIAL, BY ARGUING MATTERS NOT IN EVIDENCE AND IN AN INFLAMMATORY MANNER.

IV.    DEFENDANT DABISH WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) ALLOWED DABISH TO BE CON-VICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (2) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (3) FAILED TO OBJECT TO PROSE-CUTORIAL MISCONDUCT IN THE CLOSING ARGU-MENT, (4) AND FAILED TO OBJECT TO INADMISSI-BLE TESTIMONY ABOUT WHAT A WITNESS HEARD DEFENDANT SAY WITHOUT A FOUNDATION THAT THE WITNESS COULD IDENTIFY HIS VOICE.

V.    DEFENDANT DABISH HAS MET THE PROCEDURAL REQUIREMENTS OF GOOD CAUSE AND ACTUAL PREJUDICE UNDER MCR 6.508 (D) AND AN EVIDEN-TIARY HEARING IS REQUIRED.

10.    The attorney in the post-conviction proceedings was Craig A. Daly.

11.    On September 3, 2015, the Honorable Kevin S. Cox, successor judge, issued an Opinion denying Defendant's Motion for Relief from Judgment, for Oral Argument and for an Evidentiary Hearing.  The Order denying the motion was entered on September 4, 2015.

12.    On April 28, 2016, the Michigan Court of Appeals denied a delayed application for leave to appeal which raised the same claims raised in the motion for relief from judgment (Docket No. 330727).

13.    The Michigan Supreme Court denied an application for leave to appeal raising the same claims raised in the Michigan Court of Appeals (Docket   No. 153730).

14.    On March 10, 2017, Petitioner filed a   Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District alleging eight major violations of his federal constitutional rights.  These are :

I.    THERE WAS INSUFFICIENT EVIDENCE TO SUP-PORT THE TORTURE CONVICTION AND THE FELONY MURDER CONVICTION WHICH ALLEGED TORTURE AS ITS PREDICATE OFFENSE.

II.    PETITIONER DABISH WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL WHEN THE COUNTY JAIL ADMINISTERED SIGNIFICANT AMOUNTS OF KLONOPIN, SERO-QUEL, CELEXA AND TOPAMAX TOGETHER DUR-ING HIS TRIAL, WHICH RENDERED HIM INCOMPE-TENT TO STAND TRIAL.

III.    PETITIONER DABISH WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY (1) FAILED TO PRESENT A CRITICAL WITNESS IN SUPPORT OF THE DEFENSE, (2) AL-LOWED DABISH TO BE CONVICTED WHEN HE WAS INCOMPETENT TO STAND TRIAL, (3) FAILED TO REQUEST AN INSTRUCTION ON ACCIDENT, (4) FAILED TO OBJECT TO PROSECUTORIAL MISCON-DUCT IN HER CLOSING ARGUMENT, AND (5) FAILED TO OBJECT TO INADMISSIBLE TESTIMONY ABOUT WHAT A WITNESS HEARD PETITIONER DABISH SAY WITHOUT A FOUNDATION THAT THE WITNESS COULD IDENTIFY HIS VOICE.

IV.  PETITIONER DABISH WAS DENIED DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL JUDGE FAILED TO INSTRUCT THE JURY OF THE DEFENSE OF ACCIDENT AND VOLUNTARY MANSLAUGHTER.

V.  THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT DEPRIVING PETITIONER DABISH OF A FAIR TRIAL.

VI.  PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT ADMITTED PRIOR BAD ACTS EVIDENCE AND ALSO ADMITTED EVIDENCE OF MARIJUANA CULTIVATION.

VII.  THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO PRESENT A DEFENSE WHEN IT REFUSED TO ALLOW THIS MEDICAL EXPERT TO OFFER OPINION EVIDENCE REGARDING THE ORIGIN OF THE DECEASED'S INJURIES AND REFUSED TO ADMIT EVIDENCE OF THE DECEASED'S EMAILS UNLESS THE DEFENDANT AUTHENTICATED THEM IN FRONT OF THE JURY.

VIII.  THE TRIAL COURT DENIED PETITIONER DUE PROCESS OF LAW WHEN IT ADMITTED, OVER OBJECTION, EVIDENCE OF A PHONE CALL BETWEEN MR. DEMAYO AND THE PETITIONER, AND EVIDENCE OF A CALL MADE BY MR. DEMAYO TO THE WATERFORD POLICE DEPARTMENT.

IX.  ASSUMING THE APPLICATION OF ANY PROCEDURAL BAR TO CLAIMS RAISED IN THIS PETITION, DABISH HAS SHOWN GOOD CAUSE AND PREJUDICE TO OVERCOME ANY SUCH STATE PROCEDURAL RULE.

X.    PETITIONER DABISH IS ENTITLED TO A FEDERAL
      EVIDENTIARY HEARING.

15.    On March 6, 2019, the Magistrate Judge Ellen Carmody of the United

States District Court for the Western District entered an order staying the pending

federal petition, thus permitting Mr. Dabish to present his new claim to state court.

(Appendix C).

## SUCCESSIVE PETITION UNDER MCR 6.502(G)

16.    Throughout the pendency of these proceedings, Petitioner has continued

to investigate this matter in order to prove his innocence.

17.    He has now obtained new scientific evidence in the form of an expert

opinion supporting his innocence.

18.    At trial, the prosecution alleged that the defendant beat the victim. The

resulting blunt force injuries to her head caused her death. (Dr. Sung, Vol VIII pp 38-

39).

19.    The defense contended that she died of a subdural hematoma that she

had incurred during a car accident a few days before her death. (Dr. Dragovic XIV

pp 32-33, XIII p 4).   Other injuries were due to falling.   It offered expert opinion on

these issues.   Falling was attributable to her high blood alcohol level. (See attached

Statement of Facts 7-8).

20.     There was documented evidence offered at trial that a paramedic had inserted a breathing tube into the esophagus of the deceased rather than into her windpipe. As a result, the victim was deprived of oxygen for at least ten minutes. She did not have vital signs for ten minutes. Lack of oxygen for ten minutes could contribute to and be consistent with brain death. (Dr. Hornyak, Vol IV 95-122).

21.     Now, newly discovered scientific evidence in the form of a report from Michael Baden, a forensic expert on the cause of death, supports Petitioner's theory of his innocence in that Dr. Baden opines that none of the fresh blunt force injuries were allegedly inflicted by Mr. Dabish, were lethal and that the only cause of death was the deprivation of oxygen. (Appendix A; Baden Report and Appendix B; Curriculum Vitae).

22.     In the state of Michigan, grossly erroneous or grossly unskillful medical treatment is a defense to murder if the original injury might not have caused death and if the victim had not received such treatment. *People v. Herndon*, 246 Mich App 371, 399-400 (2001); M Crim JI 16.16.

23.     This report shows that trial counsel failed to adequately investigate the defense thus denying Mr. Dabish the effective assistance of counsel guaranteed to him by the Sixth Amendment. *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984).

24.     Likewise, appellate counsel was ineffective for failing to investigate this proof of innocence and raising it on appeal.

25.     Defendant Dabish contends that he is innocent of the offenses of which he was convicted.

## THE INSTANT PROCEEDING

26.     Because Mr. Dabish had already filed his petition for a writ of habeas corpus in federal court, he had to seek permission of that court to return to this court to raise the issue presented in this motion. Under 28 USC. §2254, a petitioner must first exhaust all state remedies. See, *O'Sullivan v. Boerckel*, 526 US 838, 845, 119 S Ct 1728, 1732 (1999).

27.     To satisfy the exhaustion requirement, the claim must be "fairly presented" to the state courts, meaning that the prisoner must have asserted both the factual and legal basis for the claims in the state courts. *McMeans v. Brigano*, 228 F3d 674, 681 (6th Cir. 2000).

28.     Where facts supporting a motion for new trial are not on the record, the trial court should hold an evidentiary hearing so that a record may be made. *People v. Ginther,* 390 Mich 436 (1973); MCR 6.508( C).

30.     Mr. Dabish is represented by retained counsel and does not need counsel appointed.

**WHEREFORE**, for the foregoing reasons, Peter Dabish asks this Court to grant this successive motion for relief from judgment and schedule an evidentiary hearing on newly discovered scientific evidence, innocence, and ineffective assistance of both trial and appellate counsel, and grant a new trial.

Respectfully submitted,

/s/*Craig A. Daly*

**CRAIG A. DALY, P.C. (P27539)**
Attorney for Petitioner Dabish
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone:  (313) 963-1455
Fax:  (313) 961-4315
E-Mail:  4bestdefense@sbcglobal.net

/s/*Elizabeth L. Jacobs*

**ELIZABETH L. JACOBS (P24245)**
Co-Counsel for Petitioner Dabish
615 Griswold, Suite 1125
Detroit, Michigan 48226
Phone: (313) 962-4090
Email: elzjacobs@aol.com

Dated: March 28, 2019

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff,

-vs-                                     LCT 10-004848-01-FC

                                            Hon. Kevin S. Cox

PETER NORMAN DABISH

        Defendant.

_____/

**BRIEF IN SUPPORT OF SUCCESSIVE
MOTION FOR RELIEF FROM JUDGMENT AND FOR
<u>EVIDENTIARY HEARING PURSUANT TO MCR 6.502(G)(2)</u>**

## TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.    A SUCCESSIVE MOTION FOR RELIEF FROM JUDG-
        MENT IS PERMITTED WHERE THERE IS A CLAIM OF
        NEW EVIDENCE AND WHERE THERE IS A SIGNIFI-
        CANT POSSIBILITY THAT THE DEFENDANT IS INNO-
        CENT OF THE CRIME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.   THIS COURT SHOULD CONDUCT AN EVIDENTIARY
        HEARING ON THE NEWLY DISCOVERED SCIENTIFIC
        EVIDENCE AND ON INEFFECTIVE ASSISTANCE OF
        BOTH TRIAL AND APPELLATE COUNSEL WHERE
        DEFENDANT'S OFFER OF PROOF INCLUDES SCIEN-
        TIFIC EVIDENCE TO SUPPORT HIS CLAIM OF INNO-
        CENCE AND ALSO THE AFFIDAVITS OF FORMER
        COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    III.  THE PROCEDURAL REQUIREMENTS OF MCR 6.508
        (D)(3) HAVE BEEN MET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

APPENDIX

## STATEMENT OF FACTS

Petitioner Peter Dabish was convicted of first-degree murder, MCL 750.316 (1)(b), second-degree murder, MCL 750.37, and torture, MCL 750.85, after a jury trial in the Third Judicial Circuit Court, County of Wayne. The second degree murder conviction was vacated because it is a lesser included offense of the first degree murder conviction. He was sentenced to a mandatory life sentence and to 23-80 years on the torture conviction.

This case involves the death of DIANA DeMAYO ("Ms. DeMayo") on March 11, 2010 after being taken from the Fort Shelby apartments in Detroit.[1]   What happened to Ms. DeMayo that led to her death was hotly contested at trial.  Medical examiners from Wayne County testified the death was caused by multiple blunt force to the head sustained by blows.  The prosecution argued that Dabish killed Ms. DeMayo because he was angry with her.  The defense argued that the injuries were a result of accidental falls due to drug and alcohol abuse, as well as a well documented car accident, two days prior to her death.  A defense forensic expert testified that the injuries that caused her death were not from blows to the head and that some of them were not sustained at or near the time of death.

---

[1]The Fort-Shelby Apartments were connected to the Double Tree Hotel and shared an entrance, as well as employees.

Dabish and Ms. DeMayo had known each other since high school (Vol. VI, p. 3).[2] Ms. DeMayo had returned to Michigan in February of 2010 after attending college in Miami, Florida (Vol. V, p. 152, 155). Ms. DeMayo was seeing a psychiatrist in Florida for anxiety and had been prescribed Xanax (Vol. V, p. 164-165). Upon her return home, Ms. DeMayo and Dabish began spending time together.

On March 9, 2010,, Dabish, who had been living in Waterford, Michigan, signed a lease for an apartment at the Fort-Shelby Hotel in downtown Detroit (Vol. X, p. 30-31). The Shelby was connected to the Double Tree Hotel and shared an entrance, as well as employees. Dabish moved in on March 10th. Ms. DeMayo also began moving her clothing into the apartment. (Vol. IV, p. 54-58; Vol. VII, p. 73). When Mr. Dabish found out, he complained to the front office supervisor that someone had given a female permission to enter his apartment without his consent (Vol. V, p. 60-61). He was also was upset that Ms. DeMayo had allegedly given her phone number to the valet and he threatened to "kick somebody's ass." (Vol. IV, p. 60-62; Vol. VII, p. 83-84).

On March 10th, Edward DeMayo, Diana's father, had several telephone contacts with his daughter and Dabish. After noticing several 911 calls on her phone,

---

[2]Trial was held on October 4, 5, 6, 7, 8, 12, 13, 18, 19, 20, 21, 22, 25, 26, 28, 2010. The transcripts are identified as Vol. I through XV, respectively.

he called and Ms. DeMayo sounded happy and had no explanation for the 911 calls (Vol. V, p. 120-122). Later, Dabish called Mr. DeMayo on Ms. DeMayo's phone, allegedly made degrading comments about a dinner he had attended at his house, said he was having anal sex with his daughter because he was mad at him (*Id.*).

In subsequent calls, Dabish allegedly said Ms. DeMayo could not come to the phone because she was crying (Vol. IV, p. 127). However, Ms. DeMayo called her father and explained that she was alright and not harmed. For his part, Dabish apologized for his earlier calls, explaining that he had a few drinks (Vol. IV, p. 134). On March 11, 2010 around 9:20 a.m., Dabish called Mr. DeMayo and told him that Diana DeMayo had overdosed on Klonopin (Vol. IV, p. 139).

ERIC BROWN, the general manager of the family business, answered two calls on March 11, 2010, at around 5:03 a.m. and 5:13 a.m. from Dabish reporting "a situation" with a young lady in his apartment that he thought had overdosed. Dabish sounded scared and panicky. Brown told Dabish to put her in the shower and call EMS (Vol IV, 76-79).

Police officers ANGELA JACKSON and KENNETH LENTON were first on the scene at around 6:20 a.m (Vol. VII, p. 91-93; Vol. X p. 95). When Dabish opened the door to the apartment, he yelled at the officers to "get your ass in here because she's dying" (Vol. VII, p. 94). Dabish added, "the bitch tried to kill herself, she tried

to OD" (Vol. VII, p. 95). Dabish was frantic, screaming, yelling and cussing (Vol. VII, p. 97). When they entered the apartment they saw a female in the living room with a little blood around her mouth and nose and breathing shallow (Vol. VII, p. 97-98). The woman's clothes were wet as were Dabish's clothes. The officers noticed blood on Dabish's clothes, the carpet and smeared on the bed (Vol. VII, p. 96-97). A kitchen cabinet door was broken (Vol. VII, p. 97-98). There was a prescription pill bottle on the island in the kitchen, but the police did not take it (Vol. VII, p. 106). Dabish said he had thrown all the knives from the kitchen out a window to keep DeMayo from killing herself, but no knives were found outside (Vol. VII, p. 102). Dabish also told the officers that he had fallen asleep and woke up to DeMayo walking around bleeding from the nose and mouth (Vol. VII, p. 103). He explained that he had put Ms. DeMayo in the shower to try to revive her and that did not help. He slapped her to wake her up and applied CPR and chest compressions in an attempt to revive her (Vol. VII, p. 112, 120).

Dabish also said that Ms. DeMayo had an argument with her father and because of him, she was going to kill herself (Vol. VII, p. 104, 114). Dabish gave inconsistent accounts of his relationship with DeMayo, saying at the time "that girl is my life", but also telling the police he barely even knew her and had no contact information for her (Vol. VII, p. 103, 108). Dabish was briefly handcuffed at the apartment so the

officers could conduct their investigation but he was subsequently released (Vol. VII, p. 110).

Two EMS technicians arrived at the apartment on the 11th, shortly after 6:30 a.m (Vol. IV, 160; Vol. VIII, p. 7). When ERIC HANSEN and AMORENA COLLINS knocked on the apartment door, Dabish opened the door and said "get the f--- in here" (Vol. IV, p. 163; Vol. VII, p. 8-9). Dabish was pacing back and forth, screaming, irate and "out of control" (Vol. IV, p. 164). Dabish pointed to Ms. DeMayo who was lying on a blanket in the living room (Vol. IV, p. 165). Dabish said she had stopped breathing and overdosed on his Klonopin (Vol. IV, p. 165-167). There was a drop of blood from her nose and abrasions on her head and chest (Vol. IV, p. 167, 177). Her face was purple in color and there was a weak pulse (Vol. IV, p. 168-170). Dabish pleaded with them to save Ms. DeMayo, explaining she took his Klonopin, she had tried to hurt herself and he had administered CPR (*Id.*, p. 11). However, Dabish could not locate the pill bottle at that time (Vol. IV, p. 168). The front of Dabish's shirt was also covered in blood (Vol. IV, p. 163, 169).

Collins first attempted to provide oxygen through a bag valve device, but was unsuccessful, so she inserted an endotracheal tube (Vol. IV, p. 141). Blood came up through the tube, which could come from the lungs or stomach if the tube was

displaced (Vol. IV, p. 281). The endotracheal tube was not properly placed in the trachea and was removed at the hospital (Vol. IV, p. 119-120).

NICOLE DABISH, the mother of Peter Dabish testified that Ms. DeMayo and her son were friends since high school (Vol. VI, p. 6). She helped her son and Ms. DeMayo move from Waterford to the apartment at Fort Shelby (Vol. VI, p. 24). Dabish called her early the next morning saying Ms. DeMayo had overdosed and to come to the apartment (Vol. VI, p. 34). Dabish told her he had called 911. His mother instructed him to slap her in the face to revive her (Vol. VI, p. 69). When she arrived at the scene, she was not able to enter the apartment, but saw Ms. DeMayo on a gurney (Vol. VI, p. 110). She said Dabish then went to the hospital where Ms. DeMayo's father was (Vol. VI, p. 45). Mrs. Dabish had seen Ms. DeMayo "high" "quite a few times" and saw her pill bottles in the Waterford apartment (Vol. VI, p. 128-129).

Medical testimony from DR. MARK HORNYAK, a neurosurgeon at Detroit Receiving Hospital, JERRY CHU, the Director of toxicology at the Detroit Medical Center, and Dr. LOKMAN SUNG, an assistant medical examiner at Wayne County was presented. Dr. Hornyak was consulted because of the head injuries to Ms. DeMayo (Vol. IV, p. 95-97). A cat scan revealed a subdural hematoma with no meaningful prognosis and since she was in a deep coma, nothing could be done (Vol.

-6-

IV, p. 98-99).   There were no skull fractures, but a small laceration above the eyebrow was noted (Vol. IV, p. 113).   A urine toxicology screen was positive for benzodiazepine and cannabis (*Id.*).   Ethanol level was 42 (Vol. IV, p. 114).   The medical records indicated that Ms. DeMayo was not properly intubated when she arrived at the hospital and had ten minutes of "downtime", which contributed to her state of being brain dead (Vol. IV, p. 121-122).   Dr. Hornyak described the injury to the brain as caused by some sort of blunt force trauma, a "high velocity or high energy injury" commonly caused by high speed motor vehicle accidents or falls from heights or unprotected falls (Vol. IV, p. 104-106).   This would be in contrast to a "low energy injury" such as being struck with an object, for example a baseball bat (*Id.*).

Mr. Chu  received blood and urine samples from Ms. DeMayo for analysis (Vol. V, p. 57-58).   The blood was negative for drugs, but had a blood alcohol level of .04, one-half the legal limit for driving (Vol. V, p. 61, 73).   The blood alcohol at the time of the incident may have been higher.   The urine tested positive for benzodiazepine, which includes Klonopin (Vol. V, p. 62-65).   It was also positive for cannabis (Vol. V, p. 84).

A urine test is more "sensitive" than a blood test because blood metabolizes quickly (Vol. V, p. 86, 88-89). Klonopin is commonly used to treat panic disorders in adults (Vol. V, p. 52).

Dr. Sung performed the autopsy (Vol. VIII, p. 38). Dr. Sung opined that the cause of death was blunt force trauma,[3] caused by at least eight blows to the head (Vol. VIII, p. 38-39). There was no defensive wounds but older bruises to the extremities were noticed. The internal examination revealed a large hemorrhage on the left side of the dura covering the brain with bleeding directly into the brain (Vol. VIII, p. 64). According to Dr. Sung, the injuries were "consistent with" the possibility of being caused by a hard slap, fist, kicking or being slammed against a surface and not a fall (Vol. VIII, p. 85-86, 114). The exact cause of the injury could not be determined. There were no skull fractures and no evidence that a weapon caused the injuries (Vol. VIII, p. 96). There were no injuries to the scalp and the time that the bruising and abrasions were caused could not be determined either (Vol. IX, p. 9). It should be noted that Dr. Sung did not shave the scalp.

The defense called police officer JAMES JARRETT, of the Waterford Township Police who stated that Ms. DeMayo was issued a traffic violation on March 8th for a car accident she had with another vehicle (Vol. XIV, p. 4-8). An airbag in

---

[3]There was a single blow to the right shoulder and one to the right eye.

her vehicle had been deployed in the accident, but no apparent injuries to her were noted (*Id.*)

Dr. LJUBISA DRAGOVIC, a forensic pathologist, neuropathologist, and current Medical Examiner for Oakland County reviewed the autopsy reports, findings and testimony prepared by the prosecution (Vol. XI, p. 79-89). Dr. Dragovic opined that the injury to DeMayo's right eye socket was not indicative of a slap or punch, but rather was consistent with her head striking the edge of a stationary object (Vol. XI, p. 92-96). The injury to her nose was consistent with a fingernail scrapping and the injury to her lower lip was not consistent with having been struck with a fist or slap (Vol. XI, p. 97-98). Instead, those injuries were consistent with a person forcibly grabbing her face and head (Vol. XI, p. 100-101). The knee injury was consistent with a fall and the bruises on the leg and hips appeared to be of different ages (Vol. XIV, p. 14-15). The shoulder injuries were consistent with a forceful squeeze rather than a punch or blow and none of the injuries to her face or body were fatal injuries (Vol. XIV, p. 17-21).

As far as the fatal head injuries, Dr. Dragovic testified that microscopic examination of the brain showed a healing process of the injury, a process present for a minimum of 24 to 36 hours prior to death (Vol. XIV, p. 32-33; Vol. XIII, p. 4). The subdural bleeding was the result of the head hitting something such as an unyielding

surface (Vol. XIII, p. 10-12). Dr. Dragovic found three general areas of hemorrhaging to the back of the decedent's head (Vol. XIII, p. 20-21). The cause of death was blunt force trauma and complications (Vol. XIII, p. 381). However, it was unclear if the injuries to the head were caused by falls or being pulled or propelled into something by another person (Vol. XIII, p. 40).

Dr. Dragovic testified that this was a suspicious death and so homicide is presumed in such cases. But he concluded that one cannot say in this case that this was a homicide because the person could have fallen down because of intoxication. He also could not say what the manner of death was because there was not enough information.(Vol. XIII, p. 39-40).

In rebuttal, Dr. CARL SCHMITT, a forensic pathologist employed by Wayne County, contradicted Dr. Dragovic, saying that there was no evident healing process in the brain, or no way to accurately date a bruise (Vol. XIV, p. 53-56). Dr. Schmitt could not tell what object struck Ms. DeMayo's head and disagreed with Dr. Dragovic regarding the cause of the facial injuries (Vol. XIV, p. 71-72). Not surprisingly, Dr. Schmitt agreed with the findings of his colleague, Dr. Sung.

Mr. Dabish challenged his convictions on the direct appeal and then filed a collateral appeal in state court pursuant to Michigan Court Rule 6.500. He was denied relief in all courts.

On March 10, 2017, he filed a petition for a writ of habeas corpus in the United States District Court. The Attorney General for the State of Michigan filed an answer and Petitioner's reply brief was filed on May 10, 2018.

On December 5, 2018, Dr. Michael Baden, a forensic pathologist, transmitted a report to counsel herein, containing his opinion on the cause of death. He first found that the blunt force injuries were limited to the skin and caused no significant internal damage. They were not lethal blows. The subdural hemorrhage was the result of a fall and not from a direct blow. Finally, he concluded that the most significant factor causing death was the "anoxic cerebral damage caused by improper intubation." (Appendix A: Baden Report, Appendix B: Baden Curriculum Vitae)

This case is before this Court pursuant to an order entered on March 6, 2019, by Magistrate Judge Ellen Carmody, of the United States District Court, Western Division. (Appendix C: Order).

## ARGUMENT

**I.   A SUCCESSIVE MOTION FOR RELIEF FROM JUDG-
MENT IS PERMITTED WHERE THERE IS A CLAIM OF
NEW EVIDENCE AND WHERE THERE IS A SIGNIFI-
CANT POSSIBILITY THAT THE DEFENDANT IS INNO-
CENT OF THE CRIME.**

MCR 6.502(G)(2) permits the filing of a successive motion for relief from

judgment based on a claim of new evidence that was not discovered before the first

motion for relief from judgment was adjudicated. New evidence includes scientific

evidence. MCR 6.502(G)(3). The term scientific evidence is a broad category

including but not limited to shifts in science.

The newly discovered evidence offered pursuant to MCR 6.502(G)(3) does not

have to meet the procedural threshold  found in *People v. Cress*, 468 Mich 678

(2003). The only requirement is that the evidence was not discovered before the first

motion. *People v. Swain*, 499 Mich 920 (2016); *People v. Watkins*, 500 Mich 851

(2016); *People v. Robinson*, 503 Mich 883 (2018).

The *Cress* factors applicable are  1) the evidence, not its materiality is newly

discovered, 2) the evidence is not cumulative, 3) the evidence  could not have been

produced at trial using reasonable diligence, and 4) the new evidence makes a

different result probable on retrial. Factor #3, pursuant to *Swain*, is not applicable.

-12-

Furthermore, where there is a significant possibility that the defendant is innocent of the crime, the good cause requirement of MCR 6.508(D)(3) is not applicable. *People v. Johnson*, 502 Mich 541, 566 (2018).

In the instant case, the new scientific evidence is the expert opinion of Dr. Michael Baden concerning the lethality of any injuries inflicted by Mr. Dabish. The prosecution alleged that Peter Dabish was responsible for several blunt force injuries. Dr. Baden opined that these were not lethal. Thus the intervening cause doctrine was available as a defense. He further opined that the grossly unskillful attempt to intubate the victim left her without oxygen for ten minutes and this was the cause of death. (Appendix A: Baden Report, Appendix B: Baden Curriculum Vitae). There is a reasonable probability that at retrial with this evidence, the jury would find the defendant not guilty of murder because the cause of death was attributable to the actions of the EMS personnel depriving Ms. DeMayo of oxygen for ten minutes and not the conduct of the Defendant. Additionally, Dr. Baden's report undermines confidence in the torture conviction.

This evidence was not discovered until 2018 when Dr. Baden issued his report. The opinion of this expert is not cumulative to the opinion testimony offered at trial or any other evidence offered at trial. Dr. Dragovic, the defense expert at trial, did not testify that the blows attributable to the defendant were not lethal. Dr. Dragovic

-13-

equivocated on the cause of death, and ultimately merely attacking the certainty of the prosecution's expert's opinion. (Statement of Facts pp 12-13).

Defendant does not have to show cause for the failure to produce this evidence at trial because the evidence raises a significant possibility that the defendant is innocent. *People v. Johnson*, *supra* and *People v. Swain*, *supra*. ( Issues II and III do discuss cause). Here Defendant is not just arguing legal innocence. He is arguing factual innocence. Nor is it merely another cumulative witness or a recanting witness. It is reliable scientific evidence.

**II.    THIS COURT SHOULD CONDUCT AN EVIDENTIARY HEARING ON THE NEWLY DISCOVERED SCIENTIFIC EVIDENCE AND ON INEFFECTIVE ASSISTANCE OF BOTH TRIAL AND APPELLATE COUNSEL WHERE DEFENDANT'S OFFER OF PROOF INCLUDES SCIENTIFIC EVIDENCE TO SUPPORT HIS CLAIM OF INNOCENCE AND ALSO THE AFFIDAVITS OF FORMER COUNSEL.**

**A.    LEGAL AUTHORITY**

To find that a defendant's right to the effective assistance of counsel was so undermined that it justifies reversal of an otherwise valid conviction, a defendant must show 1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and 2) that the representation so prejudiced the defendant as to deprive him of a fair trial. As to the second prong, the defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington,* 466 US 668 (1984); *People v. Pickens*, 446 Mich 298 (1994).

An attorney owes the client the duty to make reasonable investigations or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland v. Washington, supra* p. 691. This is a constitutionally imposed duty. *People v. Grant*, 470 Mich 477 (2004). Trial counsel's strategic decisions are deferred to only to the extent that those decisions are based on investigation. *Strickland, supra at* 689-693.

### B.   EVIDENTIARY HEARING

Where the grounds for an ineffective assistance of counsel claim are not obvious from the record, an evidentiary hearing should be held in the trial court.

> A convicted person who attacks the adequacy of the representation he received at his trial must prove his claim. To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court ... which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately.

*People v. Ginther*, 390 Mich 436 442-443 (1973); *People v. Mitchell*, 454 Mich 145 (1997)(Remanded for a hearing).

No Michigan case speaks to the quantum of proof necessary on a motion for new trial to obtain a hearing in the trial court. The *Ginther* decision and the appellate

court rule authorizing remands to the trial court just require that a claim be identified and that a need for a testimonial record be shown. MCR 7.211(C)(1)(a)(ii).  Such motions can be supported by affidavit or by an offer of proof.

The Second Circuit requires only that the claim be plausible.

> At this preliminary stage, he is not required to establish that he will necessarily succeed on the claim, and indeed, if he could presently prove that proposition, no hearing would be necessary.

*United States v. Tarricone*, 996 F2d 1414, 1418 (2nd Cir. 1993)

The Sixth Circuit, in less than dicta, refers to a prima facie case being made out. *White v. McAninch*, 235 F3d 988 (6th Cir. 2000)..   A prima facie showing of the violation of a constitutional right means *only* that "an applicant  . . . alleges facts which, if proved, would entitle him to relief." *Townsend v. Sain,* 372 US 293, 312 (1963) *overruled on other grounds, Keeney v. Tamayo-Reyes,* 504 US 1 (1992).

In the instant case, the grounds for an ineffective assistance claim are not obvious from the record. Those areas in which a record must be made are indicated below and in Issue III.

### C.    FIRST PRONG - DEFICIENT PERFORMANCE

In this case, Defendant claims that trial counsel was ineffective for failing to offer proof that the victim died as a result of grossly erroneous medical treatment and that any blows struck by the defendant, for instance the slap to try and bring her back

-16-

to consciousness, were non lethal. Trial counsel was ineffective for failing to mount the defense and ineffective for failing to ask for a jury instruction on this defense.

The Sixth Amendment to the United States Constitution guarantees to every criminal defendant the effective assistance of counsel. Part of the duty owed by counsel to his client is to conduct a reasonable investigation. *Strickland v. Washington,* 466 US 668, 690-693; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

Mr. Dabish has always maintained that he is innocent of these charges. He has always denied inflicting blunt force lethal injuries to the head of the victim. Prior to trial, defense counsel had access to the medical notes showing that a problem arose when emergency medical personnel tried to intubate Ms. Demayo. Thus, the trial attorney was on notice that the technician's action of introducing a tube into the esophagus of the victim, thus depriving her of oxygen, must be investigated as the cause of death.

Michigan jurisprudence recognizes that if a wound inflicted by defendant is nonmortal and if grossly erroneous medical treatment causes death, then the defendant is not guilty of murder. *People v. Cook,* 39 Mich 236, 240 (1875). In C*ook,* the defendant shot the victim, but the doctor administered an overdose of morphine. *Cook* laid out a two-tiered analysis. Was the injury inflicted by the .defendant fatal and if it was not, was the medical treatment grossly erroneous or grossly unskillful.

-17-

See also *People v. Herndon*, 246 Mich App 371 (2001)(the intervening cause doctrine

applies to grossly negligent medical care).

The pertinent jury instruction reads as follows:

M Crim JI 16.16 Susceptible Victim / Improper Medical Treatment

(1) If the defendant unlawfully injured [name deceased] and started a series of events that naturally or necessarily resulted in [name deceased]'s death, it is no defense that:

[Choose one or more of (2), (3), or (4):]

(2) the injury was not the only cause of death.

(3) [name deceased] was already weak or ill and this contributed to [his / her] death.

(4) the immediate cause of death was medical treatment. **It is a defense, however, if the medical treatment was grossly erroneous or grossly unskillful and the injury might not have caused death if [name deceased] had not received such treatment.**

(Emphasis added).

In this case, Dr. Baden opined that the blows the prosecution attributed to Peter

Dabish were not lethal. Thus the intervening cause doctrine was available as a

defense. He further opined that the grossly unskillful attempt to intubate the victim

left her without oxygen for ten minutes and this was the cause of death.

-18-

Trial counsel's failure to recognize grossly erroneous medical treatment as a viable defense meant that counsel, by default, adopted a defense that was unsupported by the evidence. The injuries to the victim were caused by her repeatedly falling because she was so intoxicated and high. But the toxicology report and medical and scientific evidence offered at trial did not support this contention. There was no evidence of benzodiazepine in her blood. Evidence was found in her urine but the expert opined that it had been ingested four days earlier. Her blood alcohol level was .04, one half the legal limit for driving. There was evidence of cannabis in the urine, but not in the blood. (Statement of Facts p. 6). Thus, this strategy was unreasonable.

The only viable defense, and one which also had the virtue of being true, is that the EMS technician's gross incompetence deprived Ms. DeMayo of oxygen for more than ten minutes which led to her death.

The failure to investigate a complete defense to a charge of murder can never be considered a reasonable strategic choice.

Likewise, former appellate counsel's failure to raise this issue on the direct appeal constitutes ineffective assistance of counsel on appeal.

Mr. Dabish should be permitted to hold a hearing on this crucial issue. At this hearing, he would call not only Dr. Baden but also the trial attorney, Dominick Sorise and the former appellate counsel DeDay Larene.

### III. THE PROCEDURAL REQUIREMENTS OF MCR 6.508 (D)(3) HAVE BEEN MET.

#### A. TEST AND STANDARD OF REVIEW

Generally before this Court can entertain a motion for relief from judgment, Petitioner must meet the two prong test of MCR 6.508(D)(3). First, he must show a reason why these issues were not raised on the direct appeal. That's the cause prong. Second, he must show that he was actually prejudiced by the omission of these issues.

However, newly discovered scientific evidence is not subject to the cause and prejudice requirements of the court rule. Additionally, according to the court rule, cause does not have to be shown where there is a significant possibility that the defendant is innocent.

#### THE CAUSE PRONG

Under MCR 6.508(D)(3)(a), the cause prong is satisfied if defendant shows that his appellate attorney was ineffective for failing to raise the issue on the direct appeal. *People v. Reed*, 449 Mich 375, 378-379 (1995); *Murry v. Carrier*, 477 478, 492 (1986)(procedural default under 28 USC 2254 is excused upon a showing of ineffective assistance of appellate counsel). The performance of appellate counsel is

-20-

properly reviewed under the *Strickland* standard. *People v. Uphaus*, 278 Mich App 174, 186 (2008). See *Webb v. Mitchell*, 586 F3d 383, 398 (6th Cir. 2009). A defendant "must show that his appellate counsel's decision not to raise a claim of ineffective assistance of trial counsel fell below an objective standard of reasonableness and prejudiced his appeal." *Uphaus, supra* at 186. A defendant must also overcome the presumption that his appellate counsel's decision constituted sound strategy. *Id.* Appellate counsel may legitimately winnow out weaker arguments in order to focus on those arguments that are more likely to prevail. *Id.*

Appellate counsel need not raise every non-frivolous claim in order to provide effective assistance. *Jalowiec v. Bradshaw*, 657 F3d 293, 321-22 (6th Cir. 2011). The failure to raise an issue on appeal constitutes ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the outcome of the appeal. *Howard v. Bouchard*, 405 F3d 459, 485 (6th Cir. 2005).

To show ineffective assistance when appellate counsel presents one argument instead of another, petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Caver v. Straub*, 349 F3d 340, 348 (6th Cir. 2003) (quoting *Smith v. Robbins,* 528 US 259, 288 (2000)).

## THE PREJUDICE PRONG

Under MCR 6.508(D)(3)(b), the definition of actual prejudice, relevant to the

issues raised here, is defined as follows:

> (I)  in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;
>
> . . .
>
> (iii) . . . the irregularity was so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand regardless of its effect on the outcome of the case.

### B.    DISCUSSION

#### 1.    Cause

In this case, the cause prong is met because former appellate counsel was

ineffective for the failure to investigate and raise the issue presented here. The issues

raised on the direct appeal were basically evidentiary issues and did not go to

innocence.  While the sufficiency issue was important, without the expert testimony

on the issue of grossly erroneous medical treatment, the causal connection between

the predicate felony and the felony murder conviction could not be severed.

Consequently, the sufficiency evidence could be, and was, easily rejected by the

appellate court.  The innocence issue raised here is substantially stronger than the

issues raised on the direct appeal.

There was no sound appellate trial strategy that would justify the exclusion of the issue raised here. *People v. Riley* (After Remand), 468 Mich 135, 140 (2003). And since former counsel did not spot these issues, there were no strategic choice to which this court would have to defer between the issue raised on direct appeal and the issue raised now. (Exhibit E; Larene Affidavit).

### 2.   Prejudice

On the second prong, prejudice is shown because absent trial counsel's deficient performance, defendant had a reasonably likely chanced of acquittal. MCR 6.508 (D) (3) (b)(I)  Absent appellate counsel's deficient performance, Mr. Dabish had a reasonably likely chance of a different outcome on appeal.  MCR 6.508(D)(3) (b)(iii).

This new scientific evidence would support a request for the jury instruction on Susceptible Victim/Improper Medical Treatment. M Crim JI 16.16. The jury would be told that it is a defense to murder if the medical treatment was grossly erroneous or grossly unskillful and the injury might not have caused death if the deceased had not received such treatment. M Crim JI 16.16(4).  There is a reasonable probability that the jury would acquit the defendant at a retrial.

The Court is also referred to the discussion immediately following in subsection (3).

### 3.   Significant Possibility of Innocence

Effective January 1, 2019, the court rule regarding successive motions, MCR

6.502(G), was amended as follows:

> (2) A defendant may file a second or subsequent motion based on a
> retroactive change in law that occurred after the first motion for relief
> from judgment or a claim of new evidence that was not discovered
> before the first such motion. The clerk shall refer a successive motion
> that asserts that one of these exceptions is applicable to the judge to
> whom the case is assigned for a determination whether the motion is
> within one of the exceptions.
>
> The court may waive the provisions of this rule if it concludes that
> there is a significant possibility that the defendant is innocent of the
> crime.
>
> (3) For purposes of subrule (G)(2), "new evidence" includes new
> scientific evidence. This includes, but is not limited to, shifts in science
> entailing changes:
>
>> (a) in a field of scientific knowledge, including shifts in
>> scientific consensus;
>>
>> (b) in a testifying expert's own scientific knowledge and
>> opinions; or
>>
>> ( c) in a scientific method on which the relevant scientific
>> evidence at trial was based.

In the present case, the new scientific evidence is the expert opinion of Dr.

Michael Baden who attributes the cause of death to the grossly erroneous medical

treatment of the EMS technician the subdural hematoma, not to any action of Mr.

Dabish, but to a well-documented car accident occurring a few days earlier.

-24-

He further concluded that any injuries that may have been inflicted by Mr. Dabish were non-lethal. Subsection (3) is a rule of inclusion and so is interpreted broadly.

This evidence raises a significant possibility that Peter Dabish is innocent of the offenses of which he was convicted. The new scientific evidence supports a finding that the blows attributed to Mr. Dabish were not lethal. Instead, the evidence supports a finding that the grossly erroneous medical treatment caused death. This is the intervening cause doctrine which the *Herndon* Court found applicable to grossly negligent medical care. *People v. Herndon, supra.* Thus there is a significant possibility that Mr. Dabish is innocent.

## RELIEF REQUESTED

In light of the foregoing, Defendant Dabish asks this Court to schedule an evidentiary hearing on ineffective assistance of trial counsel and of appellate counsel and on the issue of newly discovered scientific evidence and innocence, and grant a new trial.

Respectfully submitted,

/s/ *Craig A. Daly*

**CRAIG A. DALY, P.C. (P27539)**
Attorney for Petitioner Dabish
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone: (313) 963-1455
Fax: (313) 961-4315
E-Mail: 4bestdefense@sbcglobal.net

/s/ *Elizabeth L. Jacobs*

**ELIZABETH L. JACOBS (P24245)**
Co-Counsel for Petitioner Dabish
615 Griswold, Suite 1125
Detroit, Michigan 48226
Phone: (313) 962-4090
Email: elzjacobs@aol.com

Dated: March 28, 2019

-26-

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff,

-vs-

PETER NORMAN DABISH

       Defendant.

_____/

LCT 10-004848-01-FC
Hon. Kevin S. Cox

## **APPENDIX**

## TABLE OF CONTENTS

APPENDIX A    Dr. Michael M. Baden, M.D. opinion

APPENDIX B    Dr. Michael M. Baden, M.D. Curriculum Vitae

APPENDIX C    U.S. District Court Order re: Petitioner's Motion to Stay Proceedings and Hold Petition in Abeyance

APPENDIX D    Affidavit of Domnick J. Sorise

APPENDIX E    Affidavit of Deday Larene

# APPENDIX A

## MICHAEL M. BADEN, M.D.

15 West 53rd Street, New York, New York 10019
Telephone: (212) 397-2732 · Facsimile: (212) 397-2754 · Email: mbaden@mac.com

5 December 2018

*Via e-mail to 4bestdefense@sbcglobal.net*

Craig A. Daly, Esq.
577 East Larned St
Detroit, MI 48226

Re:    *Diana Demayo, deceased*

Dear Mr. Daly:

I have reviewed the autopsy report, autopsy photographs, toxicology report, EMT reports, Detroit Medical Center records and police reports that you sent to me relative to the death of Diana Demayo.

According to police they responded to a call for a possible overdose about 6:30 a.m. on March 11, 2010. EMS was already there. EMT Amorena Collins told police that they found Ms. Demayo on the floor with blood on her face in Mr. Dabish's apartment. Mr. Dabish told them that he thought she had overdosed on his Klonopin.

EMT Collins said "We intubated the victim in the apartment. She had a great pulse when we started to suction her airway through the tube. Nothing but blood was coming out. That's when we took her out of the apartment, loaded her into the rig and transported her to Detroit Receiving Hospital." Ms. Demayo was alive when she was put in the ambulance with,

what proved to be, the intubation tube improperly placed.  She was essentially dead a few minutes later when she arrived at the hospital.

Dr. Alvan Cruz, the Emergency Department receiving physician, wrote that "when she arrived here she had no vital signs ... I checked for breath sounds and saw that the endotracheal tube was not in the trachea."  The tube had been incorrectly inserted into the esophagus and stomach, not into the trachea and air passages.  The blood they suctioned was from her stomach, not from her lungs; the oxygen they were giving went into her stomach, not into her lungs.

Dr. Mark Hornyak, the attending neurosurgeon, wrote that "There was an approximate ten minutes of down time [during which her lungs received no oxygen] and CPR, which was initiated, prior to arrival."  He concluded after the CT scan was done that Ms. Demayo had a left subdural hemorrhage and "anoxic brain injury" and that she was brain dead.  Anoxic brain damage is caused when an insufficient supply of oxygen reaches the brain.

After autopsy the medical examiner determined that Ms. Demayo, 23 years old, had died of "at least 10 distinct blows to the body," and certified that the cause of death was "Multiple blunt force trauma" and classified the death as "Homicide."  Toxicology excluded the cause of death as being a Klonopin overdose.

However, the blunt injuries were limited to the skin and caused no significant internal damage.  Rather, the bruises to the right side of the head and the subdural hemorrhage on the left side of the brain are evidence of a contracoup injury that occurs not from blows to

Baden/Demayo
5 December 2018
Page -3-

the stationary head, when the impact to the head and brain are both on the same side (coup

injury), but when the moving head strikes the ground.  The impact is on one side and the

brain damage on the other side, as occurred with Ms. Demayo.

It is my opinion, to a reasonable degree of medical certainty, on the basis of my

education, training and experience, and the above materials that I have reviewed, that the

ten blunt force blows described at autopsy caused skin bruises but no lethal injury; that the

contracoup left subdural hemorrhage was the result of a fall and not from a direct blow; and

that the anoxic cerebral damage caused by improper intubation was the most significant

factor in causing Ms. Demayo's death.

Very truly yours,

Michael M. Baden

Michael M. Baden, M.D.
Former Chief Medical Examiner,
 City of New York
Former Chief Forensic Pathologist,
 New York State Police

MMB:ph

# APPENDIX B

## MICHAEL M. BADEN, M.D.

15 West 53rd Street, Suite 18
New York, New York 10019

Telephone: (212) 397-2732

Facsimile:  (212) 397-2754
E-mail:  MBaden@mac.com

### CURRICULUM VITAE

### EDUCATION

- The City College of New York                    (1955)  B.S. Degree
- New York University School of Medicine     (1959)  M.D. Degree

### POST-GRADUATE TRAINING

| | |
|---|---|
| 1959-1960 | Intern, First (Columbia) Medical Division, Bellevue Hospital |
| 1960-1961 | Resident, First (Columbia) Medical Division, Bellevue Hospital |
| 1961-1963 | Resident, Pathology, Bellevue Hospital |
| 1963-1964 | Chief Resident, Pathology, Bellevue Hospital |

### LICENSURE

- New York State Medical License                    (1960)
- Diplomate, National Board of Medical Examiner's     (1960)
- Diplomate, American Board of Pathology:
  - Anatomic Pathology     (1965)
  - Clinical Pathology     (1966)
  - Forensic Pathology     (1966)

### PROFESSIONAL POSITIONS

| | |
|---|---|
| 1985-2011 | Director, Medicolegal Investigations Unit, New York State Police |
| 1961-1985 | Office of Chief Medical Examiner, New York City; Chief Medical Examiner (1978-1979) |
| 1981-1983 | Deputy Chief Medical Examiner, Suffolk County, New York; Director of Laboratories, Suffolk County, New York |

## TEACHING APPOINTMENTS

| | |
|---|---|
| 1961-1989 | New York University School of Medicine, Associate Professor, Forensic Medicine |
| 1975-2001 | Visiting Professor of Pathology, Albert Einstein School of Medicine |
| 1975-1988 | Adjunct Professor of Law, New York Law School |
| 1975-1978 | Lecturer in Pathology, College of Physicians and Surgeons of Columbia University |
| 1986, 1989 | Visiting Professor, John Jay College of Criminal Justice |
| 1965-1978 | Assist Visiting Pathologist, Bellevue Hospital, New York |
| 2002 | Adjunct Lecturer, The Cyril H. Wecht Institute of Forensic Science and Law, Duquesne University School of Law |
| 2002 | Distinguished Professor/Adjunct Lecturer, Henry C. Lee Institute, University of New Haven (Connecticut) |

## GOVERNMENTAL APPOINTMENTS

| | |
|---|---|
| 1977-1979 | Chairman, Forensic Pathology Panel, United States Congress, Select Committee on Assassinations, Investigations into the deaths of President John F. Kennedy and Dr. Martin Luther King |
| 1973-Present | Member, New York State Correction Medical Review Board |
| 2015-Present | Member, New York State Justice Center for the Protection of People with Special Needs |
| 1976-2014 | Member, New York State Mental Hygiene Medical Review Board (*renamed* Justice Center for the Protection of People with Special Needs in 2015) |
| 1983-1986 | Member, National Crime Information Center, Committee on Missing Children, United States Department of Justice (F.B.I.) |
| 1971-1975 | Special Forensic Pathology Consultant, New York State Organized Crime Task Force (investigation of deaths at Attica Prison) |
| 1974-2006 | Director and/or Moderator, Annual Northeastern Seminar in Forensic Medicine, Colby College, Maine |
| 1973-1987 | Lecturer, Drug Enforcement Administration, Drug Law Enforcement Training School, United States Department of Justice |

## PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| 1966-Present | American Academy of Forensic Sciences; Fellow Vice President and Program Chairman (1982-1983) |
| 1965-Present | The Society of Medical Jurisprudence; Fellow, President (1981-1985) |
| 1966-Present | College of American Pathologist; Fellow, Chairman, Toxicology Subcommittee (1972-1974) |
| 1971-1975 | College of American Pathologists Foundation; Forensic Pathology Seminar Faculty |
| 1973-1976 | American Board of Pathology; Forensic Pathology Board Test Committee (1973-1976) |
| 1966-1986 | American Society of Clinical Pathologist; Fellow Member, Drug Abuse Task Force (1973-1977) |
| 1965-1978 | New York State Medical Society; Chairman, Section of Medicolegal and Workers' Compensation Matters (1972) |
| 1965-Present | Medical Society of the County of New York |
| 1969-1978 | National Association of Medical Examiner's |
| 1965-Present | American Medical Association |

## HONORS

- The City College of New York: Senior Class President; Editor-in-Chief of The Campus (newspaper); Phi Beta Kappa

- Honor Legion, New York City Police Department, 1969

- College of American Pathologists, Certificate of Appreciation (Chairman, Toxicology Resource Committee, 1972-1975)

- American Academy of Forensic Sciences, Award of Merit, 1974 and 1983

- Drug Enforcement Administration, United States Department of Justice, Certificate of Appreciation, 1982

- New Jersey Narcotic Enforcement Officers Association, Certificate of Appreciation, 1977

- Fire Department of the City of New York, Certificate of Appreciation, 1978

- New York State Bar Association, Certificate of Appreciation, 1980

- New York City Health and Hospitals Corporation, Certificate of Appreciation for participation in development of emergency facilities for Emergency Medical Services for the City of New York, 1980

- New York University, Great Teacher, 1980

- First Fellow in Forensic Science of the University of New Haven, Henry C. Lee Institute, (Connecticut), 2002

## PROFESSIONAL PUBLICATIONS AND PRESENTATIONS

1. M. Helpern and M. Baden; Editors: Atlas of Legal Medicine by Tomio Watanabe, Lippincott, 1968

2. D. Louria, M. Baden, et al.: The Dangerous Drug Problem. New York Medicine, 22:3, May 1966

3. D. Gold, P. Henkind, W. Sturner and M. Baden: Occulodermal Melanocytosis and Retinitis Pigmentosa. Am. J. of Ophthalmology, 63:271, 1967

4. B. Van Duuren, L. Lanseth, L. Orris, M. Baden and M. Kuschner: Carcinogenicity of Expoxides Lactones and Peroxy Compounds v. Subcutaneous Injection of Rats. J. Nat. Cancer Institute, 39:1213, 1967

5. M. Helpern and M. Baden: Patterns of Suicides and Homicides in New York City, Proceedings of the Seventh International Meeting of Legal Medicine (Budapest); October 1967

6. M. Baden: Pathology of Narcotic Addiction, Proceedings of the Sixth Latin American Congress of Pathology (San Juan, Puerto Rico); December 1967

7. M. Baden: The Diagnosis of Narcotism at Autopsy, Proceedings of the American Academy of Forensic Sciences (Chicago); February 1968

8 M. Baden: Medical Aspects of Drug Abuse, New York Medicine, 24:464, 1968

9. C. Cherubin, M. Baden, et al.: Infective Endocarditis in Narcotic Addicts. Ann. Int. Med., 69:1091, 1968.

10. M. Baden: Pathologic Aspects of Drug Abuse, Proceedings of the Committee on Problems of Drug Dependence, National Academy of Sciences, National Research Council, 1969.

11. W. Matusiak, L. Dal Cortivo and M. Baden: Analytical Problems on a Narcotic Addiction Laboratory, Proceedings of the American Academy of Forensic Sciences (Chicago), February 1969

12. M. Baden, P. Hushins and M. Helpern: The Laboratory for Addictive Drugs of the Office of Chief Medical Examiner of New York City, Proceedings of the International Conference on Poison Control (New York City), June 1969

13. M. Baden, S. Hofstetter and T. Smith: Patterns of Suicide in New York City, Proceedings of the Fifth International Meeting of Forensic Sciences (Toronto), June 1969

14. R.W. Richter and M. Baden: Neurological Aspects of Heroin Addiction, Proceedings of the Ninth International Congress of Neurology (New York City), September 1969

15. R.W. Richter and M. Baden: Neurological Complications of Heroin Addiction. Transactions of the American Neurological Association

16. M. Baden: Of Drugs and Urine, Editorial, Medical Tribune

17. M. Baden: Methadone-Related Deaths in New York City, Proceedings of the Second National Conference on Methadone Treatment (New York City), October 1969. Int. J. Addictions.

18. M. Baden: Chairman, Workshop on Techniques for Detecting Drugs of Abuse, Proceedings of the Statewide Conference on Prevention Aspects of Treatment and Research in Drug Abuse. New York City Narcotics Addiction Control Commission, 1969.

19. M. Baden: Investigation of Deaths of Persons Using Methadone, Proceedings of the Committee on Problems on Drug Dependence. National Academy of Sciences National Research Council, 1970.

20. M. Baden: The Changing Role of the Medical Examiner, Proceedings of the American Academy of Forensic Sciences (Chicago), February 1970, Med. Op. 7:64-68, 1971

21. N. Valanju, M. Baden, S.K. Verma and C.J. Umberger: Analytical Toxicological Determination of Drugs in Biological Material. I. Acidic Drugs. Acta Pharmaceutica Jugoslavica 20:11, 1970

22. M. Baden: Deaths from Heroin Addiction Among Teenagers in New York City, Proceedings of the Second World Meeting on Medical Law (Washington, D.C.), August 1970

23. M. Baden: Bullous Skin Lesions in Barbiturate Overdosage and Carbon Monoxide Poisoning (letter) JAMA 213:2271, 1970

24. M. Baden and J. Foley: Heroin Deaths in New York City during the 1960's. Int. M.J. of Legal Medicine, 5:1970

25. N. Valanju, M. Baden, S. Valanju and S. Verma: Rapid Isolation and Detection of Free and Bound Morphine from Human Urine. Int. M. J. of Legal Medicine, 5:1970

26. M. Baden: Angitis in Drug Abusers (letter), NEJM 264:11, 1971

27. M. Baden, et al.: Methadone Maintenance – Pro and Con. Contemporary Drug Problems, 1:17-152, 1971

28. M. Baden: Changing Patterns of Drug Abuse. Proceedings of Committee On Problems of Drug Dependence. NAS-NRC, 1971

29. M. Baden: Narcotic Abuse: A Medical Examiner's View. In: Wecht, C., Editor, Legal Medicine Annual, 1971 (Appleton-Century-Crofts, New York State) Reprinted New York State J. Med. 72:834-40, 1972

30. Y. Challenor, R. Richter, B. Bruun, M. Baden and M. Pearson: Neuromuscular Complications of Heroin Addiction. Proc. Am. Coll. Phys., 1971

31. C. Cherubin, M. Baden, et al.: Studies of Chronic Liver Disease in Narcotic Addicts. Proc. Am. Coll. Phys., 1971

32. M. Baden: Fatalities Due to Alcoholism. In: Keup, W., edit., Drug Abuse – Current Concepts and Research. Charles C. Thomas, Springfield, Illinois, 1972

33. L. Roizin, M. Helpern, M. Baden, M. Kaufman and K. Skai: Toxo-synpathys (a multifactor pathogenic concept) In: Keup, W., edit,: Drug Abuse – Current Concepts and Research. Charles C. Thomas, Springfield, Illinois, 1972

34. M. Baden, N. Valanju, S. Verma and S. Valanju: Confirmed Identification Biotransformed Drugs of Abuse in Urine. Am. J. Clin. Path. 57:43-51, 1972. Reprinted: Yearbook of Path. And Clin. Path., 1973, 357-361 (Yearbook Medical Publishers)

35. M. Baden: Homicide, Suicide and Accidental Death Among Narcotic Addicts. Human pathology 3:91-96, 1972

36. J. Pearson, R. Richter, M. Baden, Y. Challenor and B. Bruun: Transverse Myelopathy as an Illustration of the Neurologic and Neuropathologic Features of Heroin Addiction. Human Pathology, 3:107-112, 1972

37. B. Bruun, M. Baden, Y. Challenor, J. Pearson and R. Richter: De-neurologic Kimplikationer Ved Heroinmisbrug Ureakuift. F. Leeger, 134:89-93

38. C. Cherubin, W. Rosenthal, R. Stenger, A. Prince, M. Baden, R. Strauss and T. McGinn: Chronic Liver Disease in Asymptomatic Narcotic Addicts. Ann. Int. Med., 76:391-395, 1972

39. M. Baden, N. Valanju, S. Verma and S. Valanju: Identification and Excretion Patterns of Propoxyphene and Its Metabolites in Urine. Proc. Comm. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

40. R. Richter, J. Pearson, B. Bruun, Y. Challenor, J. Brust and M. Baden: Neurological Complications of Heroin Addiction. Proc. Comm. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

41. M. Baden and B. Lutz: Preliminary Analysis of 128 Methadone-Related Deaths in New York City. Proc. Com. Prob. Drug Depend., National Academy of Sciences – National Research Council, 1972

42.  L. Roizin, M. Helpern, M. Baden, M. Kaufman, S. Hashimoti, J. C. Liu and B. Eisenberg: Neuropathology of Drugs of Dependence, In: Drugs of Dependence (Mule, J.C. and Brill, H., edit.) Uniscience Series, CRC (Chemical Rubber Co.), Cleveland, Ohio 1972

43.  C. Cherubin, J. McCusker, M. Baden, F. Kavaler and Z. Amzel:  The Epidemiology of Death in Narcotic Addicts. Am. J. Epid., 96:11-22

44.  M. Baden: Narcotic Antagonists (letter) Science 177:1152, 1972

45.  M. Baden: Investigation of Deaths From Drug Abuse. Chapter in: Spitz, W.U. and Fisher, R.W., edit.: Medicolegal Investigation of Death, 1972, (Charles C. Thomas, Springfield, Illinois)

46.  L. Roizin, M. Helpern, M. Baden, et al.:  Methadone Fatalities in Heroin Addicts.  Psych. Quarterly, 46:393-410, 1972

47.  M. Baden:  Suicide in Prison, Proceedings of the American Academy of Forensic Sciences, March 1973

48.  L. R. Reichman, C. S. Shim, M. Baden and R. Richter:  Development of Tolerance to Street Heroin in Addicted and Non-Addicted Primates. Am. J. Public Health, 63:81-803, 1973

49.  M. Baden and R. S. Turoff:  Deaths of Persons Using Methadone in New York City, 1971, Proceedings of the Comm. On Problems of Drug Depend., Nat. Acad. Of Sci. Nat. Res. Council, 1973

50.  J. C. Huang and M. Baden: Rapid Methods of Screening Micro-Quantities of Abused Drugs from Urine Samples for Micro-Crystal Tests. Clinical Toxicology, 6:325-350, 1973

51.  P. Haberman and M. Baden:  Alcoholism and Violent Death.  Quarterly Journal of Studies on Alcohol, 35:221-231, 1974

52.  P. Haberman and M. Baden:  Drinking, Drugs and Death.  International Journal of the Addictions, 9:761-773, 1974

53.  D. C. Wise, M. Baden and L. Stein:  Postmortem Measurement of Enzymes in Human Brain: Evidence of a Central Noradrenergic Deficit in Schizophrenia (submitted for publication)

54.  R. Richter, J. Pearson, M. Baden, et al.:  Neurological Complications of Addiction to Heroin. Bulletin of the New York Academy of Medicine, 49:3-21, 1973

55.  M. Baden and D. Ottenberg: Alcohol – The All-American Drug of Choice.  Contemporary Drug Problems, 3:101-126, 1974

56.  M. Baden:  Pathology of the Addictive States.  Chapter in:  Medical Aspects of Drug Abuse, Richter, R., edit. 1975 (Harper & Row)

57.  M. Baden, N. Valanju, S. Verma and S. Valanju: Detection of Drugs of Abuse in Urine.  Chapter in: Medical Aspects of Drug Abuse, Richter, R., edit., 1975 (Harper & Row)

58. D. Sohn and M. Baden:  The First Year of the College of American Pathologists Toxicology Survey Program, Amer. J. of Clin. Path., 1975

59. M. Baden:  Narcotics and Drug Dependence by J. B. Williams, Book Review, Journal of Forensic Sciences, 1975

60. M. Baden:  Drug Abuse, author and narrator, audio-visual presentation produced by the College of American Pathologists, 1974

61. J. Pearson, R. Richter, M. Baden, E. Simon, et al.:  Studies on Sites of Binding and Effects of Narcotics in the Human Brain.  International Congress of Neuropathology Proceedings, Budapest, Hungary. Excerpta Medica, 1975

62. M. Baden and J. Devlin:  Child Abuse Deaths in New York City, Proceedings of the American Academy of Forensic Sciences (Chicago) 1975

63. M. Baden:  Mortality from Alcoholism and Drug Abuse, Proceedings of the Second National Drug Abuse Conference, (New Orleans) 1975

64. R. W. Richter, M. Baden, P. H. Shively, N. M. Valanju and J. Pearson:  Neuromedical Aspects of Methadone Abuse (abstract).  Neurology 4:373-379, 1975 (presented at the Annual Meeting of the American Academy of Neurology, May 3, 1975)

65. R. W. Richter, M. Baden and J. Pearson:  Neuromedical Aspects of Narcotic Addiction.  Audio-visual presentation produced and distributed by Columbia University College of Physicians and Surgeons, 1975

66. M. Baden:  Basic Pathology for Criminal Lawyers, Proceedings of the Virginia Trial Lawyers Association, 16:22-41, 1975

67. M. Baden:  Contributor, Forensic Pathology, A Handbook for Pathologists; R. Fisher and C. Petty, Editors.  College of American Pathologists and National Institute of Law Enforcement and Criminal Justice, United States Government Printing Office, 1977

68. M. Baden:  Alcohol and Violence.  Chapter in:  The Professional and Community Role of the Pathologist in Alcohol Abuse, G. Lundberg, Edit., United States Department of Transportation, National Highway Traffic Safety Administration, 1976

69. M. Baden:  Treating the Patient in Suicide Attempts and Abused Drug Overdoses.  Physicians Assistant, 1:18-20, 1976

70. P. Haberman and M. Baden:  Alcohol, Other Drugs and Violent Death.  Oxford University Press, 1978

71. M. Baden:  Medical Aspects of Child Maltreatment; the Abused and Neglected Child:  Multi-Disciplinary Court Practice.  The Practicing Law Institute, 1978

72. M. Baden:  Evaluation of Deaths in Methadone Users.  Legal Medicine Annual 1978 (Appleton-Century-Crofts)

73. O. Bubschmann, M. Baden, et al.: Craniocerebral Gunshot Injuries in Civilian Practice – Prognostic Criteria and Surgical Management: Experience with 82 cases. Journal of Trauma, 19:6-12, 1979

74. M. Fellner, M. Baden, et al.: Patterns of Autofluorescence in Skin and Hair. International Journal of Dermatology, 1980

75. S. Mackauf, M. Baden, et al.: Anatomy for Lawyers. New York State Bar Association Committee on Continuing Legal Education, 1981

76. M. Baden: The Lindbergh Kidnapping Revisited: Forensic Sciences, Then and Now. Journal of Forensic Sciences, 28:1035-1037, 1983

77. M. Baden: The Lindbergh Kidnapping: Review of the Autopsy Evidence. Journal of Forensic Sciences, 28:1071-1075, 1983

78. M. Baden: Investigation of Deaths in Custody, Proceedings of the American Academy of Forensic Sciences (New Orleans), 1985

79. M. Baden: Embalmed and Exhumed Bodies, in Handbook for Postmortem Examination of Unidentified Remains, M. Fierro, M.D., Ed. College of American Pathologists (in press)

80. M. Baden, J. A. Hennessee: Unnatural Death, Confessions of a Medical Examiner, Random House, New York 1989

81. M. Baden, M. Roach: Dead Reckoning, The New Science of Catching Killers, Simon & Schuster, New York 2001

82. M. Baden: The Role of the Medical Examiner and Coroner in the Investigation of Terrorism in Forensic Aspects of Chemical and Biological Terrorism, Lawyers & Judges Publishing Company, Inc., Tuscon, Arizona 2004.

83. M. Baden, L. Kenney Baden: "Remains Silent," Alfred A. Knopf, August 2005.

84. M. Baden: Preface in Forensic Nursing by Virginia A. Lynch. Elsevier/Mosby, St. Louis, Missouri 2006.

85. M. Baden: Exhumation in Spitz and Fisher's Medicolegal Investigation of Death, 4th Edition, Charles C. Thomas, Springfield, Illinois 2006.

86. M. Baden: Encyclopedia of Legal Medicine, Book Review, New England Journal of Medicine, 2006.

87. M. Baden, L. Kenney Baden: Scientific Evidence in Civil and Criminal Cases, 5th Edition, Contributor, Foundation Press, 2007.

88. M. Baden, L. Kenney Baden: "Skeleton Justice," Alfred A. Knopf, June 2009.

8.17.2018

89. R. Williams (with M. Baden, H. Lee and C. Wecht): Sherlock Holmes and the Autumn of Terror, Rukia Publishing, 2016.

## LECTURES

- Speaker, "Mass Disasters and Medical Legal Cases," Wayne State University, Dearborn, Michigan, May 2018

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, February, 2018

- Speaker and Panelist, Pioneers of Forensic Science, The Cyril H. Wecht Institute of Forensic Science and Law, Pittsburgh, Pennsylvania, June 1-2, 2017

- Speaker, "Drug Related Death" and "Death Harvester," Medicolegal Investigation of Death, Wayne State University, Dearborn, Michigan, May 4, 2017

- Keynote Speaker, On the Front Line: New Frontiers in Forensics, Crime and Security, New York City, April 4, 2017

- Speaker, National Medical Services speaker series, "Forensic Pathology for Toxicologists," March 2, 2017

- Speaker, New York State Bar Association, "Forensic Pathology Perspectives on Questioned Diagnoses," February 28, 2017

- Co-Chairman, Bring Your Own Slides, American Academy of Forensic Sciences, February 15, 2017

- Lecturer, Henry F. Williams Seminar, "Medgar Evers Case," Albany, New York, September 20, 2016

- Kentucky Funeral Director's Annual Meeting, "Determining Cause of Death," Louisville, Kentucky, June 30, 2016

- Mississippi Coroner's Conference, "Death Investigation," Biloxi, Mississippi, June 23, 2016

- Medicolegal Investigation of Death, Wayne State University, "Controversies in Medicolegal Cases," Dearborn, Michigan, April 28, 2016

- Keynote Speaker, Forensic Nursing Conference, Drexel University, Philadelphia, PA, April 16, 2016

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 26, 2016

- American Academy of Forensic Sciences, "Good Cop, Bad Cop," February 25, 2016

- Speaker, New York State Bar Association Fall Program on Forensics, "Time of Death," November 14, 2015

- Lecturer, Henry F. Williams Seminar, "Medgar Evers Case," Albany, New York, October 5, 2015

- Speaker, Markel Symposium, "Medical Examiner's Perspective in Police Shooting Incidents," West Haven, Connecticut, October 20, 2015

- NACDL/National Forensic College, "Special Problems in Forensic Pathology: Discovery, Time of Death Determinations and Cognitive Bias," Benjamin N Cardozo School of Law Cordozo Law School, New York, New York, June 8, 2015

- Medicolegal Investigation of Death, Wayne State University, "Asphyxial Deaths: Chokeholds, Sleeperholds and Back Pressure," Dearborn, Michigan, May 20, 2015

- "Confessions of a Medical Examiner," The Lotus Club, New York, New York, May 11, 2015

- Medicolegal Investigation of Death, "Asphyxial Deaths:  Chokeholds, Sleeperholds and Back Pressure," Wayne State University, Dearborn, Michigan, April 30, 2015

- American Academy of Forensic Science, "Prosecution Expert for Death in a Bathtub - Drew Peterson case," February 17, 2015

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 17-21, 2014

- American Academy of Forensic Sciences, "Plausible Deniability The Ethics of Inconsistent Consistency," February 17-21, 2014

- Keynote Speaker, Baruch Biomedical Society, New York, New York, October 17, 2013

- Speaker, Markle Symposium, "Medical Examiner Perspective on the Death of JFK," October 15, 2013

- Speaker, NAMFCU Annual Training, "Use of a Medical Examiner in a Nursing Home," Mobile, Alabama, October 7, 2013

- Speaker, Northeastern Association of Forensic Scientists, Cromwell, "Medical Evidence in the JFK Assassination," Connecticut, September 27, 2013

- Lecturer, Henry F. Williams Seminar, "Cold Cases with Dr. Baden," New York State Police, September 24, 2013

- "Use of a Medical Examiner in a Nursing Home Death Investigation," Resident Abuse Training Program, Virginia Beach, Virginia, June 6, 2013

- "Medicolegal Investigation of Death, "Investigating the Scene of Mass Disasters: What to Look for with Fire, Explosion or Terrorist Attack," Wayne State University, Dearborn, Michigan, May 1-3, 2012

- Children's Law Topical Conference, "When 'Abuse' is Not Abuse," Albany, New York, April 19, 2013

- "Determining Cause of Death," Making Sense of Science VI:   Forensic Science and the Law, NACDL & CACJ's 6th Annual Conference, Las Vegas, Nevada April 5-6, 2013

- American Academy of Forensic Science, Panelist, "150 Years — Does Time Bring Agreement? The H.L. Hunley, the R.M.S. Titanic, and the Assassination of John F. Kennedy," Washington, D.C., February 17-24, 2013

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 17-24, 2013

- Speaker, Corrections and Youth Services Association Annual Meeting, Saratoga Springs, New York, October 31, 2012
- Lecturer, 21st Annual Arnold Markle Symposium, "Sexually Related Homicides," October 9, 2012

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 18-19, 2012

- Society of Professional Investigators, "Current Status of the Forensic Sciences," New York, New York, September 12, 2012

- Speaker, New York State Police Sexual Abuse Seminar, Albany, New York, May 21, 2012

- "Medicolegal Investigation of Death, "Problems in Forensic Pathology," Wayne State University, Dearborn, Michigan, May 1-3, 2012

- 2012 NASDEA Spring Conference, "Drug Deaths: Homicide v. Overdose," The Roosevelt Hotel, New York City, NY, April 24, 2012

- Concord Seminars for the Dental and Medical Professions, "Forensic Odontology," Manchester, New Hampshire and Bangor, Maine, April 20-21, 2011

- Emory School of Medicine, Grand Rounds, "Forensic Pathology: The Good, The Bad, The Ugly," Atlanta, Georgia, March 3, 2012

- Major Case Squad of Greater St. Louis Annual Retraining Conference, "Forensic Pathology," St. Louis, Missouri, March 4-5, 2012

- American Academy of Forensic Sciences, "Conflicting and Misleading Testimony in the Forensic Pathology Community," February 19-25, 2012

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 19-25, 2012

- Lecturer, 20th Annual Arnold Markle Symposium, "Investigation of Sex Crime: Forensic Investigation of Sexual Assault, Serial Offenders, and Sexual Abuse," October 10, 2011

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 18-21, 2011

- Speaker, Annual Investigation for Identification, New Orleans, Louisiana, August 25-26, 2011

- Lenox Hill Hospital, Medical Grand Rounds, "Controversies in Forensic Medicine," New York City, March 11, 2011

- Valley Forge Dental Conference, Keynote Speaker, "Justice Through Science," Valley Forge, Pennsylvania, March 4, 2011

- American Academy of Forensic Sciences, Communications in Forensics, "In My Experience ..." February 21, 2011

- American Academy of Forensic Sciences,   A Multidisciplinary Look into Forensic Science: Perspectives, Views and Experiences, "Forensic Pathology Perspectives," February 22, 2011

- American Academy of Forensic Sciences, Co-Chairman, Bring Your Own Slides, February 23, 2011

- Lecturer, "CSI: Dartmouth," University of Massachusetts/Dartmouth Law School, Dartmouth, Massachusetts, November 18, 2010

- Guest Forensic Lecturer (4 lectures), Transatlantic Crossing of the Queen Elizabeth II, November 1-8, 2010

- Lecturer, Henry F. Williams Seminar, New York State Police, "Forensic Pathology," September 27-30, 2010

- Speaker, 13th Annual Investigation for Identification, New Orleans, Louisiana, "A History of Forensic Science from Cain and Abel Through Katrina," August 27-28, 2010

- Speaker, Brigham & Women's 2010 Master Clinician Section, August 1, 2010

- Speaker, "Post-Mortem with Dr. Michael Baden," Kentucky Funeral Director's Association, Louisville, Kentucky, June 30, 2010

- Speaker, Northeast College and Universities Security Association, 57th Annual Conference, Skidmore College, Saratoga Springs, New York, June 28, 2010

- Speaker, 13th Annual Investigation for Identification, New Orleans, Louisiana, "A History of Forensic Science from Cain and Abel Through Katrina," August 27-28, 2010

- Speaker, Brigham & Women's 2010 Master Clinician Section, August 1, 2010

- Speaker, "Post-Mortem with Dr. Michael Baden," Kentucky Funeral Director's Association, Louisville, Kentucky, June 30, 2010

- Speaker, Northeast College and Universities Security Association, 57th Annual Conference, Skidmore College, Saratoga Springs, New York, June 28, 2010

- Lecturer, New York Prosecutor's Training Institute, Westchester, New York, June 8, 2010

- SELETS 14th Annual Law Enforcement Training Seminar, Lawrenceberg, Tennessee, June 1, 2010

- New York State Police Sex Offense Seminar, "The Forensic Sciences," Albany, New York, May 24-28-2010

- Society of Professional Investigator's Meeting, New York City, May 20, 2010

- Wayne State University, Medicolegal Investigation of Death, "Exhumation and Time of Death," and "Fire, Explosion and Mass Casualty," April 21-22, 2010

- Oswego University, "History of Forensic Science," March 25, 2010

- American Academy of Forensic Sciences, "Bring Your Own Slides," Seattle, Washington, February 22-26, 2010

- 2010 Forensic Seminar for Capital Defense Attorneys, DePaul University College of Law, February 18-19, 2010

- CSI Symposium, Norwich University, "Forensic Pathology," January 29, 2010

- NYSP Child Physical Abuse and Neglect Seminar, November 18, 2009

- New York Council of Defense Lawyers, Rye, New York, November 7, 2009

- FBI/IT Exchange Conference, Keynote Speaker, Seattle, Washington, September 20-21, 2009

- Henry F. Williams Seminar, New York State Police, "Forensic Pathology and Child Deaths," Albany, New York, September 14-17, 2009

- New York State Funeral Director's Association, Saratoga, New York, September 1, 2009

- Cabell Sheriff's Department, West Virginia (Marshall University in Huntingdon, West Virginia), August 25, 2009

- NCSTL Conference, Tampa, Florida, May 20-21, 2009

- Wayne State University, Medicolegal Investigation of Death, "Exhumation and Time of Death," and "Forensic Questions: The Experts Answer," with Werner Spitz, M.D., Dearborn, Michigan, April 22-24, 2009

- Bronx High School of Science, March 11, 2009

- American Academy of Forensic Sciences, "Bring Your Own Slides," Denver, Colorado, February 16-21, 2009

- American Academy of Forensic Sciences, "New Investigative Techniques and Scientific Advancement for Forensic Scientists in the Future," Denver, Colorado, February 16-21, 2009

- South Carolina Funeral Director's Association, "Post Mortem with Dr. Michael Baden," Columbia, South Carolina, February 4, 2009

- CSI Symposium, "Forensic Pathology," Norwich, Connecticut, January 29-30, 2009

- New York State CASA DNA Initiative Conference, Albany, New York, January 28, 2009

- Medicolegal Investigation of Death Conference, "Exhumation and Time of Death," Las Vegas, Nevada, January 5-6, 2009

- Mattapoisett (Massachusetts) Police Department, Forensic lecture, November 25, 2008

- George Mason University, "Sexually Violent Crime: the Body as Evidence," November 10-11, 2008

- Hofstra University, "An Evening of Crime and Wine," October 29, 2008

- New Jersey State Funeral Director's Association, "Post Mortem with Dr. Michael Baden," September 17, 2008

- SPIAA 57th Annual Retraining Conference, July 23, 2008

- NY Cops Foundation Annual Dinner Gala, Keynote Speaker, June 2, 2008

- New York State Police Sex Offense Seminar "The Forensic Sciences," May 2008

- Keynote Speaker, National Council of Investigation & Security Services annual meeting, May 2, 2008

- Medicolegal Investigation of Death Conference, Wayne State University, "Terrorism," April 23, 2008

- Medicolegal Investigation of Death Conference, Wayne State University, "Exhumation and Time of Death," April 23, 2008

- 17th Annual Arnold Markle Symposium, Connecticut State Police, March 23-24, 2008

- "Forensic Pathology and Living/Injured Victims," Academy for BCI Basic School (NYSP), March 11, 2008

- Lecturer, New Jersey Chapter of Int'l Assn of Arson Investigators, March 5, 2008

- American Academy of Forensic Sciences, Young Forensic Scientists Forum "Death is My Teacher," February 19, 2008

- American Academy of Forensic Sciences, "Healthcare Serial Killer Workshop," February 19, 2008

- American Academy of Forensic Sciences, "Significant Achievements and Contributions by Forensic Scientists to the International Community," February 19, 2008

- Medicolegal Investigation of Death Conference, "Postmortem Changes & Time of Death," and "Forensic Questions: The Experts Answer," Las Vegas, Nevada, December 4-6, 2007

- 33rd Annual Arson Seminar, NYS Fire Academy, "The Role of the Forensic Pathologist in Fire Investigation," November 7, 2007

- 12th Annual Investigation for Identification Educational Conference, Pensacola, Florida, October 19-20, 2007

- Penn State University, Forensic Sciences Seminar, September 24, 2007

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," September 17-20, 2007

- Harvard Medical School, Intensive Review of Internal Medicine Course, "CSI Meets IRIM – The New Science of Catching Killers," Boston, Massachusetts, July 2007

- Arizona Judicial Conference: Forensic Pathology, 2007

- New York State Police Sex Offense Seminar "The Forensic Sciences," May 2007

- Smithsonian Associates, "Murder Investigation with Forensics: The Good, the Bad, and the Ugly," May 2007

- Medicolegal Investigation of Death Conference, "Death Investigation" and "Fire, Explosions and Terrorism," April 24-26, 2007

- Louisiana Judicial College, "CSI Effect," April 19-20, 2007

- 16th Annual Arnold Markle Symposium 2007, "Parents who Kill: Muchausen's by Proxy," April 9, 2007

- Harvard Medical School "Brigham Master Clinician: Update in Medicine," "The Forensic Sciences: From Cain and Abel to JFK to OJ Simpson," March 29, 2007

- American Academy of Forensic Sciences, "Bring Your Own Slides," February 21, 2007

- American Academy of Forensic Sciences, "Police Use of Force: Where is the Line and When is it Crossed" February 22, 2007

- Medicolegal Investigation of Death Homicide Conference, "Asphyxias, Serial Murders and Sexual Assaults," "Death Investigations: Fire, Explosions and Terrorism," Las Vegas, Nevada, November 29-30, 2006

- American College of Trust and Estate Counsel, Westin Providence, Rhode Island, October 12, 2006

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," September 19-21, 2006

- 57th Annual Harvard Associates in Police Science Conference, Vermont Criminal Justice Training Council, Burlington, Vermont, June 27, 2006

- SEAK National Expert Witness, "The Role of the Expert Witness: from the Expert's Perspective," Cape Cod, Massachusetts, June 23, 2006

- Mississippi Coroner's Association, Vicksburg, Mississippi, June 15, 2006

- Monmouth University, "Time of Death Determination" and "Electrocution, Explosives, and Fire-Related Deaths," Oceanport, New Jersey, June 13, 2006

- SELETS Homicide Conference, Lawrenceberg, Tennessee, June 7-8, 2006

- NYSP Sex Crimes Seminar "The Forensic Sciences," May 22, 2006

- Fermilab National Accelerator Laboratory, Colloquium, "How Long Has Grandpa Been Dead and Other Forensic Mysteries," Chicago, Illinois, May 17, 2006

- AtlantiCare Regional Medical Center, New Jersey, Keynote Speaker, 8th Annual Trauma Symposium, "Forensic Sciences, Trauma & Mass Disasters," May 2, 2006

- Medicolegal Investigation of Death Homicide Conference: "The Asphyxias, Serial Murders and Sexual Assaults," Detroit, Michigan, April 26-28, 2006

- Albany, New York, Area Association of Certified Fraud Examiners, keynote speaker, March 30, 2006

- American Academy of Forensic Sciences, "Victims & Defendants: Clinical Aspects of Their Death," February 21, 2006

- American Academy of Forensic Sciences, "The Role of the Forensic Scientist in the Investigation of Police-Related Deaths - A Current Dilemma," February 22, 2006

- American Academy of Forensic Sciences, ""Shaken Baby Syndrome: Medical Myth or Medical Fact?" February 24, 2006

- Clinical Forensic Nursing, Veterans Administration, Phoenix, Arizona, Impacting Patient Care Delivery, Quality Management and Investigations in Healthcare Settings, January 23, 2006

- Advanced Practical Homicide Seminar, "Modes of Death Involving Firearms, Knives, Blunt Force and Child Abuse," November 8-9, 2005

- Monmouth University, Oceanport, New Jersey, "Determining Time of Death" and "Fire-related Death and Electrocution and Explosions," June, 2005

- New York State Police, Sex Offense Seminar, "The Forensic Sciences," May 23, 2005

- New York State Association of County Coroners & Medical Examiners, "Violence Among Children," April 30-May 1, 2005

- Medicolegal Investigation of Death Conference, "Serial Killers, Autoerotic Asphyxias, Sexual Assault or Accident," and "Death by Fire and Explosion," Wayne State University, School of Medicine, April 20-22, 2005

- College of Mt. Saint Vincent, Department of Nursing, "Unraveling the Mystery of the Nurse Investigator," April 14, 2005.

- The National Clearinghouse for Science, Technology and the Law at Stetson University College of Law, "Forensic Pathology on Both Sides of the Pond," April 4, 2005

- Markle Symposium, Connecticut State Police Homicide Conference, Foxwoods Lodge, Connecticut, March 27-28, 2005

- The Learning Annex, "Revealing the Mysteries of Forensic Science," March 10, 2005

- American Academy of Forensic Sciences, "Complex Forensic Science Issues on Highly Controversial Cases," February 21-26, 2005

- Quinnipiac University, Law and Forensic Sciences, Hamden, Connecticut, February 5, 2005

- Duquesne University, The Cyril H. Wecht Institute of Forensic Science and Law, "Tracking Terrorism in the 21st Century," October 21-23, 2004

- Greater Cincinnati Regional Arson and Fire Investigators Seminar, "The Death Detective," October 14, 2004

- Col. Henry F. Williams Homicide Seminar, "Forensic Pathology," October 5, 2004

- Associated Licensed Detectives of New York State, Keynote speaker, October 1, 2004

- Nebraska Institute of Forensic Sciences, "Crime & Death Scene Reconstruction:  Utilizing Bloodstain Pattern Analysis," September 15-17, 2004

- Southeast Law Enforcement Seminar, "Fascinating Cases of Death," June 9, 2004

- Florida Coastal School of Law, "Role of Forensic Pathology in Criminal and Civil Litigation," Jacksonville, Florida, May 7, 2004

- Wayne State University, "Medicolegal Investigation of Death," Dearborn, Michigan, April 21-23, 2004

- The Three Sleuths (with Drs. Cyril Wecht and Henry Lee), The Rio Suite, Hotel & Casino, Las Vegas, Nevada, April 17, 2004

- Annual SleuthFest Meeting, Exhumation Session, "Famous Cases," March 20, 2004

- 44th Annual American College of Legal Medicine, "The Role of the Forensic Pathologist in Medical Malpractice Cases," Las Vegas, Nevada, March 5-7, 2004

- Stetson University College of Law, "The Complete History of Murder and Science in One Hour," Gulfport, Florida, January 29, 2004

- Quinnipiac Law School, Law and Forensic Science, January 24, 2004

- The City University of New York, Graduate School and University Center, "Forensic Series," December 2, 2003

- Testified before the United States Senate Committee on the Judiciary Department of Justice Oversight: "Funding Forensic Sciences, DNA and Beyond" 2003

- Duquesne University, National Symposium on the 40th Anniversary of the JFK Assassination, "Solving the Great American Murder Mystery," November 20-23, 2003

- Smithsonian Associates, Educational and Cultural Programs, "Murder, Mystery and the New Forensics," November 1, 2003

- Association of Inspectors General, John Jay College of Criminal Justice, "Non-Traditional OIG Investigations," October 17, 2003

- Colorado Association of Sex Crimes Investigator's Annual Conference, Snowmass, Colorado, August 20-22, 2003

- 31st Annual Florida Medical Examiner Educational Conference, F.A.M.E. 2003, "The History of Forensic Science from Cain & Abel to O.J. Simpson," Ponte Vedra Beach, Florida, August 6-8, 2003

- Washington County Prosecutors Office, "Dead Man Talking:  Forensic Science and Homicide Investigation," May 5 and 6, 2003

- Medicolegal Investigation of Death, Wayne State University, "Adult Sexual Assault & The Asphyxias" and "Child Sexual Assault/Abuse Myths Dearborn, Michigan, April 2-4, 2003

- New York State Trial Lawyer's Association, Wrongful Death Seminar, "Using Medical Science to Prove the Cause of Death and Conscious Pain and Suffering," March 25, 2003

- DNA Symposium, The State College of Pennsylvania, "The Role of the Forensic Pathologist regarding DNA Evidence:  From Autopsy to Courtroom," March 2003

- American Academy of Forensic Sciences, "Overview of the Legal Issues Concerning the Discovery and Investigation and Prosecution of the Abuse of Elderly Patients in Healthcare Facilities and the Homicide of All Patients in Various Medical Treatment Facilities," Chicago, Illinois, February 17-22, 2003

- American Academy of Forensic Sciences, "Presentation of Specific Cases through the Initial Contact by Prosecutors Concerning Suspected Criminal Deaths through the Exhumation and the Trial" Chicago, Illinois, February 17-22, 2003

- 1st Eastern Analytical Symposium & Exposition, Somerset, New Jersey, November 18-21, 2002

- Utah County Police Officer's Workshop, November 2002

- 10th Annual Investigation for Identification Educational Conference, "New Concepts in Forensic Pathology," Pensacola, Florida, September 20-21, 2002

- Singapore Government Ministry of Health Services Administration, Centre for Forensic Medicine, August 17-31, 2002

- State of New York, Office of the Attorney General, Medicaid Fraud Control Unit, 2002 Training Conference, June 10-13, 2002, Lake Placid, New York

- Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, International Postblast Investigation Class, May 8, 2002, Brunswick, Georgia

- American Academy of Forensic Sciences, Addressing Social and Legal Issues Associated with Police Involved Shooting Incidents Through Forensic Investigation & Shooting Scene Reconstruction, February 11-15, 2002, Atlanta, Georgia

- American Academy of Forensic Sciences, Bring Your Own Slides, February 11-15, 2002, Atlanta, Georgia

- The UMKC School of Law, The History of Murder Investigation and Forensic Science, University of Missouri, Kansas City, January 24, 2002

- DNA and the Law: Reining in the Revolution, "The Role of the Forensic Pathologist in DNA Use: From Autopsy to Courtroom," Duquesne University, November 30, 2001, Pittsburgh, Pennsylvania

- New Technologies and the Proof of Guilt & Innocence, Court TV, October 25, 2001

- 2001 Ohio Attorney General's Conference on Law Enforcement, Plenary Speaker, October 11, 2001

- The Second European-American Intensive Course in Clinical and Forensic Genetics, September 3-14, 2001, Dubrovik, Croatia

- Forensic Nursing Clinical Update, "Death Investigation, Adverse Patient Events and Evidence Collection in the Hospital Setting," August 27 and 28, 2001, Phoenix, Arizona

- Harvard Associates In Police Science, Keynote Speaker, August 20-23, 2001, 52nd Annual Conference, Annapolis, Maryland

- The Boston Strangler Case: A High Tech Hearing on the Murder of Mary Sullivan, August 4, 2001, American Bar Association Annual Meeting, Chicago, Illinois

- Emerging Technologies in Forensic Investigation, June 1-3, 2001, Nova Southeastern University, Fort Lauderdale, Florida

- The Forensic Investigation of Child Abuse and Neglect, May 30, 2001, The Family Partnership Center

- Making Communities Safer, May 21-22, 2001, New York State Alliance of Sex Offender Service Providers, Sixth Annual Training Conference, Albany, New York

- Practical Homicide and Medicolegal Death Investigation, April 9-11, 2001, Beaumont, Texas

- Police Liability in New York, May 2, 2001, Albany, New York

- Symposium on Forensic Medicine, Kuwait Institute for Medical Specialization, January 27-29, 2001, Kuwait

- Forensic Science and the Law, October 27-28, 2000, Duquesne University, Pittsburgh, Pennsylvania

- 8th Annual Investigation for Identification Educational Conference, Speaker, September 22-23, 2000, Pensacola Beach, Florida

- Advanced Practical Homicide Investigation, September 11-15,2000, Southern Law Enforcement Foundation, Irving, Texas

- Vision 2000: Together We Can, Funeral Service Conference of the Northwest, August 27-29, 2000, Coeur d'Alene Resort, Idaho

- Mississippi Attorney General Prosecutor's Annual Training Conference, April 26-28, 2000, Gulfport, Mississippi

- Forensic Crime Scene Analysis Training, April 28, 2000, Union County Police Chief's Association, Cranford, New Jersey

- At the Heart of the Matter: The Medicolegal Aspects of Organ and Tissue Donation, May 4, 2000, New York Organ Donor Network, Poughkeepsie, New York

- NYSBA Criminal Justice Section Spring Meeting, May 19-21, 2000, The Ethics of Scientific Evidence, Chautauqua, New York

- 2000 Dodge Seminar, March 20-23, 2000, Clearwater Beach, Florida

- Medicolegal Investigation of Death, March 16 and 17, 2000, Wayne State University School of Medicine and Michigan State Police

# APPENDIX C

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN

PETER DABISH,

        Petitioner,                                    Hon. Gordon J. Quist

v.                                                   Case No. 2:17-cv-10782

RANDALL HAAS,

        Respondent.

_____/

## ORDER

This matter is before the Court on <u>Petitioner's Motion to Stay Proceedings and Hold</u> <u>Petition in Abeyance</u>.  (ECF No. 11).  Petitioner was convicted of torture and first degree murder. Petitioner unsuccessfully appealed the matter in state court after which he initiated the present action, asserting several claims for relief.  Petitioner now requests that the Court stay the present action so that he can return to state court to exhaust the claim that his trial attorney was ineffective for failing to investigate and develop the factual basis for the defense that the victim died as the result of "grossly erroneous medical treatment."  As discussed herein, Petitioner's motion is **granted**.

While the Court *may* stay a habeas action to permit a petitioner the opportunity to return to state court to properly exhaust a claim, the Supreme Court has warned that such "should be available only in limited circumstances" so as to not undermine the goals of the AEDPA. *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Accordingly, granting a request for a stay in such circumstances should be granted only where: (1) the petitioner has demonstrated good cause for his failure to exhaust the claims at issue; (2) the unexhausted claims are potentially meritorious;

and (3) the petitioner has not engaged in intentionally dilatory litigation tactics.  *Id.* at 278.

Respondent opposes Petitioner's motion on the ground that Petitioner should not be permitted to amend his petition.  Petitioner, however, has not moved to amend his petition, but has instead moved to obtain a stay of the present action.  Seeking a stay and moving to amend a petition are two distinct requests governed by distinct standards.  The Court certainly recognizes that Petitioner may, at a future date, return to this Court and seek to lift the stay and amend his petition.  Nevertheless, the Court is confined to addressing the specific issue before it, rather than addressing different issues which may be asserted in the future.  The standard applicable to Petitioner's request for a stay was articulated by the *Rhines* Court as discussed above.  Petitioner satisfies this standard and Respondent's argument, addressing a wholly different question, is unpersuasive on the question whether a stay is appropriate.

The two primary cases on which Respondent relies in support of his opposition to the present motion, *Mayle v. Felix*, 545 U.S. 644 (2005) and *Watkins v. Deangelo-Kipp*, 854 F.3d 846 (6th Cir. 2017), both concern circumstances in which a petitioner submitted an amended habeas petition.  Neither case concerns a request to obtain a stay of a habeas petition so that the petitioner can return to state court.  While these decisions may be relevant to any future motion by Petitioner to amend his petition, neither case concerns whether a petitioner may be granted a stay for the purpose of returning to state court to exhaust certain claims.  As to any motion which Petitioner might, in the future, assert seeking to amend his petition, the Court has no opinion as that question is not presently before the Court.  Accordingly, the Court hereby **grants** Petitioner's motion to stay the present matter to permit him an opportunity to return to state court to properly exhaust the claim(s) in question, **provided that Petitioner complies with the instructions**

2

detailed below.

## CONCLUSION

Within 30 days of this Order, Petitioner must return to state court to exhaust his state court remedies with respect to the unexhausted claim(s) identified in the present motion. Within 30 days of this Order, Petitioner must submit to this Court an affidavit setting forth the date on which he submitted a pleading seeking relief in the state court and the claim(s) raised in such pleading. If Petitioner fails to file this affidavit within the time provided, the Court will not stay the present matter, but will instead address his petition as originally filed. Upon receipt of Petitioner's affidavit, the Court will stay this matter and administratively close this case. Once Petitioner has exhausted his state court remedies, he must file a motion to re-open this case and amend his petition, including a proposed amended petition, with this Court within 30 days of the final decision by the Michigan Supreme Court.

IT IS SO ORDERED.

Dated: March 6, 2019

_/s/ Ellen S. Carmody_____
ELLEN S. CARMODY
U.S. Magistrate Judge

3

# APPENDIX D

### STATE OF MICHIGAN
### IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE
### CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

             Plaintiff,

-vs-                                    LCT 10-004848-01-FC
                                          Hon. Kevin S. Cox

PETER NORMAN DABISH

             Defendant.

_____/

## <u>AFFIDAVIT OF DOMNICK J. SORISE</u>

COUNTY OF WAYNE )
                    )ss
STATE OF MICHIGAN)

     Domnick Sorise, being first duly sworn, deposes and says:

     1. That I was lead counsel at trial in the above captioned case.

     2. That I was responsible for all strategic decisions.

     3. I have had the opportunity to review the report of Dr. Michael Baden and also the brief in support of the Motion for Relief from Judgment which lays out the defense of grossly erroneous medical treatment/intervening cause.

     4. I did not do any investigation into the difference between lethal and non lethal blows in relation to choosing a defense.

     5. I am available to testify at an evidentiary hearing.

Further deponent saith not.

DOMNICK SORISE

Subscribed and sworn to before me
this **22** day of March, 2019.

Notary Public
My commission expires: 1/6/2022

BIANCCA LYNN RUEHLE
Notary Public - Michigan
Macomb County
My Commission Expires Jan 6, 2022
Acting in the County of Wayne

2

# APPENDIX E

### STATE OF MICHIGAN
### IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE
### CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff,

-vs-                                LCT 10-004848-01-FC

                                      Hon. Kevin S. Cox

PETER NORMAN DABISH

          Defendant.

_____/

## <u>AFFIDAVIT OF DEDAY LARENE</u>

COUNTY OF WAYNE )
               )ss
STATE OF MICHIGAN)

      Deday LaRene, being first duly sworn, deposes and says:

      1.  That I was appellate counsel on the direct appeal from the conviction in the above numbered case.

      2.  That I was responsible for all strategic decisions.

      3.  I have had the opportunity to review the report of Dr. Michael Baden and also the brief in support of the Motion for Relief from Judgment which lays out the defense of grossly erroneous medical treatment/intervening cause.

      4.  During my representation of Mr. Dabish, I explored the question of the cause of death, but I did not complete the investigation.

5. I made no strategic decision in regard to such a defense for appellate purposes.

6. I am available to testify at an evidentiary hearing.

Further deponent saith not.

DEDAY LARENE

Subscribed and sworn to before me
this 20 day of March, 2019.

Notary Public Macomb County, MI
My commission expires: 1/6/2022

BIANCCA LYNN RUEHLE
Notary Public - Michigan
Macomb County
My Commission Expires Jan 6, 2022
Acting in the County of Wayne

2